**Page 1**

```
1            IN THE UNITED STATES DISTRICT COURT
             FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
2
3
4    CALVIN E. BRACKBILL,              )
                                       )
5                   Plaintiff          )
                                       )
6         v.                           )  No.: 1:17-CV-1046
                                       )
7    STEPHEN J. RUFF,                  )
     GREGORY A. HILL,                  )
8    IAN L. DAWSON,                    )
     TYRON E. MEIK, and               )
9    CITY OF HARRISBURG, PA,           )
                                       )
10                  Defendants  )
11
12
                   --oOo--
13
14
15   DEPONENT:     CALVIN EDWARD BRACKBILL
16   BY:           Defendants
17   PLACE:        Lavery Law
                   225 Market Street
18                 Suite 304
                   Harrisburg, Pennsylvania
19
     DATE/TIME:    Monday, February 25, 2019
20                 9:41 a.m.
21   REPORTER:     Kelly S. Ryan, RPR
                   Court Reporter
22
23
24
25
```

**Page 2**

```
1    APPEARANCES:
2
3    JACOB LITIGATION
     BY:   DEVON M. JACOB, Esquire
4          P.O. Box 837
           Mechanicsburg, Pennsylvania  17055
5          717.796.7733
           djacob@jacoblitigation.com
6
7    Counsel for Plaintiff
8
9    LAVERY LAW
     BY:   ELIZABETH L. KRAMER, Esquire
10         225 Market Street, Suite 304
           P.O. Box 1245
11         Harrisburg, Pennsylvania  17108
           717.233.6633
12         ekramer@laverylaw.com
13
     Counsel for Defendants
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 3**

```
1                INDEX TO DEPONENT
2    EXAMINATION                              PAGE
3    By Ms. Kramer                          6, 255
4    Mr. Jacob                             253, 257
5
6
7
8
                 INDEX TO EXHIBITS
9
     BRACKBILL                              MARKED/
10   EXHIBIT                              REFERENCED
11   1:  E-mail chain with attached Hotel Hershey
         work schedule ..........................    22
12
     2:  Amended Complaint ...................  74, 108
13
     3:  Transcript of summary hearing held before
14       MDJ Joann Teyral .....................  83, 188
15   4:  Harrisburg Bureau of Police Vehicle Tow
         Slip Receipt ..........................   115
16
     5:  Harrisburg Police Bureau towing
17       notification ..........................   116
18   6:  Receipt from Don's Towing ............   118
19   7:  Six photographs ......................   122
20   8:  7/2/15 McKenna video, referenced but not
         marked, RETAINED BY COUNSEL .........   138
21
     9:  Plaintiff Calvin E. Brackbill's Objections
22       and Answers to Interrogatories .......   156
23   10: E-mails to Deric Moody ...............   166
24   11: E-mails to Eric Papenfuse ............   169
25   12: E-mails to Michael Brownsweiger ......   170
```

**Page 4**

```
1              INDEX TO EXHIBITS, (CONT'D.)
2    BRACKBILL                              MARKED/
     EXHIBIT                              REFERENCED
3
     13: Right-to-Know denial letter from City
4        of Harrisburg .........................   172
5    14: Citations .............................   176
6    15: Pennsylvania Financial Responsibility
         Card ..................................   179
7
     16: Allstate Insurance claim Estimate of
8        Record ................................   184
9    17: Geiger Loria Filius McLucas Reporting
         Invoice for transcript ................   193
10
     18: Dauphin County Court Reporters Estimate
11       for transcript ........................   195
12   19: Summary Appeal Docket .................   200
13   20: 9/18 Meik video, referenced but not
         marked, RETAINED BY COUNSEL ..........   240
14
     21: 7/28/15 Green video, referenced but not
15       marked, RETAINED BY COUNSEL ..........   242
16   22: 9/15/18 surveillance video, referenced
         but not marked, RETAINED BY COUNSEL ....  245
17
     23: Booking documents, referenced but not
18       marked, RETAINED BY COUNSEL ..........   255
19
20
21
22
23
24
25
```



Page 5

1    CALVIN EDWARD BRACKBILL,
2 called upon by Defendants to give testimony, being duly
3 sworn by me, testified as follows:
4        MS. KRAMER: I guess just as a preliminary
5 matter, do you want to agree to the normal stipulations?
6        MR. JACOB: I'm not trying to be difficult.
7 There are really no normal stips, is what I found, just
8 because everybody has their own definition of what's
9 normal.
10       MS. KRAMER: Yeah. No problem.
11       MR. JACOB: I would just say that this
12 deposition's being conducted in accordance with the
13 Federal Rules, which pretty much lays out what we're
14 allowed or not allowed to do.
15       MS. KRAMER: Okay.
16       MR. JACOB: And that's what I'll agree to.
17       MS. KRAMER: All right. So do you want to just
18 preserve all objections till trial except for form of the
19 question?
20       MR. JACOB: Well, the -- again, the Federal
21 Rules pretty much say that now so --
22       MS. KRAMER: Okay.
23       MR. JACOB: -- yeah. Yes.
24       MS. KRAMER: Okay.
25       MR. JACOB: And I'll just say that in accordance

Page 6

1 with the Federal Rules is how the deposition will be
2 conductedm.
3        MS. KRAMER: And will Mr. Brackbill want to read
4 and sign?
5        MR. JACOB: Yes.
6        MS. KRAMER: Okay. All right.
7        Okay. Let's get started.
8            EXAMINATION
9 BY MS. KRAMER:
10   Q   Can you just state your name for the court
11 reporter, your full name.
12   A   Calvin Edward Brackbill.
13   Q   And have you ever had your deposition taken
14 before?
15   A   No.
16   Q   Okay. So I was just going to go over some
17 general ground rules about how depositions work and how
18 you have to kind of conduct yourself, because it's kind
19 of an unnatural setting.
20       So as you've noticed, there's a stenographer
21 here, or a court reporter, who is taking down everything
22 that we say. So, essentially, everything that you say
23 today should be audible and, like, a verbal response, so
24 no head nods or head shakes.
25       That's fine if you're just -- you know, I mean,

Page 7

1 I get that that's normal in normal conversation, but it's
2 hard for her to take that down. And you don't want your
3 answer to get confused.
4        Also, no uh-huhs or huh-uhs or nods, just yes,
5 no, verbal, articulated responses just so nothing's
6 confused.
7        Also, every time I'm speaking and asking
8 questions, just let me finish my question until you start
9 answering and then vice versa. I'll let you finish your
10 answer before I start talking just so then there's not
11 any sort of overlap, because that can be hard for the
12 stenographer to take down.
13       And then other than that, if you don't
14 understand the question that I'm asking you, ask me to
15 rephrase it or ask me, you know, about what I'm trying to
16 get at or something like that. I don't want you to
17 answer anything you don't understand; and if you don't
18 know the answer to something, that's fine. You can just
19 say, I don't know.
20       Does that sound fair?
21   A   Yes.
22   Q   Okay. All right. Otherwise, I just have a
23 preliminary question I have to ask. Are you under the
24 influence of any sort of substance or medication that
25 might affect your ability to answer questions today?

Page 8

1   A   No.
2   Q   Okay. Then I'm just going to go into some
3 background questions. So what's your date of birth,
4 Mr. Brackbill?
5   A   [           ].
6   Q   Okay. And what's your current address?
7   A   [           ]
8   Q   Okay. And how long have you lived there?
9   A   Five months.
10   Q   Okay. Do you live with anyone?
11   A   No.
12   Q   Are you married?
13   A   No.
14   Q   Do you have any children?
15   A   No.
16   Q   Prior to your residence in [          ], where
17 did you live?
18   A   Whitehall.
19   Q   Whitehall, PA?
20   A   Yes.
21   Q   And where is that located, like, in relation to
22 Harrisburg?
23   A   East of -- about an hour and a half east of
24 Harrisburg.
25   Q   Okay. And how long did you live there?

Page 9

1   A   A year and a half.
2   Q   Okay. And prior to that, where did you live?
3   A   Enola.
4   Q   Okay. All right. And in preparation for the
5   deposition today, did you speak to anyone other than your
6   attorney? You don't need to tell me that you spoke with
7   your attorney.
8   A   No.
9   Q   Did you review any documents or any sort of --
10  anything else, something like documents or papers?
11      MR. JACOB: I'm going to object to him answering
12  at this time on that. The reason is, there's a case,
13  Sporck v. Peil; and that says that after you ask a set of
14  questions, you can ask if he relied on documents in order
15  to provide the answers today. But as far as a general
16  review of documents before a deposition for prep, that's
17  actually work product privilege as far as the thought
18  process of the attorney, so he won't be answering that
19  question.
20      MS. KRAMER: Okay. Well, I can rephrase my
21  question.
22  BY MS. KRAMER:
23  Q   So did you review any documents today in
24  preparation for this deposition?
25      MR. JACOB: Again, objection. He can -- you --

Page 10

1   you can ask after -- let's say you ask about a series of
2   events. After he provides his answer, you can ask if he
3   was relying on the content of any document in order to
4   provide the answers that he just provided, but you can't
5   get a list of all documents that he just generally
6   reviewed before the deposition begins.
7       MS. KRAMER: Okay. Well, I mean, I think --
8       MR. JACOB: Sporck v. Peil's the case. He won't
9   be answering that question.
10      MS. KRAMER: Okay. So you're directing him not
11  to answer?
12      MR. JACOB: That's correct.
13      MS. KRAMER: Okay. All right.
14  BY MS. KRAMER:
15  Q   Okay. So I just want to go into some more of
16  your background information. I just want to talk about
17  your education, so I'll start with your high school.
18  Where did you go to high school?
19  A   Juniata High School.
20  Q   Okay. And did you graduate?
21  A   Yes.
22  Q   And what year did you graduate?
23  A   2009.
24  Q   Okay. And after that did you go into any sort
25  of secondary education?

Page 11

1   A   Yes.
2   Q   Where did you go?
3   A   Harrisburg Area Community College.
4   Q   And did you get a degree from there?
5   A   Yes.
6   Q   What degree did you get?
7   A   An associate's in arts and an associate's in
8   business administration.
9   Q   Okay. And what year did you get the associate's
10  in arts?
11  A   2012, I believe.
12  Q   Okay. And what about the associate's in
13  business administration?
14  A   2014.
15  Q   Okay. And are those -- are the associate's
16  degrees -- are those two-year degrees?
17  A   Yes.
18  Q   Okay. Do you have any other sort of -- did you
19  undergo any other sort of schooling or education after
20  high school?
21  A   Yes.
22  Q   What else did you take?
23  A   Penn State Harrisburg.
24  Q   Okay. And when did you go there?
25  A   2014 to December 2015.

Page 12

1   Q   And did you get a degree from there?
2   A   Yes.
3   Q   What degree did you get?
4   A   Bachelor of science in management.
5   Q   And so you were there for less than a year. Did
6   that attach to some other degree you had from HACC?
7   A   Yes.
8   Q   Okay. And what degree did that attach to?
9   A   Business administration associate's.
10  Q   Okay. So when you got the bachelor's of science
11  in management from Penn State Harrisburg, that kind of
12  elevated the associate's degree to a bachelor's?
13  A   Yes.
14  Q   Okay. All right. Do you have any other degrees
15  or any other education?
16  A   No.
17  Q   Okay. Do you have any sort of special training
18  or work certifications that you've received?
19  A   I had a conductor's certification from Norfolk
20  Southern.
21  Q   And is that like a -- that's like a
22  certification to operate a train or another type of
23  vehicle?
24  A   To conduct a train.
25  Q   Okay. To conduct a train.



Page 13

1    So you are operating a train?
2    A   No.
3    Q   Okay. Can you explain what conduct a train
4    means.
5    A   Sure. It's when you actually align the switches
6    for the engineers. You direct them back and forward the
7    train, how many car counts and all that stuff.
8    Q   Okay. So you wouldn't necessarily be on the
9    train at that time? Would you be, like, in a -- like
10   a -- would you be on the train while you're doing that?
11   A   Yes and no.
12   Q   Okay. All right. We can go into that more with
13   your work history.
14       So are you currently employed right now?
15   A   Yes.
16   Q   Where are you employed?
17   A   Republic Services.
18   Q   You said Public Services?
19   A   Republic Services.
20   Q   Okay. Republic Services.
21       And what is Republic Services?
22   A   A waste hauling/collection company.
23   Q   What's your job title with Republic Services?
24   A   Operations supervisor.
25   Q   And is that a management position?

Page 14

1    A   Yes.
2    Q   And can you explain what your job duties are?
3    A   Yes. I'm responsible for the safety of my
4    employees, the crew in/crew out schedule for each day's
5    worth of work, communicating with customers when trash
6    will not get picked up and other operational activities.
7    Q   Okay. In that waste hauling business, do
8    you -- do you work for local governments, or are you
9    doing, like, more private waste hauling for businesses?
10   A   Could you please elaborate.
11   Q   So who do you -- who are normally your customers
12   in -- for this Republic Services?
13   A   Municipalities.
14   Q   Municipalities. All right.
15       So do you work with, like, Waste Management?
16   A   No.
17   Q   Okay. What kind of waste hauling do you guys do
18   typically?
19   A   Could you please elaborate.
20   Q   Like, what kind of waste -- do you guys, like,
21   haul a certain type of waste? Do you do anything -- do
22   you normally do like, you know, like scrap metal or
23   something like large objects?
24       I'm just trying to figure out exactly -- if this
25   is just like a catch-all waste hauling or if you guys

Page 15

1    specialize in something.
2    A   Municipal solid waste and recycling.
3        MR. JACOB: Counsel, respectfully, of course,
4    I'm going to give you leeway; but if we could get to the
5    incident, that would -- the type of waste that he hauls
6    is --
7        MS. KRAMER: Okay.
8        MR. JACOB: -- certainly not going to be at all
9    relevant to this case or admissible at trial so...
10       MS. KRAMER: Okay. I get that.
11   BY MS. KRAMER:
12   Q   How long have you worked for Republic Services?
13   A   Ten months.
14   Q   And have you always been the operations
15   supervisor there?
16   A   Yes.
17   Q   And prior to working at Republic Services, where
18   did you work?
19   A   Norfolk Southern.
20   Q   And was that the position you had where you were
21   the conductor?
22   A   No.
23   Q   What was your job title there?
24   A   Operations supervisor.
25   Q   Okay. And how long did you have that job?

Page 16

1    A   Two years, five months.
2    Q   Okay. So you started -- what year did you start
3    in then?
4    A   2016.
5    Q   Okay. And then prior to that where did you
6    work?
7    A   UPS.
8    Q   And what was your position at UPS?
9    A   Part-time supervisor.
10   Q   And when did you work at UPS as a part-time
11   supervisor?
12   A   October 2015 to January 2016.
13   Q   Okay. And where else did you -- have you
14   worked? Where'd you work prior to that?
15   A   Hotel Hershey.
16   Q   All right. And what was your position at Hotel
17   Hershey?
18   A   Food and Beverage Administration Intern.
19   Q   Was that the only position you held there?
20   A   Yes.
21   Q   And how long did you work there?
22   A   May 2015 to September 2015.
23   Q   Okay. And what was your reason for leaving the
24   Hotel Hershey?
25   A   The end of internship.

Page 17

1  Q   Okay. Did you have a position there through
2  Penn State Harrisburg?
3  A   It was an internship. Yes.
4  Q   So was it part of any degree that you got?
5  A   Yes.
6  Q   Okay. All right. So, yeah, now we'll kind of
7  get into, you know, why we're here today.
8      MR. JACOB:  Before we do -- off the record.
9      (Discussion held off the record.)
10 BY MS. KRAMER:
11 Q   I guess I did miss one background question. So
12 have you ever been convicted of a felony?
13 A   No.
14 Q   Okay. Do you have any sort of criminal record?
15 A   Please elaborate.
16 Q   Have you ever been convicted of a crime or
17 misdemeanor?
18 A   No.
19 Q   Okay. So now we'll get into why we're here
20 today. I mean, we're here today involving a lawsuit that
21 you have against various police officers of the
22 Harrisburg Police Department who I represent and relates
23 to an incident that occurred June 28th, 2015; and we'll
24 go back to that night -- or I guess it's the early
25 morning of June 28th, 2015. Do you remember that day?

Page 18

1  A   Yes.
2  Q   Okay. And so the night before would have been
3  June 27th, 2015. What were you doing that night into the
4  early morning?
5      You can kind of just go over -- what were you
6  doing that day before any of the incidents that occurred
7  between the officers and yourself?
8  A   Working at the Hotel Hershey.
9  Q   Okay. And what hours did you work that day?
10 A   I don't remember.
11 Q   Did you start work the night before, meaning
12 June 27th, 2015?
13 A   Yes.
14 Q   And then you would have ended work in the early
15 morning of June 28th, 2015?
16 A   Yes.
17 Q   And you don't remember exactly how many hours
18 you worked that day?
19 A   No.
20 Q   Do you know what a typical shift was like when
21 you worked for the Hotel Hershey?
22 A   Roughly eight to ten hours.
23 Q   Okay. Do you think that you worked eight to ten
24 hours that day, or you can't remember?
25 A   I believe I worked more.

Page 19

1  Q   You worked more than eight to ten hours that
2  day?
3  A   Yes.
4  Q   Okay. Is there a reason why you would work more
5  than eight to ten hours on a given night?
6  A   Yes.
7  Q   And what would that be?
8  A   We had a room service server come in late.
9  Q   Okay. So were you providing coverage?
10 A   Yes.
11 Q   And so with your position at the Hotel Hershey,
12 what kind of job functions did you do, and do you know
13 what you were doing that night?
14 A   The job functions that I did, I was responsible
15 for the servers, ensuring they were following company
16 policy --
17 Q   Um-hum.
18 A   -- and were professional and courteous to the
19 hotel guests when they were serving them in the rooms,
20 and that night all I remember is staying later and going
21 down and making a BLT in the kitchen.
22 Q   Okay. So you made yourself a sandwich before
23 you left at the end of the night?
24 A   No.
25 Q   Okay. Can you explain what you meant then.

Page 20

1  A   I made a BLT for a room service guest.
2  Q   Okay. So do you typically make or prepare food,
3  or did you when you worked there, for the room service
4  guests?
5  A   No.
6  Q   Okay. So that was something that you were doing
7  as, like, a coverage function?
8  A   Yes.
9  Q   Okay. Do you typically handle the food or did
10 you typically handle food or beverage when you were
11 working as the room service intern?
12 A   Please elaborate.
13 Q   Did you typically physically hold food and put
14 it together while you were serving in that position?
15 A   No.
16 Q   Okay. But you did prepare food on that day?
17 A   One BLT. Yes.
18 Q   Okay. Did you ever serve beverages in that
19 role?
20 A   Yes.
21 Q   Okay. And could you elaborate what you mean by
22 that?
23 A   On Jazz on the Veranda on Friday nights, I
24 believe it is --
25 Q   Um-hum.

Page 21

1 A -- I would have to assist servers in delivering
2 beverages.
3 Q Okay. So would you -- what is Jazz on the
4 Veranda?
5 A It was a function they had every Friday night.
6 Q And so would you be going outside and serving
7 beverages to the patrons of the Hotel Hershey who were
8 attending Jazz on the Veranda?
9 A Occasionally.
10 Q Okay. And what kind of beverages would you
11 serve?
12 A Liqueur, beers, wines.
13 Q Okay. And do you know that either, you know,
14 the night of June 27th or early in the morning on
15 June 28th, 2015, had you served any beverages to any
16 patrons at the Hotel Hershey?
17 A No.
18 Q Okay. And so would you normally carry items up
19 to the guests at the Hotel Hershey?
20 A No.
21 Q You would just be observing the individuals who
22 would be serving the food to patrons?
23 A Yes. I would oversee it.
24 Q Okay. And so other than, you know, one of the
25 room servers being late and you making a BLT, do you

Page 22

1 remember anything else from that day of work?
2 A No. I knew it was rainy that day.
3 Q Okay. So it was rainy that day?
4 A (No verbal response.)
5 Q Was it raining when you left work that day?
6 A Yes.
7 Q Do you know what time you left work?
8 A No.
9 Q Okay.
10 A I don't remember.
11 MS. KRAMER: That's okay.
12 I'm just going to bring an exhibit in. Okay.
13 We can just mark this Brackbill Number 1.
14 I have a copy for you, too.
15 MR. JACOB: Thank you.
16 (Brackbill Exhibit Number 1 was marked for
17 identification.)
18 BY MS. KRAMER:
19 Q All right. So this is a document that we
20 received from you in discovery. Do you recognize this
21 document?
22 A Yes.
23 Q Okay. And so this is like a little packet of
24 three documents. The front page is, you know, an e-mail
25 chain as well as the second page, and then the third page

Page 23

1 is like a chart. Can you explain to me what this e-mail
2 chain is?
3 A This is our weekly schedule.
4 Q Okay. And so was this sent out each week when
5 you worked for the Hotel Hershey?
6 A Yes.
7 Q Okay. And did this have your schedule for that
8 week on it?
9 A Yes.
10 Q And where is your schedule listed on this
11 document?
12 A It's the fourth line down from the top.
13 Q Okay.
14 A Right under where it says, Calvin Brackbill.
15 Q Okay. And so that's the third page of this
16 packet; and at the bottom of the page, it's labeled
17 Brackbill Plaintiff 0154?
18 A Yes.
19 Q Okay. And so you're saying you're on this chart
20 about four lines down. And can you just explain to me
21 what it means here?
22 I mean, you're saying this is your schedule for
23 the week of -- it looks like it's Monday, 22 to Sunday,
24 28, so what month and what year did this pertain to?
25 A This would be -- if you reference the second

Page 24

1 page --
2 Q Um-hum.
3 A -- where it says Brackbill Plaintiff 1053, it
4 would be June 22nd through June 28th.
5 Q Okay. And what year would that be?
6 A 2015.
7 Q Okay. And so when -- I'm looking at this
8 document. Next to your name and then under the column
9 that's titled, Monday 22, there's an X there. What does
10 the X mean?
11 A I was off.
12 Q Okay. And then if we go over and we see there's
13 a number four in the columns titled, Wednesday 24,
14 Thursday 25, Friday 26, Saturday 27, Sunday 28, can you
15 just tell me -- I mean, do you see the number four there
16 in those columns?
17 A Yes.
18 Q Okay. And can you just tell me what that number
19 four signifies or indicates?
20 A Start time.
21 Q Okay. So would that be 4 in the afternoon?
22 A Yes, 4 p.m.
23 Q Okay. And it doesn't indicate an end time?
24 A No.
25 Q And why is that?

Page 25

1    A    As managers, we don't really have a set
2    schedule. We work until the work's completed and we've
3    completed our work for the day.
4    Q    Okay. But you had said that you typically would
5    work an eight- to ten-hour shift?
6    A    Yes.
7    Q    Okay. And if we go the whole way over in that
8    column, there's a -- it says, key. Do you see that?
9    A    Yes.
10   Q    And then under -- like, across from your name in
11   that column, it says, Harvest. What does that mean?
12   A    That is a color-code key for where the
13   bartenders would be. That's just the key. The Harvest
14   is actually down below the Hotel Hershey. It's one of
15   their dining areas.
16   Q    Oh, okay. So that doesn't have anything to do
17   with your schedule?
18   A    Correct.
19   Q    Okay. So that has to do with other locations.
20        Okay. And then so if we look over in the column
21   where it says, Saturday 27, 4 -- so on June 27th, you
22   would have started at 4 p.m.?
23   A    Yes.
24   Q    And you're saying -- do you know when you got
25   off your shift?

Page 26

1    A    I do not recall.
2    Q    Do you have any idea of approximately when you
3    would have got off your shift?
4    A    It would have been around 2:40, 2:35.
5    Q    Okay. So -- and that's in the morning of --
6    A    The a.m.
7    Q    -- June 28th, 2015?
8    A    Yes.
9    Q    Okay. All right. And -- okay. I think we're
10   done with that document. But one question I have for you
11   is, you stated that your job position with Hotel Hershey
12   included the title of, like, an intern; is that correct?
13   A    Yes.
14   Q    So were you paid when you worked at the Hotel
15   Hershey?
16   A    Yes.
17   Q    Okay. What was your hourly rate?
18   A    Ten dollars an hour.
19   Q    Okay. And you also got school credit for that
20   position?
21   A    Yes.
22   Q    Okay. All right. So moving on from that, so
23   when you got off work, you said you remember it was rainy
24   or raining. Would you say it was like misty outside, or
25   was it actually raining?

Page 27

1    A    It was raining.
2    Q    Okay. How heavy do you recall it was?
3    A    Medium.
4    Q    Medium.
5        Okay. Was there any sort of thunder or
6    lightning?
7    A    I don't remember.
8    Q    Okay. Was there -- do you remember if there was
9    any visibility issues?
10   A    No.
11   Q    Okay. And then -- so when you got off work,
12   what did you do?
13   A    I drove home to my apartment on Market Street.
14   Q    Okay. And where did you live on Market Street?
15   A    It was the Harrisburg University Apartments.
16   Q    Okay. So that was in downtown Harrisburg?
17   A    Yes.
18   Q    Okay. And when did you live at the Harrisburg
19   University Apartments?
20   A    Could you please elaborate.
21   Q    Like time-frame-wise, like what time period were
22   you residing there?
23   A    June 2015 to September 2015.
24   Q    Okay. And so did you live there as part of your
25   internship with the Hotel Hershey?

Page 28

1    A    Yes.
2    Q    Was that housing provided to you by Penn State
3    Harrisburg?
4    A    No.
5    Q    It was provided to you by the Harrisburg
6    University?
7    A    No.
8    Q    Was it provided to you by the Hotel Hershey?
9    A    Yes.
10   Q    Okay. Did they pay for your housing?
11   A    No.
12   Q    Okay. And so the internship with the Hotel
13   Hershey, was that for your degree that you got from Penn
14   State Harrisburg?
15   A    Yes.
16   Q    And how long did it take you to drive from, you
17   know, the Hotel Hershey to where you lived on Market
18   Street in Harrisburg?
19   A    I don't know exactly.
20   Q    Okay. Can you estimate at all?
21   A    Twenty-five, 30 minutes.
22   Q    Okay. And -- okay. So when you were driving
23   home that night, do you remember anything in particular
24   about driving home that night?
25   A    Yes.



Page 29

1  Q   What do you remember?
2  A   I remember it raining out.
3  Q   It was raining.
4      And when you were driving -- you said there was
5  no visibility issues, but was there any visibility issues
6  when you were driving?
7  A   No.
8  Q   Okay. All right. And then at some point when
9  you were driving, you ended up stopping your car; isn't
10 that correct?
11 A   Yes.
12 Q   And that was while you were in downtown
13 Harrisburg?
14 A   Yes.
15 Q   And why did you stop your car?
16 A   There was a stoplight there.
17 Q   Okay. And then -- so did you just, you know,
18 drive back to your apartment that evening and, you know,
19 go to sleep?
20 A   No.
21 Q   Why not?
22 A   Well, as soon as the light turned green, I
23 started to go --
24 Q   Um-hum.
25 A   -- and I noticed that -- I heard a sound. And I

Page 30

1  stopped my car immediately and I got out, and that's when
2  said incident happened.
3  Q   Okay. And do you -- what intersection was this?
4  A   It was near Bricco and Pennsylvania Place.
5  Q   Okay. So Pennsylvania Place, as in the
6  apartment building off of Chestnut Street?
7  A   Yes.
8  Q   And then Bricco, as in the restaurant on the
9  corner of 3rd and Chestnut Street?
10 A   Yes.
11 Q   Okay. And so which direction were you driving
12 into that intersection on that evening?
13 A   I don't know.
14 Q   Well, were -- do you know which direction you --
15 A   I was coming from, like, 2nd Street heading
16 toward the Amtrak center. I'm honestly unsure of the
17 direction.
18 Q   Okay. So you were driving away from, like, the
19 train station?
20 A   I was driving to -- closer to the train station,
21 like heading --
22 Q   Oh, you were heading towards the train station?
23 A   Correct, yes, from 2nd Street.
24 Q   Okay. And so when you were at this
25 intersection, which road were you on when you entered the

Page 31

1  intersection? Were you on Chestnut Street or --
2  A   Yes.
3  Q   Okay. And were you turning, or were you just
4  stopping at the light?
5  A   I was stopping at the light.
6  Q   And then continuing on?
7  A   Yes.
8  Q   Okay. And you said you heard a sound right when
9  you had heard the light turn green -- I mean right when
10 you saw the light turn green at this intersection?
11 A   No.
12 Q   Okay. When did you hear a sound?
13 A   I proceeded to go after the light turned green,
14 and I heard a sound.
15 Q   Okay. And what kind of sound did you hear?
16 A   It sounded like a scraping sound.
17 Q   Was it loud?
18 A   Yes. A medium sound. I wouldn't say it was --
19 Q   Was it --
20 A   -- ear-screeching loud.
21 Q   Okay. But it was decently loud? Like, you said
22 medium?
23 A   Medium.
24     MR. JACOB:  Objection.
25     MS. KRAMER:  Okay.

Page 32

1  BY MS. KRAMER:
2  Q   All right. And so when you proceeded after you
3  got the green light at the intersection at Chestnut
4  Street, you said right when you started driving you heard
5  that scraping sound. And had you heard that sound at any
6  other point in that evening?
7  A   No.
8  Q   Okay. Did you have music playing in your car
9  that night while you were driving?
10 A   I don't remember.
11 Q   You don't remember.
12     Do you normally play music when you drive in
13 your car?
14 A   Yes.
15 Q   Okay. Do you play your music loud or soft?
16 A   Loud.
17 Q   Loud. Okay.
18     What type of music do you typically like to
19 listen to?
20 A   Country.
21 Q   Country. Okay.
22     So you don't remember if you were actually
23 listening to music that night?
24 A   I don't remember.
25 Q   Okay. And did you have your windows up while

Page 33

1  you were driving?
2  A  Yes.
3  Q  Okay. Did you have your windows up while you
4  were driving the entire time?
5  A  No.
6  Q  Okay. When did you not have your windows up?
7  A  I rolled it down at the light.
8  Q  Okay. And did that occur before or after you
9  heard the sound?
10  A  Before.
11  Q  Before.
12     And why did you roll your windows down?
13  A  It had stopped raining.
14  Q  So do you -- was it -- I mean, meaning why did
15  you put the windows down? Just because it stopped
16  raining?
17  A  To get some fresh air.
18  Q  To get some fresh air.
19     Was it hot out that evening?
20  A  I don't remember.
21  Q  Okay. And so previously when you were driving
22  though, you had your windows up?
23  A  Yes.
24  Q  Okay. So before you were -- you got to the
25  intersection, your windows were up?

Page 34

1  A  Yes.
2  Q  Okay. And did you figure out what the sound was
3  that you heard that night?
4  A  After I got out of the car, yes.
5  Q  Okay. So you are at the intersection, you hear
6  the sound, and you get out of your car. Did you pull
7  your car over?
8  A  No.
9  Q  Okay. So did you just leave it in the road?
10  A  I stopped in the middle of the road. Yes.
11  Q  Did you stop -- were you past the intersection
12  at that point?
13  A  Yes.
14  Q  Okay. So you're on -- were you on Chestnut
15  Street?
16  A  Yes.
17  Q  Okay. So you stopped in the middle of the road
18  and got out of your car, and what did you see at that
19  point?
20  A  Regarding my car?
21  Q  Yeah. I mean, after you got out of your car,
22  what did you do?
23  A  I walked up and I noticed the bumper was sagging
24  in the middle.
25  Q  Okay. And when you say sagging, was it somewhat

Page 35

1  detached from the car? Was it hanging off of it? If you
2  want to explain it more, go ahead.
3  A  The two clips appeared to have came loose, and
4  it was just kind of sagging in the middle on the roadway.
5  Q  Okay. Was it touching the road?
6  A  Yes.
7  Q  Okay. Was the metal part touching the road?
8  A  Yes.
9  Q  Were the outer edges on the left or right side,
10  were they touching the road?
11  A  No.
12  Q  Okay. And when you said, like, the tabs had
13  come undone, can you explain to me what that means?
14  A  Sure. The tabs on the corners of the bumpers
15  that secure it to the fender --
16  Q  Um-hum.
17  A  -- they had come unclipped.
18  Q  Okay. And had this ever happened to you before?
19  A  No.
20  Q  Okay. So they've never come unclipped before?
21  A  No.
22  Q  Okay. And --
23     MR. JACOB: Can we go off the record for a
24  second?
25     MS. KRAMER: Sure.

Page 36

1     (Discussion held off the record.)
2     MR. JACOB: Back on the record.
3     MS. KRAMER: Okay.
4  BY MS. KRAMER:
5  Q  All right. And so after you saw that, you know,
6  the bumper had been sagging, you said in the middle, do
7  you -- did you have any idea how long it had been like
8  this?
9  A  No.
10  Q  Okay. And so was it your understanding that
11  that was the cause of the sound that you heard, the
12  scraping sound?
13  A  Yes.
14  Q  Okay. And so the part -- the bumper that was
15  sagging -- the part of the bumper that was sagging onto
16  the road, was that a part of the car that came with it
17  when you bought it? Was it something like an accessory
18  that you added to the car? Was it, you know, part of the
19  model when you bought it?
20     MR. JACOB: Objection.
21     MS. KRAMER: I'll rephrase my question.
22  BY MS. KRAMER:
23  Q  So the part of the bumper that was sagging on
24  the car -- or I guess -- I'll go back.
25     The car -- what car were you driving that night?

Page 37

1    A   A 2004 BMW 325ci.
2    Q   Okay. And do you still have that car?
3    A   Yes.
4    Q   Okay. And do you still drive it?
5    A   Yes.
6    Q   All right. And when did you first buy that car?
7    A   April 2013, I believe.
8    Q   Okay. And where did you -- did you buy that car
9    used?
10   A   Yes.
11   Q   Okay. And when you bought that car in April of
12   2013, was that portion of the bumper that you said was,
13   you know, sagging onto the -- onto Chestnut Street, was
14   that part of the car when you bought it --
15   A   Yes.
16   Q   -- originally?
17       Okay. So it wasn't something that you had, you
18   know, bought after the fact and added to the car? Like,
19   it wasn't an accessory like a spoiler or something like
20   that?
21   A   No.
22   Q   So the part of the car that was sagging on the
23   road, you said that was the bumper?
24   A   The bumper cover.
25   Q   The bumper cover. Okay.

Page 38

1        And what is the purpose of a bumper cover?
2    A   I'm not sure.
3    Q   Okay. So you don't have any idea of what the
4    purpose is?
5    A   Without being a mechanic, I would assume it's to
6    cover up the bumper.
7        MR. JACOB: You're not here to assume though.
8    If you know, answer.
9        THE DEPONENT: I don't know.
10       MS. KRAMER: Yeah, that's fine.
11   BY MS. KRAMER:
12   Q   Do you know what the purpose of a bumper is?
13   A   No.
14   Q   Okay. Do you know what the difference is
15   between a bumper cover and a bumper?
16   A   No.
17   Q   Okay. And where's the bumper cover on your BMW
18   in relation to the bumper position-wise? Is it on top of
19   it?
20   A   On top of it.
21   Q   It's on top of it.
22       Does it cover it entirely?
23   A   Yes.
24   Q   Okay. All right. And so after you inspected
25   the bumper cover that you said was sagging on the road,

Page 39

1    did you try and fix the issue?
2    A   Yes.
3    Q   Okay. So what did you do?
4    A   I lifted it up and put it back in the clips.
5    Q   Okay. And did that resolve the problem?
6    A   (No verbal response.)
7    Q   I mean, did it clip back into place?
8    A   Yes.
9    Q   Okay. So was it no longer sagging onto the
10   road?
11   A   Yes.
12   Q   Okay. And so did anything else happen while you
13   were inspecting the bumper cover in the road?
14   A   Yes.
15   Q   And what else happened?
16   A   Officer Hill approached me.
17   Q   Okay. And how did he approach you? Was he on
18   foot? Was he in a car?
19   A   On foot.
20   Q   Which direction was he coming from?
21   A   From the train station, from Morrison Towers,
22   that way.
23   Q   Okay. So was he coming head on to you? Like,
24   if you were driving -- you said you were driving towards
25   the train station, correct?

Page 40

1    A   Um-hum.
2    Q   So your car was pointed in the direction of the
3    Amtrak station in Harrisburg?
4    A   Yes.
5    Q   So was he walking towards your car at that
6    point?
7    A   Yes.
8    Q   And was he by himself?
9    A   Yes.
10   Q   And when he approached you, what happened?
11   A   He asked me what I hit.
12   Q   And did you respond to that question?
13   A   Yes.
14   Q   And what did you tell him?
15   A   I don't know what I hit. I didn't hit anything.
16   Q   And at that point did he say anything else to
17   you?
18   A   Yes.
19   Q   What else did he say to you?
20   A   You must have hit something.
21   Q   Okay. And what did you tell him at that point?
22   A   That's when I told him that I didn't hit
23   anything again.
24   Q   And did he say anything else to you?
25   A   Yes.

Page 41

1  Q  What else did he say to you?
2  A  He asked me if I had been drinking.
3  Q  Okay. And at this point, is it just you and
4  him?
5  A  Yes.
6  Q  Okay. And did you -- did you respond to him
7  when he asked you if you had been drinking?
8  A  Yes.
9  Q  And what did you tell him?
10  A  No, I had not been drinking. I was coming from
11  work.
12  Q  And did he say anything in response to that?
13  A  He asked me for my license, I believe.
14  Q  All right. And did you show him your license?
15  A  Yes.
16  Q  Okay. Did you say anything else to him at that
17  point?
18  A  I don't remember.
19  Q  Okay. You don't remember saying anything else
20  to him after you showed him the license -- your license?
21  A  No.
22  Q  Okay. What happened after you showed him your
23  license?
24  A  He looked at the -- he looked at the license.
25  Q  Did he say anything after -- while he was

Page 42

1  looking at the license?
2  A  Yes.
3  Q  What did he say?
4  A  What are you doing here in Harrisburg?
5  Q  Why would he say that?
6  A  He saw my license said Port Royal.
7  Q  And why did your license say Port Royal?
8  A  Because I used to live there when I lived with
9  my parents.
10  Q  Okay. And when was the last time you lived
11  there?
12  A  With my parents, 2014, August of 2014.
13  Q  Okay. And so he asked you, basically, what are
14  you doing in Harrisburg, and did you respond to that?
15  A  Yes.
16  Q  What did you tell him in response?
17  A  I said, I'm heading home from work, just going
18  to my apartment right up the street.
19  Q  Okay. And when you said right up the street,
20  you meant your apartment with the Harrisburg University?
21  A  Yes.
22  Q  Okay. And that's the one on Market Street?
23  A  Yes.
24  Q  Okay. And so what did he say in response to
25  that?

Page 43

1  A  I don't remember.
2  Q  You don't remember what he said in response to
3  that?
4  A  No.
5  Q  Okay. At that point was it still just you and
6  Officer Hill interacting?
7  A  It's around that time that Officer Ruff came up.
8  Q  Okay. And do you know exactly when he came up,
9  or it was around the time when he was asking you why you
10  were in Harrisburg?
11  A  Yes.
12  Q  That's when Officer Ruff came up?
13  A  Yes.
14  Q  Okay. And do you know which direction Officer
15  Ruff came from?
16  A  The Morrison Towers.
17  Q  Okay. So he also came kind of from, like, a
18  head-on direction towards you?
19  A  Yes.
20  Q  And did he come by foot?
21  A  Yes.
22  Q  Okay. And were both of these officers in their
23  full uniform at the time?
24  A  Yes.
25  Q  Okay. And what happened when Officer Ruff came

Page 44

1  to the scene?
2  A  He asked me what I hit.
3  Q  Okay. And what did you tell him in response?
4  A  I told him I didn't hit anything.
5  Q  And was Officer Ruff and Officer Hill, were they
6  talking amongst themselves now at this point?
7  A  Could you please elaborate.
8  Q  Were -- I know they're asking you questions at
9  the time. Were they talking to each other about the
10  situation?
11  A  I don't remember.
12  Q  So you don't remember if there was any sort of
13  conversation going on between Officer Hill and Officer
14  Ruff at this point in time?
15  A  Yes. I don't remember.
16  Q  Okay. And so after you told Officer Ruff that
17  you didn't hit anything, what happened after that?
18  A  He asked me if I had been drinking.
19  Q  Okay. So he also asked you if you had been
20  drinking?
21  A  Yes.
22  Q  And what did you tell Officer Ruff in response
23  to that question?
24  A  I told him I had not been drinking and I was on
25  my way home from work.

Page 45

1    Q   Okay. And what happened after that? Did
2  Officer Ruff say anything else to you?
3    A   Yes.
4    Q   What else did he say to you?
5    A   He said that he can smell alcohol on me.
6    Q   Okay. So Officer Ruff told you that he could
7  smell alcohol on you?
8    A   Yes.
9    Q   Okay. And that was after he asked you if you
10 had been drinking?
11   A   Yes.
12   Q   And did you say anything in response after he
13 said that he smelled alcohol on you?
14   A   I said, I haven't been drinking. I'm coming
15 home from work.
16   Q   Okay. Do you have any idea why Officer Ruff
17 might have smelled alcohol on you?
18   A   No.
19   Q   Okay. Did you have any cologne on that evening?
20   A   No.
21   Q   Do you normally wear cologne?
22   A   No.
23   Q   Okay. Had anybody spilled any beverage on you
24 while you had been working at the Hotel Hershey earlier
25 that day?

Page 46

1    A   No.
2    Q   Okay. And you didn't have anything to drink
3  that night?
4    A   No.
5    Q   Okay. And do you remember when the last time
6  was that you did have an alcoholic drink prior to this
7  incident?
8    A   No.
9    Q   Okay. Do you normally drink alcoholic beverages
10 like in social occasions?
11   A   Occasionally.
12   Q   Okay. So you -- you do drink alcohol
13 occasionally?
14   A   Yes.
15   Q   Okay. All right. Do you have any idea why the
16 officers might have thought you were drinking that night?
17   A   No.
18   Q   Were you on any sort of substance at the time
19 when you were interacting with the officers?
20   A   No.
21   Q   So you weren't on any sort of medications?
22   A   No.
23   Q   Okay. And I guess, obviously, no illicit drugs?
24   A   No.
25   Q   Okay. Were you being prescribed any sort of

Page 47

1  medications back in 2015?
2    A   I don't remember.
3    Q   Okay. So you weren't -- you can't recall being
4  on any sort of regular prescription back in 2015?
5    A   No.
6    Q   Okay. All right. And so after you told Officer
7  Ruff again that, you know, you hadn't been drinking, what
8  happened after that?
9    A   Officer Hill, I believe, said he smelled alcohol
10 on me as well.
11   Q   Okay. So did you say anything in response to
12 that?
13   A   Yeah. I told him I haven't been drinking.
14   Q   Okay.
15   A   And I -- we went back and forth a couple times
16 over this issue.
17   Q   Okay. So there was a -- multiple interactions
18 about whether or not you had been drinking?
19   A   Yes.
20   Q   Okay. Amongst you and the officers?
21   A   Yes.
22   Q   And you said that both officers had indicated --
23 Officer Ruff and Officer Hill -- that you smelled -- they
24 smelled alcohol on your person?
25   A   Yes.

Page 48

1    Q   Okay. Do you remember anything else that was
2  said during those interactions?
3        I know you said they asked you if you had been
4  drinking and they said they smelled alcohol on you. Do
5  you remember anything else they said to you about that
6  issue?
7    A   Yes.
8    Q   What else did they say to you?
9    A   Officer Hill, when I asked -- this was after I
10 was placed in cuffs -- he -- he -- I remember him
11 distinctly -- when I asked what I was being arrested for,
12 he distinctly said, are you retarded? We've already told
13 you.
14   Q   All right. So Officer Ruff said to you --
15   A   Are you retarded? We've already told you.
16   Q   In response to why you were being arrested?
17   A   Yes.
18   Q   Okay. So let's back up a second. So you said,
19 you know, at some point you were placed in cuffs?
20   A   Um-hum.
21   Q   When did that -- did that occur right after the
22 time that Hill said to you -- Officer Hill said to you
23 that he smelled alcohol on you, or did anything happen in
24 between then?
25   A   I asked to speak to a sergeant. After multiple


Page 49

1  exchanges of being asked if I was -- or being told I was
2  drinking and all that stuff, I asked to speak to a
3  sergeant.
4  Q   Okay. And when you asked to speak to a
5  sergeant, what was the response by the officers, meaning
6  Officer Hill and Officer Ruff?
7  A   Officer Hill turned around, pointed down the
8  street toward the Amtrak station and said, he's actually
9  coming right now.
10  Q   Did you see what he was pointing at?
11  A   Yes.
12  Q   What was he pointing at?
13  A   A Chevy SUV, a blue Chevy SUV with Harrisburg
14  Police on the side.
15  Q   Okay. So it was a marked Harrisburg police car?
16  A   Yes.
17  Q   And when you say blue, is it dark blue?
18  A   Yes.
19  Q   Like navy?
20  A   Yes.
21  Q   Okay. All right. And so did that car
22  eventually arrive to the scene?
23  A   Yes.
24  Q   And what happened when the Chevy SUV that was a
25  marked Harrisburg Police car arrived to the scene?

Page 50

1  A   I walked up to it.
2  Q   Okay. So you walked up to the car?
3  A   Um-hum.
4  Q   Where was Officer Hill and Officer Ruff at this
5  point in relation to you?
6  A   I'm not sure. I believe Officer Ruff was behind
7  me.
8  Q   Okay. And throughout this interaction, were you
9  guys all standing in the street on Chestnut Street, or
10  are you on the sidewalk, if you remember?
11  A   In the street.
12  Q   Near your car?
13  A   In front.
14  Q   In front of your car. Okay.
15       And so when -- after you walked up to the SUV,
16  what happened?
17  A   I let the person know in there, which was
18  Corporal Melk --
19  Q   Okay.
20  A   -- I let Corporal Melk know that the two guys
21  were harassing me for drinking.
22  Q   Okay. Do you remember what you told him
23  exactly, or is that what you remember is kind of what you
24  said to him?
25  A   I believe I said, these two guys are harassing

Page 51

1  me for drinking.
2  Q   Okay. Did you tell him that you hadn't been
3  drinking?
4  A   Yes.
5  Q   Okay. What did -- did Corporal Melk say
6  anything in response to what you told him?
7  A   He laughed. And he said, it looks like you've
8  been drinking.
9  Q   Okay. And did you say anything in response to
10  that?
11  A   Yes.
12  Q   Do you remember what you said?
13  A   I said, I have not been drinking.
14  Q   Okay. And, again, do you have any idea why
15  Corporal Melk might have thought you were drinking that
16  night?
17  A   No.
18  Q   And was there anything -- did Corporal Melk say
19  anything else to you?
20  A   No.
21  Q   Okay. So was that the end of the interaction
22  between you and Corporal Melk?
23  A   Yes. It was rather quick.
24  Q   Okay. And did he stay on the scene, or did he
25  leave after that interaction?

Page 52

1  A   He left.
2  Q   He left.
3       So he drove away?
4  A   Yes.
5  Q   So did he drive away after your conversation
6  with him ended?
7  A   After I was -- after he left, I was cuffed. So
8  yes.
9  Q   Okay. So you -- he wasn't there when you were
10  put in handcuffs?
11  A   Not that I recall. He was driving away.
12  Q   Okay. So you remember Officer Melk driving away
13  when you were actually placed in the handcuffs?
14  A   Yes.
15  Q   Okay. And when you were telling the officers,
16  you know, Corporal Melk or Officer Ruff or Hill, that you
17  hadn't been drinking and you told them you were coming
18  from work, did you offer to show them anything to
19  indicate that you had been at work or explain why you had
20  been at work?
21  A   Yes.
22  Q   And what did you tell them?
23  A   I told them -- I showed them my Hotel Hershey
24  badge right here with my name --
25  Q   Um-hum.

Page 53

1    A   -- Calvin Brackbill.
2        MR. JACOB:  Just for the record, he's indicating
3    his left chest area.
4        MS. KRAMER:  Okay.  Yep.
5    BY MS. KRAMER:
6    Q   And so did -- it was a name tag that you were
7    wearing at the time?
8    A   Yes.
9    Q   Did it have Hotel Hershey written on it?
10   A   No.
11   Q   But it had your name?
12   A   It said, Hershey's, and it had Calvin Brackbill
13   underneath.
14   Q   Okay.  So it just said Hershey's and then your
15   name?
16   A   Yes.
17   Q   Okay.  Were you wearing a uniform at the time?
18   A   I was wearing dress -- dress pants and a white
19   dress shirt and a tie.
20   Q   Okay.
21   A   That was our uniform.  It wasn't a uniform
22   per se though.
23   Q   Okay.  It was like the dress code?
24   A   Correct.
25   Q   Okay.

Page 54

1    A   Yes.
2    Q   And when you had showed the officers your work
3    name tag, did they say anything in response?
4    A   No.
5    Q   Okay.  Were you sure that they -- like, you said
6    you showed it to them.  Do you know that they saw it?
7    A   I don't.
8    Q   Okay.  Would it have been hard to miss?
9    A   Yes.
10   Q   Okay.  And what color was it?
11   A   It was a white name tag with like a dark
12   chocolate-colored Hershey's --
13   Q   Um-hum.
14   A   -- and black -- Calvin Brackbill in black ink.
15   Q   Okay.  And how big was it; would you estimate?
16   A   Say about 3 inches in diameter, 2 1/2 to
17   3 inches.
18   Q   Okay.  So about 3-inches long?
19   A   Two-and-a-half to 3-inches long, yes.
20   Q   Okay.  And then like an inch-and-a-half tall
21   or --
22   A   Yeah, about an inch and a half.  Yes.
23   Q   Okay.  All right.  So did anything else happen,
24   you know, when Officer -- Corporal Melk was on the scene?
25   A   (No verbal response.)

Page 55

1    Q   I know you said he didn't really -- he laughed
2    and told you that it looked like you had been drinking,
3    but you said there wasn't much interaction after that?
4    A   No.  There was very little interaction.
5    Q   Okay.  And so was that the extent of your
6    conversation with Corporal Melk that night?
7    A   Yes.
8    Q   Okay.  And so did he do anything before he left
9    that you remember?
10   A   I -- I don't remember.
11   Q   Okay.  And do you know what Officer Hill and
12   Officer Ruff were doing when you were having a
13   conversation with Corporal Melk?
14   A   I -- I remember Officer Ruff being behind me,
15   and I don't know where Officer Hill was.
16   Q   Okay.  Do you know where he was behind you, like
17   directly behind you, to your right, or to your left?
18   A   He was behind me.
19   Q   Okay.  Do you know how close he was?
20   A   A couple -- 2 to 3 feet.
21   Q   Okay.  M
22   A   Relatively close.
23   Q   All right.  Okay.  And what else do you remember
24   after that?
25   A   They put me in cuffs.

Page 56

1    Q   Okay.
2    A   And I remember laughing.  And I asked them, what
3    am I being arrested for?  And he was like, we told you
4    once.  Officer Hill said, we told you once, DUI.
5    Q   Um-hum.  And when you said they placed you in
6    cuffs, was it Officer Hill and Officer Ruff who placed
7    you in cuffs?
8    A   Officer Ruff placed the handcuffs on me.
9    Q   Okay.
10   A   Officer Hill was standing in front of me at that
11   point.
12   Q   Okay.  And you said that they were laughing.  So
13   were they laughing --
14   A   No.
15   Q   Okay.  Who was laughing?
16   A   I laughed.  I laughed because I was shocked that
17   I was getting arrested in my work uniform.
18   Q   And did you laugh before or after they put the
19   cuffs on you?
20   A   After.
21   Q   Okay.  And you said that Officer -- when you
22   asked why you were arrested, Officer Ruff asked -- I
23   mean, stated, are you retarded?  We already told you that
24   you have a -- like, Officer Hill said a DUI?
25   A   Um-hum.



Page 57

1   Q   So had a DUI been mentioned to you before that
2   point?
3         MR. JACOB:  Objection.
4         MS. KRAMER:  I can rephrase the question,
5   because I know it was a little complicated.
6         MR. JACOB:  Yeah.  I didn't want to speak to it
7   unless you want me to --
8         MS. KRAMER:  Yeah.  It was complicated.  Sorry.
9   BY MS. KRAMER:
10  Q   So you stated that, I guess, Officer Ruff told
11  you that Officer Hill had already told you that you were
12  getting arrested for a DUI while you were in the
13  handcuffs?
14  A   Yes.
15  Q   And had being charged with or cited with a DUI
16  been mentioned to you before that point?
17  A   No.
18  Q   Okay.  So Officer Hill did not tell you that he
19  suspected you were driving under the influence?
20  A   No.
21  Q   Or he didn't tell you that he was going to
22  charge you with a DUI or driving under the influence?
23  A   No.
24  Q   Okay.  And did Officer Ruff say anything to that
25  effect?

Page 58

1   A   No.  Other than the -- asking if I had been
2   drinking.
3   Q   Okay.  And so at that point, what happened after
4   you're in handcuffs and Officer Ruff told you that, you
5   know, Officer Hill said you're going to be under arrest
6   for a DUI?  What happened at that point?
7   A   I remember going back and forth with him, asking
8   what I was being arrested for, and they said DUI.  I
9   said, I wasn't drinking.  I was coming from work.
10  Q   Um-hum.
11  A   And like I said, at some point in that
12  conversation -- I don't know exactly when -- that's when
13  I laughed and asked again, like, what am I being arrested
14  for here?  I just couldn't understand.
15  Q   Okay.  And so -- so, again, you were just asking
16  them why you were being arrested, and they were just
17  telling you again it was for drinking?
18  A   Yes.
19  Q   Okay.  And was there any other conversation
20  amongst you and the officers that night, meaning Officer
21  Ruff and Officer Hill?
22  A   Between that conversation and being transported?
23  Q   Yeah.
24  A   Yes.
25  Q   Okay.  And when you said transported, when did

Page 59

1   that happen?
2   A   After they searched my car.
3   Q   Okay.  Were you there when they were searching
4   your car?
5   A   Yes.
6   Q   And were you in handcuffs at that point?
7   A   Yes.
8   Q   Okay.  And who searched your car?
9   A   Officer Ruff.
10  Q   Okay.  And what was Officer Hill doing while
11  Officer Ruff was searching your car?
12  A   Standing behind me in handcuffs.
13  Q   Okay.  Was he holding on to you?
14  A   I don't remember.
15  Q   Okay.  Was there anyone else on the scene at
16  that point?
17  A   I don't remember.
18  Q   Okay.  So -- but you do remember Officer Ruff,
19  yourself, and Officer Hill were there?
20  A   Yes.  At the time they were searching my car.
21  Q   Okay.  And do you remember what -- what did
22  Officer -- when Officer Ruff was searching your car, what
23  was he doing, if you remember?
24  A   He opened the trunk, looked in the trunk.
25  He -- he went through the car.

Page 60

1   Q   And when you say he went through the car, can
2   you just be a little bit more specific or tell us at
3   least what you remember.  Did he go through the back of
4   the car, in the front of the car, in your compartments or
5   what?  Just --
6   A   He opened the trunk, and he opened both front
7   doors.  That's all I remember.
8   Q   Okay.  Do you know if he went in the glove box?
9   A   I don't know.
10  Q   Okay.  But you could see that he had opened both
11  front doors on the car as well as the trunk?
12  A   Yes.
13  Q   Did he take anything out of the car?
14  A   He -- he -- there was -- there was a pill box
15  for asthma medicine.  He asked me if they were
16  prescription or if they were over-the-counter.  I said
17  they were over-the-counter.
18  Q   Okay.  So you were taking asthma medicine at the
19  time?
20  A   I had it on me.  I had not taken any.
21  Q   Okay.  And you said it wasn't a medication that
22  you took by a prescription?
23  A   No.
24  Q   So you could just buy it at the pharmacy?
25  A   Yes.

Page 61

1    Q   Okay.
2    A   Yes. I believe it was Claritin.
3    Q   Okay. Claritin.
4        And that was for your asthma?
5    A   Yes.
6    Q   And had you taken it that night?
7    A   No.
8    Q   Okay. And so he asked you about the asthma
9    medication?
10   A   Um-hum.
11   Q   And did you explain to him what it was?
12   A   Yeah. I just said, that's for my asthma. Yes.
13   Q   Okay. Did he ask you about anything else that
14   he found in the car?
15   A   No.
16   Q   Okay. Did you see him take anything else out
17   from the car?
18   A   No.
19   Q   Okay. And then -- so do you know what happened
20   after Officer Ruff searched your car?
21   A   Well, in between him doing that, I was standing
22   on the sidewalk with Officer Hill. And I had asked
23   him -- I was like, aren't you guys going to perform
24   sobriety tests on me? And I raised my -- I believe it
25   was my right foot up. And at that point, he yanked back

Page 62

1    on the cuffs and said, we don't have time for that.
2    Q   Okay. So while Officer Ruff is searching your
3    car, you're standing on the sidewalk with Officer Hill,
4    and you ask Officer Hill about taking a field sobriety
5    test?
6    A   Yes. I began to put my one foot up --
7    Q   Um-hum.
8    A   -- as if I was doing a field sobriety test, and
9    he -- he yanked back on my cuffs enough so I could get
10   off balance and said, we don't have time for that.
11   Q   Okay. And before he yanked on you, were you
12   able to, you know, raise your right leg up without any
13   problem?
14   A   Yes.
15   Q   Okay. And so after he -- after Officer Hill
16   told you that they didn't have time to perform a field
17   sobriety test, did you say anything to him in response?
18   Did he say anything else?
19   A   I don't remember.
20   Q   Okay. And then at that point, what happened
21   after that?
22   A   After that, Officer Ruff got done searching my
23   car, and I remember Officer Hill taking me over to the
24   other side of the street where Bricco was. And that's
25   when I met up with Ian Dodson (sic), transport officer.

Page 63

1    Q   Okay. And so when you said you were taken over
2    to where Bricco was, were you taken over on the sidewalk?
3    A   Yes.
4    Q   So were you on the sidewalk right next to the
5    Bricco restaurant?
6    A   No.
7    Q   Were you across the street from Bricco?
8    A   Yes. On the sidewalk at the Pennsylvania Place.
9    Q   Okay. All right. So you are still on the
10   sidewalk that was, like, adjacent to Chestnut Street?
11   A   Yes.
12   Q   Okay. But you were, like, across from the
13   Bricco restaurant?
14   A   On the other side of the street. Yes.
15   Q   Okay. And so when you were taken over there by
16   Officer Ruff, you said you met up -- you were taken over
17   there by Officer Hill?
18   A   Yes.
19   Q   Okay. Officer Hill took you over to that point
20   in the sidewalk. You said at that point Officer Dawson
21   arrived on the scene?
22   A   Yes.
23   Q   And what happened after Officer Dawson arrived
24   on the scene?
25   A   Well, I was actually -- just to clarify, I was

Page 64

1    walked -- Officer Dodson (sic) was there with his
2    transport van --
3    Q   Um-hum.
4    A   -- parked parallel to the sidewalk. And I was
5    walked across the street from the sidewalk at
6    Pennsylvania Place, walked across the street by Officer
7    Hill, and then at that point Officer Dodson (sic) was
8    there facing me. He reached his hand out and he said,
9    hang in there, man. I think you'll be fine. It looks
10   like you're just coming from work.
11   Q   Okay. And so that was the first thing Officer
12   Dawson said to you?
13   A   Yes.
14   Q   Okay. And did you say anything in response to
15   him?
16   A   Yes.
17   Q   And what did you say?
18   A   I said, that's what I've been trying to tell
19   these guys all night.
20   Q   Okay. And did he say anything else after that?
21   A   I think he just said that you'll -- just hang in
22   there; you'll be fine again -- or something along those
23   lines.
24   Q   Okay. And so when did Officer Dawson's
25   transport van arrive to the scene? Was it while Officer



1  Ruff was searching your car?
2  A  I don't -- I don't remember.
3  Q  Okay. So once you walked over to his van, were
4  you then placed in the van?
5  A  Yes.
6  Q  And who --
7  A  I was -- I was searched.
8  Q  Okay. You were physically searched?
9  A  Yes.
10  Q  And who searched you?
11  A  I believe it was Officer Ian Dodson (sic).
12  Q  Okay. And when Officer Dawson searched you,
13  what did that entail?
14  A  He searched my pockets. He patted me down from
15  the top down to my legs. And I remember him pulling out
16  my key card to get into the Harrisburg University's
17  doors; and I remember stating that, see, I said I was
18  just going home. I live right down the street here.
19  Q  Okay.
20  A  I remember saying something to the tune that the
21  guys wouldn't listen to me about that.
22  Q  Okay. And where was Officer Ruff and Officer
23  Hill at this point? Were they near Officer Dawson while
24  he was performing the search?
25  A  Officer Hill was.

1  Q  Okay. And where was Officer Ruff?
2  A  I don't know.
3  Q  Okay. And so you said that Officer Dawson found
4  your Harrisburg University key card that you use to get
5  into your apartment. Was there anything else that he
6  found on your person?
7  A  My wallet would have been in there and my cell
8  phone -- or I don't believe -- I believe I left my cell
9  phone in the car.
10  Q  Okay. And so did he take these items from you?
11  A  No.
12  Q  Okay. So he gave them back to you?
13  A  Yes.
14  Q  Okay. And then do you remember anything else
15  that Officer Dawson said to you during that interaction?
16  A  No.
17  Q  Like --
18  A  Other than get -- no.
19  Q  Okay. So while he was searching you, you
20  remember him asking -- talking to you about the
21  Harrisburg University key card. Do you remember him
22  making any other comments to you?
23  A  While he was searching me?
24  Q  Yes.
25  A  No.

1  Q  Okay. And was Officer Hill saying anything
2  during the search?
3  A  Not that I remember.
4  Q  Okay.
5  A  I don't remember.
6  Q  All right.
7  MR. JACOB: At some point can we -- we've been
8  going for over an hour, so I just figured it might be a
9  good time for break. But I'll let you decide where to
10  break it.
11  MS. KRAMER: Oh, yeah, no problem. We can take
12  a break if you want.
13  Do you need a break?
14  THE DEPONENT: Sure.
15  MS. KRAMER: Okay. All right. Do you want to
16  take like a 15-minute, 10-minute break?
17  MR. JACOB: Just five, ten minutes.
18  MS. KRAMER: Five minutes?
19  MR. JACOB: Yeah.
20  MS. KRAMER: Okay. All right.
21  MR. JACOB: Stand up, circulate.
22  (A recess was taken.)
23  BY MS. KRAMER:
24  Q  So I think before we went off the record we were
25  talking about right before you were put in the transport

1  van. So after you had spoken to Officer Dawson and he
2  had searched you, were you then put in the transport van?
3  A  Yes.
4  Q  Okay. And who put you in the transport van?
5  A  Ian Dawson.
6  Q  Okay. And were you handcuffed at this time?
7  A  Yes.
8  Q  Okay. And I guess he placed you in the back of
9  the van then?
10  A  The side.
11  Q  The side of the van.
12  Okay. And then once you were placed in the van,
13  I guess he then drove you to the booking center?
14  A  Yes.
15  Q  Okay. Did anyone ride with you in the transport
16  van other than yourself and Ian Dawson?
17  A  In the back?
18  Q  Yeah, in the back.
19  A  No.
20  Q  Okay. Was anyone else in the van?
21  A  I don't know.
22  Q  Okay. So you -- but you know that Officer
23  Dawson was in the van?
24  A  Yes.
25  Q  And when you were in the van with Officer

Page 69

1 Dawson, did you have any sort of conversations with him?
2 A No. I was in the back in the metal casing, in
3 the --
4 Q Okay.
5 A -- the compartment.
6 Q Okay. So you wouldn't have been able to talk to
7 him at that point?
8 A No.
9 Q Okay.
10 MR. JACOB: Off the record.
11 (Discussion held off the record.)
12 BY MS. KRAMER:
13 Q Okay. So -- and then -- okay. And then you
14 were transported to the booking center?
15 A Um-hum.
16 Q And then when you got to the booking center,
17 what happened?
18 A Officer Dawson escorted me out of the van and
19 into the lobby area at the booking center.
20 Q Okay. All right. And before we get into, like,
21 everything that happened at the booking center, I just
22 want to kind of go back to all your interactions with the
23 officers.
24 In general, do you remember what your demeanor
25 was like when you were interacting with Officer Hill

Page 70

1 initially when he first came to you?
2 A Yes.
3 Q And what was your demeanor like?
4 A I was very calm and just explaining the
5 situation to him and telling him I didn't hit anything.
6 Q So when you say you were calm, were you talking
7 in -- like what type of volume were you talking in?
8 MR. JACOB: Objection.
9 BY MS. KRAMER:
10 Q How loud were you speaking when you were talking
11 to Officer Hill?
12 A Just in the normal tone. I speak rather loudly
13 in general.
14 Q Okay. So the tone you're talking in right now,
15 would you have been talking louder or quieter?
16 A Probably a little louder.
17 Q Okay. But you don't -- were you using a
18 confrontational tone at all?
19 A No.
20 Q Okay. Was there any point in your interactions
21 with the officers where your demeanor or tone changed?
22 A Yes.
23 Q Okay. And when was that?
24 A Toward the end, after explaining multiple times
25 to him that I had not been drinking, I got a little

Page 71

1 frustrated.
2 Q Okay. So when you said you got frustrated, how
3 did that, like, manifest? Like, how did that affect the
4 way you were interacting with the officers? Were you
5 getting louder or shorter or more confrontational? Like
6 when you say you got frustrated, how did that affect the
7 way you were interacting with them?
8 MR. JACOB: Objection.
9 BY MS. KRAMER:
10 Q Okay. So when you said -- you said you got
11 frustrated with the officers at one point after you
12 explained you had not been drinking multiple times. How
13 did that -- yeah -- how did that affect the way you were
14 interacting with them?
15 A I -- I guess I became a little frustrated that
16 they were not hearing what I was saying when I said I was
17 not drinking and I was just on my way home from work and
18 I did not hit anything. After repeating that multiple
19 times, I just became a little frustrated.
20 Q Okay. Did you -- did the volume of your voice
21 increase at that point?
22 A Yes.
23 Q Did you get confrontational with them?
24 A No.
25 Q All right. Did you -- so were you -- do you

Page 72

1 remember being aggressive at all?
2 A No.
3 Q Okay. And when you said you got frustrated --
4 MR. JACOB: Wait. He's -- that wasn't clear.
5 No, he doesn't remember or, no, he didn't get aggressive,
6 just so we're clear on the record.
7 BY MS. KRAMER:
8 Q All right. And so did you not get aggressive,
9 or do you remember being aggressive -- or sorry. Let me
10 rephrase that.
11 At any point did you get aggressive with the
12 officers?
13 A No, I did not get aggressive with the officers.
14 Q Okay. And when you say you got frustrated, was
15 that before or after you were put in handcuffs?
16 A Both before and after.
17 Q Okay. So you first got frustrated before you
18 were placed in the handcuffs?
19 A Yes.
20 Q Okay. And did you get frustrated before Officer
21 Ruff arrived?
22 A No.
23 Q Okay. So you got frustrated after Officer Hill
24 and Officer Ruff were already at the scene?
25 A Yes.



Page 73

1  Q  Okay. And do you think that your frustrated
2  attitude could have been interpreted as being
3  intoxicated?
4        MR. JACOB: Objection.
5        THE DEPONENT: No.
6        MR. JACOB: It calls for speculation.
7        MS. KRAMER: Yeah. Okay. He can answer though.
8        MR. JACOB: It -- well, it calls for
9  speculation.
10       MS. KRAMER: Yeah. I know but --
11       THE DEPONENT: No.
12       MS. KRAMER: Okay.
13  BY MS. KRAMER:
14   Q  And when you were speaking with the officers,
15  how close were you generally?
16   A  A couple feet away, 3 or 4 feet away.
17   Q  Okay. Did that distance change once you became
18  frustrated?
19   A  No.
20   Q  Okay. And you said you were about a couple feet
21  away from the officers, about 3 to 4 feet. Is that the
22  distance you stand normally when you speak with someone?
23   A  Yes.
24   Q  Okay.
25   A  Roughly.

Page 74

1        MS. KRAMER: All right. Okay. I'm just going
2  to bring in another exhibit. We can mark this as
3  Brackbill 2.
4        MR. JACOB: Thank you.
5        (Brackbill Exhibit Number 2 was marked for
6  identification.)
7  BY MS. KRAMER:
8   Q  And, Mr. Brackbill, do you know what this
9  document is?
10   A  Yes.
11   Q  And what is it?
12   A  This is the Amended Complaint.
13   Q  So was this the complaint -- this is your
14  complaint?
15   A  Yes. This is the amended complaint.
16   Q  In the lawsuit that you have against the
17  officers in Harrisburg for the incident that arose on
18  June 28th, 2015?
19   A  Yes.
20   Q  All right. And I'm just going to go through
21  some of the statements in this complaint.
22        Who prepared this document, if you remember?
23   A  My attorney.
24   Q  Okay. And did you provide him information that
25  he used to prepare this document?

Page 75

1        MR. JACOB: Objection. You want privileged
2  information or --
3        MS. KRAMER: I'm just asking if he gave you
4  factual information in drafting the complaint. It's kind
5  of -- I'm not asking him the substance of it.
6        MR. JACOB: All right.
7        MS. KRAMER: Yeah.
8  BY MS. KRAMER:
9   Q  So did you provide your attorney the factual --
10  some of the factual information that's contained in this
11  Amended Complaint?
12   A  Yes.
13   Q  Okay. All right.
14        Okay. So I want to direct you to paragraph 21
15  of the Amended Complaint. It's at the bottom of page 4.
16  Do you see that?
17   A  Yes.
18   Q  I'm going to read that to you. It says, Calvin
19  further explained that in January of 2015 he had slid on
20  ice into a curb damaging the cover, which is presumably
21  what led to the cover coming loose again on this night.
22        And so that statement, what does that refer to
23  exactly?
24   A  Please elaborate.
25   Q  So in the complaint, if you read, you know, the

Page 76

1  statement right before that, paragraph 20, where it says,
2  Calvin explained to the officers that he was returning
3  from work, had not consumed alcoholic beverages, and had
4  not struck anything with his vehicle.
5        So that next paragraph, paragraph 21, it said
6  that you further explained the situation. So was that in
7  relation to the officer's questions?
8   A  Yes. I believe I explained that to Hill, and I
9  think I did briefly mention it to Ian Dawson.
10   Q  Okay. And so -- so there was a situation where
11  you had hit something with your car?
12   A  Yes.
13   Q  Previously?
14   A  Yes.
15   Q  Okay. And do you remember that situation?
16   A  Yes.
17   Q  And so that was in January of 2015?
18   A  Yes.
19   Q  Okay. And can you explain to me what happened?
20   A  Sure. Yes. I was heading back from my
21  apartment to campus to meet up with one of my friends to
22  study for an exam, I believe it was, and I had turned
23  into the rear parking lot at Penn State Harrisburg. And
24  I was going about 5 miles an hour roughly, and there was
25  a sheet of ice which caused my car, when it was turning,

Page 77

1 to just slide into a curb --
2 Q Um-hum.
3 A -- in the parking lot. And at that point I
4 ended up putting my car in reverse after it slid into the
5 curb, and it ripped the front bumper partially off.
6 Q Okay. And you say it ripped the front bumper
7 off. Do you mean the bumper or the bumper cover?
8 A The bumper cover.
9 Q Okay. So was the bumper still attached to the
10 vehicle?
11 A Yes.
12 Q Okay. Did the bumper cover come entirely off
13 during that situation?
14 A It was -- yes.
15 Q Okay. So -- and did you have to pick it up off
16 the ground, and were you able to re-attach it?
17 A I -- I let it sit on the tabs. I let it sit on
18 the corners there, and it was enough to last me for a
19 couple days until I was able to repair it more in depth
20 myself at my dad's shop.
21 Q Okay. And so when you said you had it sit on
22 the tabs, meaning you were able to kind of readjust the
23 bumper cover and put it kind of back in place?
24 A I was able to put it back -- back on the car,
25 yes.

Page 78

1 Q Okay. And when you put it back onto the car,
2 was it dragging at all on --
3 A No.
4 Q Okay. All right. And you said in this
5 situation you slid on some ice when you were in the
6 parking lot at Penn State Harrisburg. What time of day
7 did that occur?
8 A I believe it was in the afternoon around 2 to
9 4 p.m.
10 Q Okay. Do you know if it was -- what the weather
11 was like?
12 A It had just snowed. It was overcast.
13 Q So was there snow on the ground?
14 A Yes.
15 Q Was there snow in the parking lot?
16 A Yes. A coating of it.
17 Q Okay. And was there ice as well, I'm assuming?
18 A Yes.
19 Q Okay. Was it -- the ice that you slid on, was
20 it visible, or was it like black ice?
21 A It wasn't visible.
22 Q Okay. So you couldn't readily see it?
23 A I couldn't see it.
24 Q Okay. Did you see it after you had hit the
25 curb?

Page 79

1 A Yes.
2 Q Okay. So you could see the patch of ice after
3 you hit the curb?
4 A Yes.
5 Q Okay. Was there any other damage to your car in
6 that January of 2015 incident?
7 A No.
8 Q Okay. And you said that you -- you were able to
9 drive away from that situation?
10 A Yes.
11 Q Okay. All right.
12 Okay. And then I just want to direct you down
13 to paragraph 22. Do you see that paragraph?
14 A Um-hum.
15 Q It says, Defendant Hill stated twice that he
16 smelled the odor of alcoholic beverages -- in
17 parenthesis -- despite the fact that alcohol is odorless
18 and non-alcoholic beer smells the same as beer containing
19 alcohol, end parenthesis.
20 In here it states that, you know, Defendant Hill
21 smelled the alcohol on you. Is there a reason why you
22 didn't say that Defendant Ruff also stated that?
23 A Please elaborate.
24 Q When you were talking earlier, you stated that
25 Defendant Ruff told you that he smelled alcohol on your

Page 80

1 person.
2 A Yes.
3 Q Is there a reason why it's not included here in
4 the complaint?
5 MR. JACOB: Sorry.
6 THE DEPONENT: I don't know.
7 BY MS. KRAMER:
8 Q All right. But you do remember that Defendant
9 Ruff --
10 A Yes.
11 Q -- told you that he smelled alcohol as well?
12 A Yes.
13 Q Okay. All right.
14 Okay. Then I want to direct you to
15 paragraph 27. That's on the following page, page 5.
16 This relates to when you said you were handcuffed --
17 A Um-hum.
18 Q -- by Defendant Ruff.
19 So you said -- paragraph 27 reads, Defendant
20 Ruff roughly grabbed Calvin's hands and handcuffed him to
21 the rear, causing pain.
22 So do you remember that as how it occurred when
23 you were handcuffed?
24 A Yes.
25 Q So do you think that -- do you remember

Page 81

1  Defendant Ruff handcuffing you in kind of a rough manner?
2    A   Yes.
3    Q   Can you describe that for me?
4    A   He just -- I was -- at the time -- I believe
5  this is just right after we finished talking with Officer
6  Melk --
7    Q   Okay.
8    A   -- or Corporal Melk. Officer Hill was in front
9  of me. And I had my hands around the normal stance of
10  the body, and he grabbed them quickly and cuffed them up
11  as I was still talking to Officer Hill. And I believe at
12  that time Officer Melk was -- or Corporal Melk was
13  leaving.
14    Q   Okay. And so when you said you had your arms in
15  a normal stance, you kind of positioned your body in the
16  way that you had your arms kind of down straight?
17    A   Correct, yes.
18    Q   And then you said, after that, while you were
19  talking to Officer Hill, Officer Ruff grabbed your arms
20  and pulled them behind you?
21    A   Yes.
22    Q   Okay. And did you -- did he do it in a fast
23  manner?
24    A   Yes.
25    Q   In a forceful manner?

Page 82

1    A   Yes.
2    Q   And did it hurt when he grabbed your arms?
3    A   A little, yes.
4    Q   Did it hurt when he actually put your arms in
5  the handcuffs?
6    A   A little, yes.
7    Q   Were you uncomfortable when you were then in the
8  handcuffs?
9    A   A little bit, yes.
10    Q   Did you say anything to the officers about being
11  uncomfortable?
12    A   No.
13    Q   Did you tell them that it hurt when they
14  handcuffed you?
15    A   No.
16    Q   Okay. Do you think -- can you just explain a
17  little bit about the pain that you said you felt while
18  you were in the handcuffs, because you said it was a
19  little -- it hurt a little bit?
20    A   The cuffs were just a little tight, it felt
21  like, you know --
22    Q   Okay.
23    A   -- just jamming up against the -- I guess my
24  vein here.
25    Q   Okay. You're indicating the vein on your wrist?

Page 83

1    A   Yes.
2    Q   So you --
3        MR. JACOB: Right wrist?
4        THE DEPONENT: Well, yeah.
5  BY MS. KRAMER:
6    Q   But was it tight on both wrists?
7    A   Yes.
8    Q   Okay. And you're saying it was uncomfortable
9  because it was pushing up again the vein --
10    A   Yes.
11    Q   -- on your wrist?
12    A   Yes.
13    Q   Okay. Did you have any sort of cuts or bruising
14  from the handcuffs?
15    A   No.
16    Q   Did you have any pain afterwards? Like, the day
17  after did you feel any sort of pain?
18    A   No.
19        MS. KRAMER: Okay. I think that's all I need
20  right now on that.
21        Okay. I'm going to pull out another exhibit.
22  We can mark this exhibit -- I guess we're at Brackbill 3.
23        MR. JACOB: Thank you.
24        (Brackbill Exhibit Number 3 was marked for
25  identification.)

Page 84

1  BY MS. KRAMER:
2    Q   Okay. And, Mr. Brackbill, do you recognize what
3  this document is?
4    A   Yes.
5    Q   And what is it?
6    A   A transcript from the district court summary
7  hearing.
8    Q   Okay. And --
9        MR. JACOB: Just for the record, it incorrectly
10  says preliminary hearing, but it was the summary hearing.
11  I don't know why that ever got put on there as
12  preliminary hearing.
13        MS. KRAMER: Okay.
14  BY MS. KRAMER:
15    Q   But -- so this was the hearing in front of the
16  magisterial district judge that you had?
17    A   Yes.
18    Q   Okay. And that occurred on November 5th, 2015?
19    A   Yes.
20    Q   Okay. And do you remember testifying on that
21  day?
22    A   Yes.
23    Q   And a record was made of what you testified to
24  that day?
25    A   Yes.

Page 85

1  Q   Okay. And just to be concise, I -- I put two
2  pages on one page; so if that gets confusing, just let me
3  know.
4      Okay. I just want to direct you to page 7 of
5  the transcript. Do you see that?
6  A   Um-hum.
7      MR. JACOB: Yes?
8      MS. KRAMER: Yeah. And this isn't your
9  testimony.
10     MR. JACOB: He can't say, um-hum. It's got to
11 be yes or no.
12     MS. KRAMER: Oh, yeah.
13 BY MS. KRAMER:
14 Q   So you see page 7?
15 A   Yes.
16 Q   Okay.
17 A   Yes.
18 Q   All right. And then so this portion, this is
19 Officer Ruff testifying. So I'm just going to read on
20 line 11.
21     It says, Question -- Q, meaning question, All
22 right. You indicate he was combative. How was he
23 combative?
24     And then it says, Answer, A, Well, he was
25 physically confrontational with Officer Hill, bumping his

Page 86

1  chest into his body.
2      And so I know this isn't your testimony, but was
3  there any time during your interactions with Officer Hill
4  on June 28th, 2015, where you bumped your chest into
5  Officer Hill's body?
6  A   No.
7  Q   Okay. Did you ever get close to Officer Hill
8  when you were speaking with him?
9  A   No.
10 Q   Okay. All right. And then just going over to
11 the next page where -- it's page 8 -- on line 16, it says
12 Question, Okay. Other than that, how else was he
13 combative?
14     A, Yelling, flailing his arms.
15     And then did you see that portion?
16 A   Yes.
17 Q   Okay. Was there any time during your
18 interactions with Officer Ruff on June 28th, 2015, where
19 you were yelling or flailing your arms?
20 A   Like I said, after -- after I had told them
21 multiple times that I was not drinking, I'm sure I raised
22 my voice to the level that could be construed as yelling.
23 Q   Okay.
24 A   And, no, on the flailing of the arms.
25 Q   Okay. So you didn't flail your arms at any

Page 87

1  point?
2  A   No.
3  Q   Okay. But you're saying that you did raise your
4  voice and the officers could construe that as yelling?
5  A   Could have construed it as yelling, yes.
6  Q   Okay. Did you consider the way that you were
7  talking as yelling?
8  A   No.
9  Q   Okay. What would you qualify it as?
10 A   Just talking in a raised voice.
11 Q   Okay. Do you -- when you were talking in a
12 raised voice, was it confrontational?
13 A   I don't believe it was.
14 Q   Okay. Now I want to direct you to page --
15 okay -- so if you go to page 20, line 20, it says,
16 Question, and when you got out and you were looking at
17 your vehicle, what did you find?
18     And then it says, Answer, I found my front
19 bumper was off.
20     So the statement where it says, I found my front
21 bumper was off, was that your testimony during the
22 hearing?
23 A   Yes.
24 Q   Okay. When you say it was off, was that -- was
25 the bumper entirely off?

Page 88

1  A   No.
2      MR. JACOB: I'm going to also object. According
3  to the rules, we can request -- when a transcript's used,
4  you can request any other portion be read in, so if you
5  would also read in 23 to 25.
6      MS. KRAMER: Sure.
7      Twenty-three says, Question, when you say front
8  bumper, are you talking about the entire bumper, the
9  structure, or the cover?
10     And then it says, Answer, It was the front
11 bumper cover.
12     MR. JACOB: Was that your testimony?
13     THE DEPONENT: Yes.
14     MR. JACOB: Thank you.
15     MS. KRAMER: Okay. I think that's all the
16 questions I have on here, so I'll move on.
17 BY MS. KRAMER:
18 Q   All right. So we'll go back to after you were,
19 you know, handcuffed and put in the transport van and you
20 were then taken to the booking center. What happened
21 once you got to the booking center?
22 A   Officer Dawson escorted me out of the van and
23 into the lobby area.
24 Q   Okay. And then what happened?
25 A   And then I was handed off to the judicial center

Page 89

1 agents where they removed the handcuffs from me. And, I
2 believe they had me kneel on a -- like a bench --
3 Q Okay.
4 A -- and put my hands up against the wall while
5 they searched me there, and then they put leg cuffs on
6 me.
7 Q Okay. So can you explain what the search
8 entailed, what they did?
9 Q They did the same search that the officers did
10 on the scene and Officer Dawson did on the scene. And it
11 entailed searching my pockets, patting me down, making me
12 remove my watch, I believe it was, and made me remove my
13 necktie and remove everything that was in my pockets.
14 Q Okay.
15 A And they put that in a bag, and then they
16 labeled the bag.
17 Q Okay. And so did they take all the items on
18 your person at that point?
19 A Yes.
20 Q Okay. And then you said you were put in leg
21 cuffs while you were kneeling on a bench?
22 A Yes. It was around that time. I -- I don't
23 know if it was while I was kneeling on the bench or not.
24 Q At some point around the time they
25 searched you, they -- after they searched you, did they

Page 90

1 put the leg cuffs on?
2 A I -- I don't know.
3 Q Okay. And then so what happened after they put
4 the leg cuffs on?
5 A They had -- I sat on the bench --
6 Q Okay.
7 A -- at some point. I sat on the bench, and
8 that's when I was harassed by some of the employees
9 there. I heard remarks stating that I would lose my job
10 at the Hotel Hershey. And then I believe at some point
11 Officer Ruff came up to me, and he read me what I believe
12 was the DL-26.
13 Q Okay. And so when you said you were sitting on
14 this bench, are you in, like, a waiting area?
15 A Yes, the lobby.
16 Q The lobby. Okay.
17 And you said Officer Ruff was there, correct?
18 A Yes.
19 Q When did he arrive there?
20 A I believe he arrived -- I don't know.
21 Q Okay. But he was there at some point --
22 A Yes.
23 Q -- after you were sitting on the bench there?
24 A Yes.
25 Q And you said he came up to you and read the --

Page 91

1 gave you or read the DL-26?
2 A Yes.
3 Q And what else happened?
4 A During that time while he was reading the DL-26,
5 I remember questioning him about my car specifically. I
6 believe I may have interrupted him and questioned him
7 about my car and, if I was proven not guilty of this, if
8 I get the -- get reimbursed for the towing money. I do
9 remember asking that. And while I was asking that, I
10 remember another employee of the judicial center stating
11 that I'm refusing. They yelled out, he's refusing. I
12 remember that.
13 Q Um-hum. And when you're saying that someone at
14 the booking center yelled out, he's refusing, that was in
15 reference to the blood testing?
16 A Correct, yes.
17 Q Okay. And that was to test if you had any sort
18 of substance in your system?
19 A Yes.
20 Q Yeah. Okay.
21 A Yes.
22 Q And when you were -- when you remember the
23 employees yelling these comments to you, was it directed
24 to you? Was it kind of -- or was it, like, behind your
25 back?

Page 92

1 A They were just yelling out in general --
2 Q Okay.
3 A -- in the lobby for, I guess, all the other
4 employees to hear, the officers, myself.
5 Q Okay. So they weren't talking amongst
6 themselves?
7 A No.
8 Q Okay. Do you remember who these employees were
9 at all?
10 A No.
11 Q The employees that you said stated that you were
12 going to lose your job at the Hershey Hotel, was that one
13 person that said that?
14 A Yes.
15 Q Were they a male or female?
16 A A young male.
17 Q A young male. Okay.
18 And do you remember anything else about him,
19 like what he looked like?
20 A He was a younger male, short hair.
21 Q Okay. Do you remember what color hair he had?
22 A I don't remember.
23 Q Okay. Do you remember what race or ethnicity he
24 was?
25 A Caucasian.



Page 93

1 Q Okay. All right. And then the individual that
2 yelled that he's -- the individual that stated that you
3 were refusing to have the chemical testing done, was that
4 the same person that made the comment about you losing
5 your job?
6 A I don't know.
7 Q You don't know.
8 Was it a male that said that?
9 A Yes.
10 Q Did you see the person say that when they did?
11 A No. Officer Ruff was right here, and he was in
12 the middle, I guess, answering my question about the
13 towing.
14 Q Okay.
15 A And that just came out of nowhere.
16 Q Okay. And then getting back to your questions
17 about your car being towed, when you left the scene on
18 Chestnut Street by the transport van, was your car still
19 on the scene?
20 A Yes. In the middle of the street.
21 Q And were you told at that point what was going
22 to happen to your car?
23 A No.
24 Q Okay.
25 A I do remember as I was being walked over a tow

Page 94

1 truck was coming up, a flatbed truck.
2 Q Okay. You -- when you said you were being
3 walked over, you mean to the transport van?
4 A Yes. We walked over from the Pennsylvania Place
5 across the road to the sidewalk where the transport van
6 was beside Bricco.
7 Q Okay. All right. So you --
8 A I do remember -- I do remember vaguely looking
9 back and seeing a tow truck backing up there.
10 Q Okay. And do you remember anything about the
11 tow truck?
12 A It was a -- it was a rollback. It was a flatbed
13 tow truck.
14 Q Okay. Do you remember if it had, like, a
15 company name on it?
16 A I don't remember seeing it that night, but I
17 know from the next day it was Don's Towing in Harrisburg.
18 Q Okay. But no comments were made to you by
19 either of the officers that your car was going to be
20 towed at that point?
21 A That's correct.
22 Q Okay.
23 A Yes.
24 Q And so did Officer Ruff answer your questions
25 about your car when you were in the booking center?

Page 95

1 A Yes, he did.
2 Q And what did he tell you?
3 A He said, why would we pay to tow your -- or why
4 would we pay you for the towing of your car?
5 Q Okay. And that was in response to your question
6 about --
7 A Will I get reimbursed, yes.
8 Q If you'd get reimbursed. Okay.
9 And what happened after that?
10 A I remember him finishing off reading the DL-26.
11 Q Um-hum.
12 A And I remember signing it, and then I remember
13 asking him for the names of all the officers involved.
14 And I remember him saying, Officer Hill. I said, Officer
15 Hill? And he's like, yeah, Officer Hill. And he made,
16 like, a hill with his hand. And then I didn't really
17 have to ask him his name because it was right there on
18 his uniform.
19 Q Okay. And you're saying he, as in Officer Ruff?
20 A Yes.
21 Q Yeah. And when you're saying, you know, he was
22 going through the DL-26 form, that's in relation to the
23 chemical --
24 A Yes.
25 Q -- blood testing?

Page 96

1 Okay. And so you signed that form?
2 A Yes.
3 Q Okay. So you consented to the blood testing?
4 A Yes.
5 Q And then did Officer Ruff tell you about any
6 other officers that were involved in the interaction that
7 you had just had on Chestnut Street?
8 A No. He just told me -- I asked him about the
9 other officer, Officer Hill, because Officer Dawson and
10 Officer Ruff are, of course, there still at the time
11 because they had just gotten done transporting me.
12 And --
13 Q Okay. So did -- was Officer Ruff in the
14 transport van?
15 A I don't -- I don't remember.
16 Q Okay. But he was at the booking center when you
17 arrived?
18 A Yes.
19 Q Okay. And so where was Officer Dawson during
20 this interaction?
21 A He was, I believe, at the front desk there
22 talking to the employees in the lobby of the judicial
23 center.
24 Q Okay. But he wasn't with you and Officer Ruff
25 when you were going over the chemical testing --

Page 97

1    A    That's correct.
2    Q    -- chemical blood testing?
3         Okay. And then -- so after you signed the form
4    to have the chemical blood testing done, what happened?
5    A    I believe there was a brief wait, at which time
6    I was taken back into this little, small area. There was
7    an African-American nurse there. I sat down in a chair
8    right beside -- to her -- it would have been her right;
9    and I put my one arm up on the -- it was like a vanity
10   there. And then I believe she started rubbing alcohol
11   and had me turn it up like this, started rubbing alcohol
12   on it, and then she started to draw blood.
13   Q    All right. So you're indicating that she was
14   rubbing, like, the inside of your elbow to take blood
15   when you had put your arm up?
16   A    Yes.
17   Q    Okay. Do you remember any interactions that you
18   had with the nurse during -- while she was drawing your
19   blood?
20   A    Yes.
21   Q    What do you remember?
22   A    I remember her joking at one point that she was
23   having trouble getting blood after she had already stuck
24   me and drew blood. And I remember her saying that, and I
25   remember Officer Ruff laughing about that. And that's

Page 98

1    all I really remember.
2    Q    Okay. So was Officer Ruff in the small area
3    that you were in when you were having your blood drawn?
4    A    Yes.
5    Q    Okay. And you said that the nurse made a joke
6    about having an issue drawing blood from you, correct?
7    A    Yes.
8    Q    Did she poke you multiple times with the needle
9    to take the blood?
10   A    Yes. I believe she did two vials.
11   Q    Okay. Two vials.
12        So she took two vials of blood?
13   A    Yes.
14   Q    Okay. And how many times did she stick, like, a
15   needle into your arm?
16   A    I don't remember.
17   Q    Okay. Was it more than two times?
18   A    I don't remember. I don't think --
19   Q    Okay.
20   A    I don't think so, but I don't remember.
21   Q    Okay. Other than her -- other than the nurse
22   making that joke, do you remember anything else about
23   that interaction?
24   A    With the nurse?
25   Q    Yeah. And when you were having your blood

Page 99

1    drawn?
2    A    No.
3    Q    Okay. Do you remember Officer Ruff saying
4    anything else?
5    A    No.
6    Q    Okay.
7    A    Not that I remember.
8    Q    All right. So after you had your blood drawn,
9    what happened?
10   A    They took me back out. I was escorted back out,
11   and I believe I was placed in a holding cell at that
12   time.
13   Q    Okay. And what happened while you were in the
14   holding cell?
15   A    I just remember sitting on a bench. It was a
16   long duration. I believe it was about four hours --
17   four, four and a half hours. I -- to briefly summarize
18   everything, I remember sitting on a bench there. At some
19   point I was in the holding cell with another
20   African-American guy. He was 18 years old. He was
21   actually in handcuffs and leg shackles.
22        And I remember briefly talking with him, talking
23   about my experience, and how I -- they had just made a
24   huge mistake. And I remember laying down. I was very,
25   very tired after a long day of working and it being in

Page 100

1    the early morning hours. I remember laying down and
2    trying to get some sleep there.
3         I remember at some point someone came and
4    knocked on the cell door and said, wake up. And then a
5    little bit of time passed. I'm not sure of the time. I
6    remember someone else coming to the door and pulling me
7    out at that point to go get fingerprinted.
8    Q    Okay. So when you were in the holding cell, you
9    indicated that the other individual in the cell with you
10   had, like, restraints on such as handcuffs?
11   A    Um-hum.
12   Q    And you stated that you didn't have handcuffs
13   on?
14   A    Correct.
15   Q    Okay. When were your handcuffs removed?
16   A    When I walked in the door and they searched me.
17   Q    Okay. And you stated at one point that you had,
18   like, leg shackles on?
19   A    Um-hum.
20        MR. JACOB: Yes or no?
21        MS. KRAMER: Yeah. We -- just verbalize it.
22        MR. JACOB: You need to give --
23        THE DEPONENT: Yes.
24   BY MS. KRAMER:
25   Q    And do you remember when they -- did they take

Page 101

1 that off at some point?
2 A No. I don't remember.
3 Q Okay.
4 A But it was on the majority of the night while I
5 was in the cell.
6 Q Okay. And can you describe the leg shackles for
7 me? Like, what material were they made out of?
8 A Metal.
9 Q Were they heavy?
10 A I guess a little bit. I mean --
11 Q Did they constrain your ability to walk?
12 A Yes. It limited my ability to walk.
13 Q How so?
14 A Well, I could -- I could only move my legs so
15 far apart --
16 Q Okay.
17 A -- because --
18 Q Is that, like, moving them forward and
19 backwards?
20 A Yes.
21 Q And side to side?
22 A Yes.
23 Q Okay.
24 A I could only -- I couldn't -- I wouldn't have
25 been able to move them far enough to run.

Page 102

1 Q Okay. And how were they attached to you?
2 A They were attached around my ankles.
3 Q Okay. So you had -- it was attached around each
4 ankle?
5 A Yes.
6 Q And then were they connected together?
7 A Yes.
8 Q By what?
9 A I don't know. A chain, it appeared to be.
10 Q Okay. All right. And do you know if you had
11 the leg shackles on when you had the blood test done?
12 A Yes.
13 Q Okay. And when you were in the holding cell
14 with the other individual, did you have the leg shackles
15 on?
16 A Yes.
17 Q Okay. All right. And then you said you were in
18 the holding cell for quite a while. You indicated around
19 four hours?
20 A Yes, around four, four and a half hours. I
21 don't know the exact time.
22 Q And were you in the holding cell for four and a
23 half hours uninterrupted?
24 A Yes.
25 Q Okay.

Page 103

1 A Well --
2 Q Well, go ahead. Sorry.
3 A Please elaborate on that, actually.
4 Q So I know you stated you went into the holding
5 cell and then you stated that at some point they pulled
6 you out of the cell to be fingerprinted. Was the period
7 between when you first entered the holding cell and when
8 you were fingerprinted, was that the four, four and a
9 half hours?
10 A No.
11 Q Okay. How much time do you think was between
12 that?
13 A I don't know.
14 Q Okay. But would you say you were in the holding
15 cell overall for four, four and a half hours?
16 A Yes.
17 Q Okay. During the course of that early morning
18 on June 28th, 2015?
19 A Yes.
20 Q Okay. And so you stated you were pulled out to
21 be fingerprinted. What happened with that? Can you just
22 explain? You said someone came to get you?
23 A Yes. Someone came and knocked on the door.
24 They escorted me straight across the lobby into what
25 appeared to be a little cubical area and then -- and they

Page 104

1 put my fingers in some solution or something there.
2 Q Okay.
3 A And then I had to do one finger --
4 Q Okay.
5 A -- roll it back and forth and then I had to do
6 the other finger and roll it back and forth and do each
7 finger and roll it back and forth. And I believe I did
8 both hands. And then at one point I remember asking the
9 name -- the young guy who was doing the fingerprinting, I
10 remember asking his name.
11 Q Um-hum, yeah.
12 A And he asked me what I needed his name for. And
13 I said, well, when I file the complaint out about the way
14 I was treated here. And he made the remark that I would
15 almost have to be killed before something would be done.
16 Q Okay. So you told him that you had the intent
17 to file some sort of complaint or --
18 A Um-hum.
19 Q -- lawsuit in relation to your treatment at the
20 booking center?
21 A A complaint -- a personnel complaint.
22 Q Oh, okay. A personnel complaint.
23 A Um-hum.
24 Q And then he told you in response that you would
25 have to have been killed for anything to be done?

Page 105

1  A   No. Correction. I would almost had to have
2  been killed --
3  Q   Okay.
4  A   -- for anything to be done.
5  Q   All right. And so did you intend to file a
6  personnel complaint against him?
7  A   After I got out?
8  Q   No. At that time when you --
9  A   No.
10  Q   Okay. Who did you intend to file a personnel
11  complaint against?
12  A   The members of the judicial center for the way
13  they had treated me that night, and it would have been
14  with their boss.
15  Q   Okay. And when you say the way that they
16  treated you that night, that includes the statements that
17  you indicated they said earlier about -- that you would
18  lose your job and that -- correct?
19  A   Yes.
20  Q   And then the other statement about -- that you
21  were refusing to have the chemical testing -- the
22  chemical blood test done?
23  A   Yes.
24  Q   And then the statement that -- and also
25  including the statement that the nurse had made to you?

Page 106

1  A   Yes.
2  Q   Okay. About having trouble getting blood from
3  you?
4  A   Yes.
5  Q   Was there any other treatment that I didn't just
6  describe that your complaint would have concerned?
7  A   At that time or after my stay?
8  Q   At that time.
9  A   Not that I remember.
10  Q   Okay. All right. And do you remember if when
11  you were being fingerprinted you still had the leg
12  shackles on?
13  A   Yes.
14  Q   Okay. And so after the man that made the
15  comment to -- the man who had been fingerprinting you
16  made that comment about you would have to just about have
17  been killed for anything to be done, what happened after
18  that?
19  A   Well, I was finished fingerprinting. This was
20  within the duration of the time I was being
21  fingerprinted. And then once I was fingerprinted, I
22  believe they gave me a chance to call someone to come get
23  me; and at that point I went -- I went on to call my mom
24  and she would -- to let her know. And I do remember
25  while I was on the phone, I was giving her the long story

Page 107

1  instead of the short of it and someone walked by me there
2  and said, make it quick; we don't need a sob story.
3  Q   Do you remember who the person was that made
4  that comment?
5  A   No.
6  Q   The person -- the guy that fingerprinted you, do
7  you remember if he was one of the individuals that made
8  any of the other comments towards you?
9  A   Yes. He was the young individual who made the
10  Hotel Hershey comment.
11  Q   So the man who fingerprinted you also was
12  the man who made the comment that you were going to lose
13  your job at Hotel Hershey?
14  A   Yes.
15  Q   Okay. And then you don't -- do you know who
16  made the comment to you about -- that they didn't need a
17  sob story?
18  A   No.
19  Q   Okay. Do you know if they were a man or a
20  woman?
21  A   Male.
22  Q   Male. Okay.
23      Did you see who the person was?
24  A   Yes. But I don't -- I -- I don't remember him.
25  Q   Okay. All right. No problem.

Page 108

1      I'm just going to direct you back to the
2  complaint, so that was identified as Brackbill 2. So we
3  have that document right there, and then just go to
4  page 6, paragraph 40.
5  A   Yes.
6  Q   Okay. And paragraph 40 reads, Calvin was held
7  in a locked cell for approximately four hours where he
8  was relentlessly teased by processing center personnel.
9      So did this statement relate to when you were at
10  the booking center?
11  A   Yes.
12  Q   And when it says relentlessly teased by
13  processing center personnel, do you believe that that's
14  an accurate description of how the processing personnel
15  treated you at the booking center?
16  A   Yes.
17  Q   Okay. So were you being -- were people making
18  comments to you while you were in the holding cell?
19  A   Yes.
20  Q   And what kind of comments were they making to
21  you?
22  A   As I said earlier, the one guy knocked on the
23  door and told me to wake up.
24  Q   Okay. So at one point when you were in the
25  holding cell, an individual came up to the door and told

Page 109

1  you to wake up?
2  A  Yeah. Because they said I was sleeping.
3  Q  Okay. Did they tell you you weren't allowed to
4  sleep?
5  A  No.
6  Q  Okay. And do you know how long you were in the
7  cell when the guy came up to the door and told you to
8  stop sleeping?
9  A  I don't remember.
10  Q  Was it -- were any other comments made to you
11  while you were in the holding cell?
12  A  I don't remember.
13  Q  Okay. Were there any other comments that we
14  didn't already go over that were made to you while you
15  were at the booking center that you felt was classified
16  as like teasing or harassing?
17  A  Yes.
18  Q  What else were those comments?
19  A  When I was escorted out of my cell toward the
20  end of the stay after my mom had arrived, the one young
21  kid who had escorted me down to the fingerprinting
22  station and had also made the comment about losing my job
23  at Hotel Hershey --
24  Q  Yeah.
25  A  -- he had said, have fun working at McDonald's.

Page 110

1  Q  Okay. And did you say anything in response to
2  that?
3  A  No.
4  Q  Were there any other comments made to you --
5  A  Yeah.
6  Q  -- that -- I'm sorry. What did you say?
7  A  I'm sorry. I interrupted you.
8  Q  Yeah. That's okay.
9      What -- were there any other comments that were
10  made to you while you were at the booking center?
11  A  Yes.
12  Q  And what were the other comments that were made
13  to you?
14  A  While I was doing my checkout paperwork, I
15  noticed I had to sign this paperwork stating I got my
16  belongings back; and I noticed before I actually signed
17  the bottom of it, it actually said, too intoxicated,
18  stating I was too intoxicated to sign, stating that I had
19  given them said belongings.
20      So when I questioned them about that, I said,
21  why does it say too intoxicated, the one older gentleman
22  said, shut up, man. Shut up while you're ahead. We're
23  letting you out early.
24  Q  Okay. So were there any other comments made to
25  you while you were at the judicial center?

Page 111

1  A  Not that I recall.
2  Q  All right. And so you said you called your
3  mom --
4  A  Um-hum.
5  Q  -- when you were at the judicial center. And
6  after you called her, did they tell you that you were
7  going to be able to be released?
8  A  Yes, once she arrived.
9  Q  Okay. Did she have to sign any paperwork or pay
10  anything for you to be released?
11  A  No.
12  Q  Okay. So they were going to let you go?
13  A  Yes.
14  Q  Okay. And how long did you wait for your mom to
15  come and get you at the booking center?
16  A  I don't know.
17  Q  When you were waiting for your mom to come and
18  pick you up, were you placed in the holding cell again?
19  A  Yes.
20  Q  Okay. And then -- so you said after your mom
21  arrived you were allowed to leave?
22  A  Yes.
23  Q  Okay. And then what happened after you were
24  released?
25  A  A nice younger guy escorted me out to the area,

Page 112

1  to the parking lot, and he stated once we were outside
2  the building that third shift was very rough. He was
3  like, and if I were you, I'd file a complaint against
4  them.
5  Q  Okay. And when you say a nice guy escorted you
6  out, was he another booking center employee?
7  A  Yes.
8  Q  Okay. And when he said that third shift is
9  rough, he was referring to the individuals that were on
10  duty during the time you were at the judicial center?
11  A  Yes.
12  Q  Okay. And so after you were escorted to the
13  parking lot, what happened after that?
14  A  My -- I went to my mom's car and got in.
15  Q  Okay. And where did you guys go from there?
16  A  We went back to Harrisburg city.
17  Q  And what was the purpose of that?
18  A  To get information on my car that was towed.
19  Q  Okay. And where did you go to get information
20  on your car?
21  A  We went to the Harrisburg Police Department.
22  Q  And what were you told there?
23  A  We had to wait in the lobby till a gentleman
24  came down. And then once the gentleman came down, we
25  asked about what happens when the car's towed, how do we

Page 113

1  go about getting it back, and he said he'd have to go
2  check to make sure there was a slip making sure it wasn't
3  a part of an investigation.
4       So he came back with that. I remember my mom
5  stating something to him like, don't they do field
6  sobriety tests down here when you get arrested?
7       And I remember explaining to him that one of the
8  officers that I remember was African-American and had an
9  earring in; and the gentleman, who also was
10  African-American, stated that there is no one here that
11  works -- there is no African-American police officer that
12  works here that has an earring in.
13  Q   Can you explain that? I guess I'm a little
14  confused. What -- you're saying -- who was the
15  individual that you spoke to with the earring?
16  A   The individual that I spoke to with the earring
17  was Officer Dawson.
18  Q   Oh, Officer Dawson from --
19  A   Correct.
20  Q   -- the interaction before?
21  A   Yes.
22       And I remembered mentioning that when -- after
23  we left the booking center, when we went to the
24  Harrisburg Police Department to go get my car, we had
25  talked to this gentleman who was also

Page 114

1  African-American -- and I do not remember -- I do not
2  know his name -- and we had -- my mom had inquired about,
3  don't they do standardized field sobriety tests down here
4  when someone gets arrested for a DUI?
5       And I don't remember his response to that, but I
6  mentioned about needing the name of an officer who was
7  involved in it, which now is known as Officer Dawson.
8  And I had mentioned that he had an earring, and this
9  gentleman at the window said, there is no
10  African-American police officer that works here with an
11  earring.
12  Q   Okay. All right. And so you observed Officer
13  Dawson wearing an earring --
14  A   Yes.
15  Q   -- during the June 28th, 2015 --
16  A   Yes.
17  Q   -- incident?
18  A   Yes.
19  Q   Okay. All right. And so when you got to the
20  Harrisburg Police Department, you said -- you mentioned
21  something about a towing slip?
22  A   Yes.
23  Q   Were you provided with that paperwork?
24  A   Yes.
25       MS. KRAMER: Okay. All right. So I'm providing

Page 115

1  you a document that can be marked as Brackbill 5, I
2  believe -- 4, Brackbill 4.
3       (Brackbill Exhibit Number 4 was marked for
4  identification.)
5  BY MS. KRAMER:
6  Q   And, Mr. Brackbill, can you tell me what this
7  document is?
8  A   This is the slip me and my mother went to the
9  Harrisburg Police Department to get to retrieve the towed
10  vehicle.
11  Q   And so you indicated that once you got this
12  slip, you would able to get your car?
13  A   Yes.
14  Q   Okay. And I see here it says cost/amount paid
15  on the document. Do you see that?
16  A   Yes.
17  Q   It states $10. What did that indicate?
18  A   That was the amount we had to pay to get this
19  slip to retrieve my car.
20  Q   Okay. And did you pay that amount?
21  A   Yes.
22  Q   All right. And then after you got this slip,
23  what did you do?
24  A   We went to Don's Towing to retrieve the car.
25       MS. KRAMER: All right. Okay. I'm also going

Page 116

1  to show you another document. This will be Brackbill 5.
2       THE DEPONENT: Thank you.
3       MR. JACOB: Thank you.
4       (Brackbill Exhibit Number 5 was marked for
5  identification.)
6  BY MS. KRAMER:
7  Q   Can you tell me what this document is?
8  A   This was the document that the Harrisburg police
9  gave me to state that I was picking up my car.
10  Q   Okay. So were you provided this document at the
11  Harrisburg Police Department when you got the towing slip
12  as well?
13  A   Yes.
14  Q   Okay. And is that your signature down there
15  below that dotted line?
16  A   Yes.
17  Q   Okay. And did you sign this when you were at
18  the Harrisburg police station on June 28th of 2015?
19  A   I don't remember.
20  Q   Okay. Another question I forgot to ask you is,
21  do you know what time it was when you actually left the
22  judicial center, like when you were released?
23  A   I don't remember.
24  Q   Was it the morning?
25  A   Yes.

Page 117

1  Q  Was it -- you don't know exactly what time it
2  was?
3  A  I don't remember.
4  Q  Okay. All right. But it was still June 28th,
5  2015?
6  A  Yes.
7  Q  Okay. All right. And then did you have to
8  present this document to Don's Towing?
9  A  I believe I had to present one document, yes.
10  I'm not sure which.
11  Q  Okay. If you see in the -- it's kind of like
12  the upper, middle right corner, somebody wrote, picked up
13  6/28/15, CS, and then there's like a little star?
14  A  A star.
15  Q  Do you know who wrote that?
16  A  I do not.
17  Q  Was this on the document when you received it?
18  A  No.
19  Q  Okay. And down where your signature line is, it
20  says, I hereby acknowledge receipt of the above vehicle
21  and promise to pay any charges which have been incurred.
22  Do you see that?
23  A  Yes.
24  Q  Okay. And so you agreed to that when you signed
25  this document?

Page 118

1  A  Yes.
2  Q  So what types of charges were incurred by
3  getting -- by the towing of your vehicle?
4  A  I incurred a towing charge and a storage charge.
5  Q  Do you know what the towing charge was?
6  A  I do not.
7  Q  Do you know what the storage charge was?
8  A  I do not.
9  Q  Did you pay those charges?
10  A  Yes.
11  Q  Okay. Did this also include the $10 fee that
12  you paid with the Harrisburg tow slip that you received?
13  A  Yes. That is part of the payment I had to
14  forfeit in order to receive my car.
15  Q  Okay. And when you paid the $10, how did you
16  pay that?
17  A  Cash.
18  Q  Okay. Do you remember how you paid for the --
19  the towing fee?
20  A  Cash.
21    MS. KRAMER: Okay. I'm going to show you
22  another document. This will be Brackbill 6.
23    MR. JACOB: Thank you.
24    (Brackbill Exhibit Number 6 was marked for
25  identification.)

Page 119

1  BY MS. KRAMER:
2  Q  All right. Mr. Brackbill, can you tell me what
3  this is?
4  A  This is the receipt from Don's Towing.
5  Q  Okay. And when did you receive this document?
6  A  After I paid for my car to -- after I paid for
7  the towing for my car and picked it up.
8  Q  Okay. And so I'm just going to go down the
9  document where it has a description of what you were
10  charged. Under line 2, it says, tow. And if you look
11  over --
12  A  Um-hum.
13  Q  -- it looks like it says $75. Do you have -- is
14  that -- do you believe that it cost $75 to have the car
15  towed?
16  A  Yes.
17  Q  Okay. And then if you go down to -- right below
18  that it says, storage -- or I feel like that's at least
19  what it's supposed to say -- it says $35?
20  A  Yes.
21  Q  And then is that the amount that you remember it
22  costing?
23  A  Yes.
24  Q  Okay. And then below that it says, City
25  surcharge. Do you remember being charged a City

Page 120

1  surcharge fee?
2  A  Yes.
3  Q  Okay. And then across from that it says $15.
4  Do you remember that being the City surcharge fee?
5  A  Yes.
6  Q  Okay. And so then the total below that it says,
7  $125. So is that what you paid on June 28, 2015, for the
8  towing of your vehicle?
9  A  Yes.
10  Q  And you said you paid that in cash?
11  A  Yes.
12  Q  Okay. All right. I think we're done with that
13  document.
14    All right. And so after you got -- once you saw
15  your vehicle when you were picking it up from the towing
16  place, do you remember what condition the car was in?
17  A  Yes.
18  Q  Can you describe what kind of condition the car
19  was in?
20  A  Please elaborate.
21  Q  Okay. When you first saw your car when you went
22  to pick it up, where was it?
23  A  On the back of the rollback.
24  Q  Okay. And in your opinion, did your car look as
25  it did, you know, earlier that day in the early hours



Page 121

1 when you had the interaction with the officers?
2 A Yes.
3 Q The outside looked the same?
4 A Yes.
5 Q Did the inside look the same?
6 A No.
7 Q What was different about the inside?
8 A Everything was ripped out of the glove box and
9 strewn around.
10 Q Okay. So you said -- when you say everything,
11 what does that include?
12 A I believe the vehicle's owner's manual, the
13 insurance card, and that's all I remember.
14 Q Okay. And as we discussed earlier, at some
15 point before, your bumper cover had become detached from
16 your car, correct?
17 A Um-hum.
18 Q At this point when you saw the car when you were
19 picking it up, what condition was the bumper cover in?
20 A The same condition it was when I had left it
21 there that night.
22 Q Okay. And you had re-attached it prior to when
23 it was towed?
24 A Just slipped it back up on the tabs.
25 MS. KRAMER: Okay. All right. I just have a

Page 122

1 few more documents for you to look at.
2 And if you need a break at all -- I mean, we've
3 been here for some time -- just let me know.
4 MR. JACOB: Yeah. A break would be good.
5 THE DEPONENT: Yeah. I'd like to take a break.
6 MS. KRAMER: Okay. No problem.
7 MR. JACOB: It's been about another hour so...
8 MS. KRAMER: Yeah.
9 (A recess was taken.)
10 MS. KRAMER: So -- all right. Here we go. I
11 have some more documents. Then this will be Brackbill 7.
12 MR. JACOB: Thank you.
13 (Brackbill Exhibit Number 7 was marked for
14 identification.)
15 BY MS. KRAMER:
16 Q All right. Mr. Brackbill, do you recognize
17 these documents? It's a few different images stapled
18 together.
19 A Yes.
20 Q Can you tell me what these are?
21 A These are pictures of the exterior and interior
22 of my car when it was on the back of Don's rollback after
23 it was towed.
24 Q Okay. So these were photos of your car when you
25 went to pick it up after you had been released from the

Page 123

1 booking center?
2 A Yes.
3 Q Okay. And so let's just focus on the first
4 image. And I guess -- so did you take all of these
5 pictures?
6 A Yes.
7 Q Okay. And how did you take these pictures?
8 A With an iPhone 6, I believe it was.
9 Q Okay. And just from glancing through this
10 packet, did you notice if you have any other pictures
11 that were not included in this packet?
12 A I do know there is a video I took of the
13 interior of the car.
14 Q Yep. Okay.
15 A I know there's that.
16 Q Yeah. I have -- I have the video.
17 All right. So on the first page, I just want
18 you to focus on the car there. So you said this is
19 essentially what the car looked like before you had been
20 arrested, correct?
21 A Correct, yes.
22 Q And I just want to -- right below the headlight
23 there, is kind of like that gap of, like, black area --
24 A Um-hum.
25 Q -- between I guess either the bumper or the

Page 124

1 bumper cover. What -- can you describe what that area is
2 right there?
3 MR. JACOB: I think you just did.
4 MS. KRAMER: Yeah.
5 BY MS. KRAMER:
6 Q I mean -- well, is that part of --
7 A I'm not sure.
8 Q I mean, is that -- because if you look at -- if
9 you go to the -- go to the third page in the packet.
10 A Um-hum.
11 Q That's, you know, the other side of the vehicle.
12 A Um-hum.
13 Q The front side of the vehicle.
14 A Yes.
15 Q Do you notice the difference between that third
16 image and the first image you looked at in the way that
17 the vehicle looks?
18 A Yes.
19 Q Okay. And I know that these are, you know,
20 different sides of the vehicle. If you're looking at it
21 face on, the first image is the right side of the
22 vehicle, and the third image is the left side of the
23 vehicle, correct?
24 A Um-hum, yes.
25 Q So, I mean, what do you notice that's different

**Page 125**

1 between the first image and the third image?
2    A  There's no gap in the image which shows the left
3 side of the vehicle, and then there is a gap on the
4 driver's side in the first image.
5    Q  Okay. So you said there is a gap; and when you
6 say there's a gap, where is there a gap?
7    A  At the front of the driver's side fender where
8 it meets the top of the bumper cover.
9    Q  Okay. And did that gap have anything to do with
10 how the bumper cover came loose that early morning?
11    A  Yes. It wasn't attached to the clips there.
12    Q  Okay. So this image shows that the bumper cover
13 isn't fully attached to the clips?
14    A  Yes.
15    Q  But it's attached partially?
16    A  Yes.
17    Q  Okay. And you had -- this is the condition that
18 the car was in after you adjusted it when you stopped
19 your car on Chestnut Street?
20    A  Yes.
21    Q  Okay. And when it was in this condition, was
22 the bumper cover -- would it have dragged on the surface
23 below the car?
24    A  Can you repeat that?
25    Q  As the car's depicted in the first page of

**Page 126**

1 Brackbill 7, would the bumper cover have dragged on the
2 ground below the car in this condition?
3    A  No.
4    Q  Okay. And can you -- I think on -- you can do
5 it on my picture, and then I can make a copy of this and
6 make it another exhibit, if you want. Can you just
7 circle on this image --
8        MR. JACOB: Do you want him to just do it on the
9 exhibit?
10       MS. KRAMER: Yeah, I guess he can just do it on
11 the exhibit, too.
12 BY MS. KRAMER:
13    Q  Well, actually, first, can you just, on your
14 picture, can you point for me where the bumper is versus
15 the bumper cover?
16    A  No, I can't, because the bumper's underneath the
17 bumper cover.
18    Q  Okay. So you can't see the bumper in this first
19 picture?
20    A  Correct, yes.
21    Q  Okay. Are there any pictures in this packet of
22 documents where you can see the bumper?
23    A  No.
24    Q  Okay. All right. So on the exhibit,
25 Brackbill 7, can you just circle the -- you can use my

**Page 127**

1 highlighter -- or I guess --
2       MS. KRAMER: Can we do the exhibits in color?
3       MR. JACOB: I have red.
4       MS. KRAMER: Okay. You have red.
5       MR. JACOB: I have red.
6       MS. KRAMER: I don't think that's -- will that
7 show up?
8       Yeah. I'm going to -- do you want to use my
9 highlighter? You can color in --
10      THE DEPONENT: Whatever you want.
11      MS. KRAMER: Color in where the bumper cover is
12 on the car.
13      THE DEPONENT: The bumper cover?
14      MS. KRAMER: Yeah. You don't have to be neat
15 about it.
16      MR. JACOB: Somebody go an A in kindergarten.
17      THE DEPONENT: There you go.
18      MS. KRAMER: Okay. Thank you.
19 BY MS. KRAMER:
20    Q  So there's an area right here that you didn't
21 cover. Do you see that, what I'm pointing out?
22    A  Yes.
23    Q  Did you intentionally not color that in?
24    A  Yes.
25    Q  Okay. So I'm pointing to a small area on the

**Page 128**

1 bumper cover that you left gray. It's like a long
2 rectangular -- like trapezoidal shape.
3    A  Yes.
4    Q  Why did you not color that in?
5    A  That's the reflector on the bumper cover.
6       MS. KRAMER: All right. Thank you. So
7 that's -- we Have that marked as Exhibit 7. And if you
8 want --
9       MR. JACOB: That's fine.
10      MS. KRAMER: -- if we could just make that one
11 in color.
12      All right. And then I just want to flip to
13 page --
14      MR. JACOB: Can I just see the results of his
15 work?
16      MS. KRAMER: Sure. Yeah. No problem.
17      MR. JACOB: Thanks.
18 BY MS. KRAMER:
19    Q  If you go to the fourth page in the packet,
20 it's -- at the bottom it's -- it has Brackbill
21 Plaintiff 0005. Do you see that?
22    A  Yes.
23    Q  Can you tell me what this image depicts?
24    A  This is a picture of the interior of my car
25 after it was towed while it was still on the rollback of

Page 129

1 Don's Towing.
2    Q    Okay. And you stated previously that they had,
3 you know, strewn a bunch of documents around the car. Is
4 this how the car was when the documents were strewn
5 around the car?
6    A    Yes, minus the iPhone, which was actually laying
7 on the passenger seat, which is what I used to photograph
8 these pictures from.
9    Q    Okay. And so is there anything else in this
10 image that you feel was out of place after you had gotten
11 the car?
12    A    As I mentioned, the registration, the car
13 manual.
14    Q    Okay. And so the registration that you're
15 indicating, that's the -- the envelope or piece of paper
16 that's on the seat, the driver's seat?
17    A    Yes.
18    Q    Okay. And then on the passenger seat,
19 there's -- that would be the manual?
20    A    Yes.
21    Q    Okay. The car manual.
22        And what is that paper bag on the passenger
23 seat?
24    A    I don't remember --
25    Q    Okay.

Page 130

1    A    -- what was in that.
2    Q    Okay. All right.
3        Okay. And then near the cup holder --
4    A    Um-hum.
5    Q    -- there's a rectangular object that looks like
6 it's for vitamins or something?
7    A    Yes.
8    Q    Is that the object that you stated had your
9 asthma medication in it?
10    A    Yes.
11    Q    Okay. All right. And so how -- all right. And
12 then let's go to the page after that. So this is the --
13 can you tell me what this is an image of?
14    A    This is a picture of the rear of my car while it
15 was on the exterior of the rollback at Don's Towing; and
16 to the right of the picture is Calvin, the tow truck
17 driver, that was present for the release of my car as
18 well as the towing of my car.
19    Q    Okay. Is there anything out of place in the way
20 that your car looks here?
21    A    No.
22    Q    Okay. If we look at your license plate, it
23 looks like you have a vanity plate; is that correct?
24    A    Yes.
25    Q    Okay. And your vanity plate says, DJ, and then

Page 131

1 it's your first name but just missing an I?
2    A    Yes.
3    Q    Is there a reason why you use the name DJ Calvn?
4    A    Yes.
5    Q    Are you a DJ?
6    A    Yes.
7    Q    Is that a form of income? Is that a form of
8 income for you?
9    A    Yes.
10    Q    Okay. So are you employed as a DJ?
11    A    I -- I am self-employed. I have a part-time
12 company. I do it -- a couple here or there.
13    Q    Okay.
14    A    Weddings.
15    Q    All right. So you just kind of do it on the
16 side?
17    A    Yes.
18    Q    All right. And do you still do that?
19    A    Yes.
20    Q    And you did that at the time of June 28th, 2015?
21    A    Yes. Yes.
22    Q    Okay. And how long have you been doing that?
23    A    Ten years.
24    Q    Okay. All right. And is that just like some
25 extra money that you earn, or is that like a primary

Page 132

1 source of income?
2    A    Extra money.
3    Q    Okay. All right. And so then if we could just
4 look at the last page in this packet, this looks like
5 it's a -- this is another picture of the interior of your
6 car, correct?
7    A    Yes.
8    Q    Is there anything that this image shows that the
9 other picture that we saw doesn't that you want to point
10 out?
11    A    No. It just -- I think it just goes a little
12 closer on the cup holder with a pair of sunglasses there
13 and Chapstick. I believe that's the only thing it goes a
14 little in depth on.
15    Q    Okay. All right. So then we'll just move on
16 from there. So after you got your car back and you had
17 been released, did you -- did anything else happen in
18 relation to this underlying incident?
19        Like, I know you stated you wanted to make a
20 complaint to -- about some of the booking department
21 employees? Did you do that?
22    A    Yes.
23    Q    Okay. And how did you do that?
24    A    I believe I first went to Ruby Doub. She was
25 Commissioner Jeff Haste's secretary.



Page 133

1 Q And do you remember when you communicated with
2 Ruby Doub?
3 A Are you looking for a date?
4 Q Yeah.
5 A I -- I don't know.
6 Q Okay. How did you first make contact with her?
7 Did you give her a call? Did you talk to her in person?
8 A I went in the Dauphin County building, right
9 down there on Second Street. I believe I asked the
10 security officer down there present when they search you
11 before you come in where you go regarding a complaint
12 against the judicial center, and I think he directed me
13 to a floor.
14 At that point I believe I talked to a secretary.
15 And she went and got Ruby, and she told me to sit and
16 wait. And then Ruby came out, sat with me on the couch,
17 and I filled a complaint out.
18 Q All right. And what happened after you filled
19 the complaint out?
20 A That day?
21 Q Yeah. Or, I mean, like, was anything done in
22 response to the complaint?
23 A Yes. I believe it was forwarded to Chief John
24 Goshert.
25 Q Okay.

Page 134

1 A And then at that point I believe John Goshert
2 reached out and gave me a call regarding the complaint,
3 said he would like to meet with me in person.
4 Q Okay. Was there any time between when you made
5 this complaint that you went back to the booking center?
6 A Yes.
7 Q Okay. And when was that?
8 A Actually, that was -- that was -- that was
9 prior -- prior to the complaint, the official complaint,
10 I believe. Yes. I originally went back to the booking
11 center to make the complaint there. At that point I was
12 met -- this was about a week after the incident, I
13 believe --
14 Q Okay.
15 A -- a couple days, a week after -- I was met by
16 Patrick McKenna.
17 Q Okay. And do you know what Patrick McKenna's
18 job title was?
19 A I -- I was under the impression he was the sole
20 supervisor for that facility.
21 Q Okay. And so when you went back to the booking
22 center like a week after you had been released --
23 A Um-hum.
24 Q -- when you went there, did you only speak to
25 Mr. McKenna?

Page 135

1 A Yes.
2 Q Okay. And what did you talk to Mr. McKenna
3 about?
4 A We didn't do a whole lot of talking. There was
5 actually a -- he met me at the front door. We went in,
6 walked in. Then we went into, like, one of the -- I
7 guess it's one of the courtrooms in the judicial center.
8 Q Okay.
9 A That's what I believe it is. We started
10 talking. I think we had gotten into a debate as to if I
11 could record him, and he said he would not permit me to
12 record him. At that point I said I would like to record
13 him. And at that point I believe I turned myself -- I
14 started -- started to record him.
15 At that point he -- he told me to leave the
16 building. I asked why I was being asked to leave the
17 building. He said because I would not lower my voice.
18 And then I continued to record him as we walked through
19 the lobby out into the outside exterior of the building.
20 And at one point he said to me that I will be cited for
21 videotaping him without his permission.
22 Q Okay. And so were you ever cited for
23 videotaping Mr. McKenna?
24 A No.
25 Q Okay. And you said you at one point got into a

Page 136

1 debate with Mr. McKenna about whether or not you could
2 record him, correct?
3 A Yes.
4 Q When you say debate, was it kind of like an
5 argument?
6 A No.
7 Q Well, why was it a debate and not an argument?
8 A Please elaborate.
9 Q When you say debate, what do you mean by that?
10 A We just went back and forth. As I said, we just
11 went back and forth, and I said that I was going to
12 record -- that I could record him. And he said he was
13 not giving me permission to record him, and we just went
14 back and forth over that subject. So I guess it was just
15 more back and forth than a debate.
16 Q Okay. Were -- was anyone raising their voice
17 during this debate?
18 A No. I was speaking in my normal voice, which is
19 loud, which is normally loud and --
20 Q Okay.
21 A Yeah.
22 Q Was he being loud or argumentative during the
23 debate?
24 A We were about the same level, actually.
25 Q Okay. Do you think you were being



Page 137

1  argumentative?
2  A   No.  I think we were both very firm.
3  Q   Okay.  Do you think that Mr. McKenna could have
4  thought that your firmness was being argumentative?
5  A   Possibly.
6  Q   Okay.  And you said that when -- essentially,
7  you guys were having a debate over whether you could
8  record him.  Why did you want to record Mr. McKenna?
9  A   To ensure he was telling the truth and hold him
10 accountable.
11 Q   Okay.  And why did you feel you needed to do
12 that?
13 A   Due to everything I went through at the booking
14 center, I just wanted to ensure that the full truth came
15 out and that...
16 Q   Okay.  And when you -- did you guys talk about
17 anything else about besides just whether or not you could
18 record him?  I mean, were you able to explain to him what
19 kind of complaint you wanted to make?
20 A   No.
21 Q   Okay.  So you never got into the substance of
22 your complaint?
23 A   Correct, yes.
24 Q   Okay.  But you told him that you wanted to make
25 a complaint?

Page 138

1  A   Yes.
2  Q   Okay.  Did you give him any information about
3  yourself?
4  A   Yes.
5  Q   And you didn't give him -- did you give him any
6  information about the June 28th, 2015 incident?
7  A   I believe just about the -- a very brief
8  overview of the incident.  I don't really know --
9  Q   Okay.
10 A   -- to be honest with you.
11 Q   All right.  Okay.  So I'm -- I mean, as you
12 said, you said you did eventually take a video of
13 Mr. McKenna on this day?
14 A   Yes.
15 Q   Okay.  So I'm going to play the video that I
16 believe to be the one that you took on that day.
17 A   Yes.
18     MS. KRAMER:  I don't know -- if we could go off
19 the record for one second.
20     (Discussion held off the record.)
21     MS. KRAMER:  Okay.  So I'm going to play this,
22 and I guess this will be Brackbill 8.  It can be a little
23 slow so...
24     (Brackbill Exhibit Number 8 was referenced but
25 was to be marked for identification at a later time.)

Page 139

1  BY MS. KRAMER:
2  Q   So, Mr. Brackbill, is this the video that you
3  took when you went down to the booking center, at least
4  from what you can tell from the first frame?
5  A   Yes.
6  Q   And you took this video on your cell phone?
7  A   Yes.
8     MR. JACOB:  Can we just say it's video file
9  7-2-15.MOV --
10    MS. KRAMER:  Yeah.
11    MR. JACOB:  -- and that you're going to retain
12 the original video, but we're marking it as an exhibit?
13 Is that what we decided?
14    MS. KRAMER:  Sure.  Yeah.  We can do that.
15    MR. JACOB:  Okay.  So that would Exhibit 8 then,
16 right?
17    MS. KRAMER:  Yes.  I think it's 7 -- oh, it was
18 8, yeah.  Okay.  Exhibit 8.
19 BY MS. KRAMER:
20 Q   And then so the title of this video, it says
21 7-2 -- 7-2-2015, is that related to the date when the
22 video was taken?
23 A   I -- without knowing when it was taken, I would
24 assume so, yes.
25 Q   Okay.

Page 140

1  A   It was a few days to a week after.
2  Q   Okay.  So you -- it's possible that this was
3  taken on July 2nd?
4  A   Yes.
5  Q   Okay.  All right.  So I'm going to just play the
6  video, and then we'll have it -- the audio transcribed.
7     MS. KRAMER:  Hopefully it's not too fast for
8  you.
9     (The court reporter interrupted.)
10    MR. JACOB:  Good luck.
11    (The following video was played:)
12    MR. BRACKBILL:  Why do I need to lower my voice?
13    MR. McKENNA:  Please leave the building.
14    MR. BRACKBILL:  Why do I need to lower my voice?
15    MR. McKENNA:  Please lower -- leave the
16 building.
17    MR. BRACKBILL:  Why do I need to lower -- lower
18 my voice?
19    MR. McKENNA:  Because you're being
20 disrespectful.
21    MR. BRACKBILL:  Okay.  So --
22    MR. McKENNA:  Just leave the building.
23    MR. BRACKBILL:  -- I just have a complaint to
24 file.
25    MR. McKENNA:  And that's -- (inaudible).



Page 141

1    MR. BRACKBILL: I just have a complaint to file
2  against one of your people.
3    MR. McKENNA: I have your name. You're going to
4  be charged with videotaping me --
5    MR. BRACKBILL: Okay.
6    MR. McKENNA: -- without permission.
7    MR. BRACKBILL: Okay.
8    MR. McKENNA: Please leave the building --
9  (inaudible).
10    MR. BRACKBILL: You're going -- you're a public
11  official.
12    (End of video.)
13  BY MS. KRAMER:
14    Q    All right. So was that -- that was the video
15  that you took when you went to the booking center?
16    A    Yes.
17    Q    Okay. And I think at the beginning of the video
18  there is someone asking, why do I need to lower my voice,
19  a few times. Would that individual be you?
20    A    Yes.
21    Q    And why were you asking that question?
22    A    He may have been telling me to lower my voice.
23  It may have been perceived that I was yelling, or
24  something, at him.
25    Q    All right. So you -- you're saying it was

Page 142

1  possible that it was -- that you were yelling during the
2  interaction --
3    MR. JACOB: Objection. That's not what he said.
4    MS. KRAMER: Okay.
5  BY MS. KRAMER:
6    Q    So you're saying that it could have been --
7  Mr. McKenna could have perceived your -- whatever you
8  were saying to him was yelling?
9    A    He could have perceived it that way, yes.
10    Q    Okay. And the other -- the individual that we
11  see in the video, is that Mr. McKenna?
12    A    Yes.
13    Q    And from watching the video, it sounded like
14  Mr. McKenna stated in response to your question, why am I
15  being recorded (sic), because you're being disrespectful.
16  Did you hear that?
17    A    Yes.
18    Q    Okay. So you heard Mr. McKenna say on the
19  video, because you're being disrespectful?
20    A    Yes.
21    Q    Okay. Do you remember him saying that to you on
22  that day?
23    A    Not really, but the video shows it.
24    Q    Okay. And were you being disrespectful when you
25  went to the booking center that day?

Page 143

1    A    No.
2    Q    Okay. Why do you think he said you were being
3  disrespectful?
4    MR. JACOB: Objection.
5  BY MS. KRAMER:
6    Q    Why do you think Mr. McKenna thought you were
7  being disrespectful on that day?
8    MR. JACOB: Objection. Calls for speculation.
9    MS. KRAMER: You can answer.
10    THE DEPONENT: He could have perceived that --
11  his perception of our interaction could have been
12  perceived as being disrespectful.
13  BY MS. KRAMER:
14    Q    Okay. And you stated that he could have
15  perceived that you were yelling, correct?
16    MR. JACOB: Objection.
17    THE DEPONENT: That he -- he could have
18  perceived it that way. I was not yelling at him.
19  BY MS. KRAMER:
20    Q    Okay. But did you raise your voice during the
21  interaction?
22    A    Like I said before, I'm a loud individual. When
23  I get excited, my voice does go loud. It's always been
24  that way. I was not yelling at Mr. McKenna that day.
25    Q    And do you feel that when you watch this video

Page 144

1  here today that you are acting reasonable in the video?
2    A    Yes.
3    Q    Do you feel that Mr. McKenna was acting
4  reasonable in the video?
5    A    Yes.
6    Q    Okay. All right. And then you said after this
7  interaction, you then made a complaint to Jeff Haste
8  through his secretary, Ruby Doub?
9    A    Yes.
10    Q    And at that point you were contacted by John
11  Goshert, who wanted to meet with you?
12    A    Yes.
13    Q    Okay. And then did you meet with him?
14    A    Yes.
15    Q    And what happened during that meeting?
16    A    We just talked about the overview. We talked
17  about the initial arrest just briefly, and then we talked
18  about the interaction mainly at the booking center.
19    Q    And what was the result of after having met with
20  Mr. Goshert and being interviewed by him?
21    A    Please elaborate.
22    Q    What happened with your complaint?
23    A    It -- it took a while. He was referring it to
24  the new person in charge of the judicial center, director
25  of the judicial center, I believe it was, which was



Page 145

1  Stanley Pleskonko; and they were in the process of -- I
2  believe something actually happened with Mr. McKenna. I
3  think he got asked to resign.
4      So they were in the process of filling his job
5  with Mr. Pleskonko, so it took a couple months until I
6  actually could meet with him. I think it was
7  mid-September. If my memory recalls right, it was
8  mid-September when I actually met with Pleskonko.
9  Q   All right. So you met with the new director?
10  A   Yes.
11  Q   That was -- and can you state his name again.
12  A   Stanley Pleskonko.
13  Q   Okay. Can you spell his last name for the court
14  reporter.
15  A   P --
16  Q   If you can.
17  A   P-L-E-S-K-O-N-K-O.
18  Q   Okay.
19      MR. JACOB:  Better than I would have done.
20  BY MS. KRAMER:
21  Q   And so the meeting you had with Mr. Pleskonko,
22  that was after the meeting you had with Mr. Goshert?
23  A   Yes.
24  Q   Okay. And do you know how much time was in
25  between those meetings?

Page 146

1  A   I believe it was -- it was a month and a half or
2  so. Like I said, if I remember correctly, it was
3  mid-September when I met with Pleskonko, and I believe it
4  was in July when I met with Goshert.
5  Q   Okay.
6  A   Sometime mid to end of July.
7  Q   Okay. And after you met with Pleskonko, what
8  happened with your complaint?
9  A   He sent me a letter in the -- via first-class
10  mail stating that all complaints are taken very seriously
11  here and the matter will be looked into and they couldn't
12  discuss because of, you know, personnel stuff.
13  Q   Okay. Did you ever get any sort of information
14  on the result of your complaint?
15  A   Yes.
16  Q   And when was that?
17  A   It was sometime following the complaint. I
18  don't know the exact date.
19  Q   When you say complaint, you are referring to the
20  complaint you filed with the booking center?
21  A   Yes.
22  Q   Or concerning the booking center?
23  A   Yes.
24  Q   Not your complaint in this lawsuit?
25  A   Yes.

Page 147

1  Q   Okay. And what did they end up -- what did they
2  end up concluding in regards to your complaint?
3  A   I never heard back the specifics because it was
4  a personnel issue. They said in the letter that it
5  was taken -- that matters like this were taken very
6  seriously and it will be looked into and addressed.
7  That's all I ever heard, and I left it be at that.
8  Q   Okay. But then through the course of this
9  lawsuit that you have right now against --
10  A   Um-hum.
11  Q   -- Harrisburg police officers, Ruff, Meik, and
12  Hill, did you eventually learn what happened with the
13  complaint that you made in regards to the Dauphin County
14  Judicial Center?
15  A   No.
16  Q   Okay. All right. And then you stated earlier
17  that you wanted to make a complaint about some of the
18  Harrisburg police officers, correct?
19  A   Yes.
20  Q   And did you follow up with that?
21  A   Yes.
22  Q   And what did you first do?
23  A   It was -- it was either a day or two after. I
24  had went to Chief Carter's office, and I told him I
25  wanted to make a complaint. I believe I came in with my

Page 148

1  time card of the week. I had my one manager print out a
2  time card, Kate Ensminger. She printed out that time
3  card, and I brought that to Chief Carter. And I told him
4  a brief overview. I don't remember all the specifics.
5      I gave him a brief overview and said that I was
6  falsely arrested for a DUI. I hadn't been drinking.
7  Here is my time slip to show when I got off. At that
8  point he said Captain Moody would be looking into it.
9  And I believe Captain Moody was in his office that day,
10  too. He came out and said something to me regarding it
11  and said that he'll look into it.
12      And -- and then Chief Carter -- I remember when
13  he went -- before -- like I said, I don't remember all
14  the specifics of the conversation --
15  Q   Yeah. M
16  A   -- it was so long ago -- but I do remember him
17  asking if he could keep that time slip. And I said, no,
18  and that my -- I would need to have that for my lawyer.
19  That was the only copy I had. So that was the first
20  occurrence.
21  Q   Okay. And when you mentioned that time slip,
22  was that the same document we looked at earlier that was
23  marked Brackbill 1?
24  A   No.
25  Q   So there was another time slip that you had in

Page 149

1 your possession?
2 A Yes.
3 Q And was that provided to us in discovery?
4 MR. JACOB: I thought so. If not, we will
5 provide it. It must --
6 MS. KRAMER: Yeah. I mean, I didn't see it.
7 MR. JACOB: I'm sorry. It may have been --
8 MS. KRAMER: That's okay.
9 MR. JACOB: It may have been an oversight.
10 MS. KRAMER: Yeah.
11 BY MS. KRAMER:
12 Q Okay. So that was a time card that --
13 A Um-hum.
14 Q Did that time card show the actual hours you
15 clocked in and clocked out that day?
16 A Yes, ma'am.
17 Q Okay. All right. So, yeah, if you can look for
18 that and make sure we get that, that would be great.
19 A Um-hum.
20 Q And so you said the time -- the first meeting
21 you had with Chief Carter, he essentially told you he was
22 going to look into the matter, correct?
23 A Yes. He was going to refer it to Captain Moody.
24 Q Okay. And then you said you spoke briefly with
25 Captain Moody that same day and he kind of, like, just

Page 150

1 popped his head in and said he'd look into it?
2 A Yeah.
3 Q Did you ever talk to Moody after that?
4 A Yes.
5 Q Did you meet with him in person?
6 A Yes.
7 Q Was that the next time you spoke to him?
8 A Yes.
9 Q And do you know when that was?
10 A A date?
11 Q Yeah, a date, I guess.
12 A I do not.
13 Q How many days was it after the initial meeting
14 you had with Chief Carter?
15 A I believe it was four or five, five or six,
16 roughly a week, less than a week after.
17 Q Okay. And what happened during your meeting
18 with Deputy Moody?
19 A I remember we had -- I came back and I asked him
20 if he had gotten the results of the blood test back yet
21 and if he had spoken to the officers, and he said he had
22 not had time to speak with the officers due to them being
23 on night shift because they were all night-shift
24 employees.
25 And he said that he's still looking into it, and

Page 151

1 I think it was just very brief like that. And he -- I
2 think he said something about sending me an e-mail. He
3 told me to send him an e-mail going forward, and I think
4 he may have said I should hear something back within
5 about a week or two.
6 Q Okay.
7 A And he said they'd e-mail me within a week or
8 two or something like that.
9 Q And these meetings with Carter and Moody,
10 they were all about your concerns with how the incident
11 that occurred on June 28th, 2015, was handled, correct?
12 A Yes.
13 Q Was there anything else he brought up in these
14 meetings?
15 A As far as?
16 Q I mean, besides just your concern over the
17 officers' conduct, was there anything else that you
18 brought up?
19 A I mentioned needing my DUI results.
20 Q Okay. And did they provide those to you?
21 A No.
22 Q Okay. Were you eventually provided those?
23 A After multiple attempts at speaking to the City
24 solicitor's assistant, yes.
25 Q Okay. And when you say your DUI results, you

Page 152

1 mean the chemical blood testing that was performed on you
2 at the booking center on June 28th, 2015?
3 A Yes.
4 Q Okay. And did you have any other meetings with
5 anyone associated with the Harrisburg Police Department
6 around the time you made your first complaint to Chief
7 Carter?
8 A As far as any other meetings with Moody or them?
9 Q Yeah. Or some -- another person. Did you have
10 any other meetings?
11 A Yes. I went to see Moody again. I had sent him
12 a couple of e-mails requesting my blood results like he
13 had asked. I sent him e-mails. And I hadn't heard back,
14 so I remember going in to see him again.
15 And I remember this time he wasn't available and
16 there was a guy who was the public relations guy. I
17 forget his name off the top of my head. He's since been
18 asked to resign for a criminal charge in another
19 jurisdiction. He was the public relations guy. I
20 remember asking to speak to Moody, and he was not in.
21 They had told me he was at some vigil, a candlelight
22 vigil for someone.
23 Q Okay.
24 A And so I remember walking back the hall and then
25 this -- this other guy, who I also spoke to very briefly



Page 153

1 before regarding my incident, he remembered -- he kind of
2 remembered my name. I remember him saying, Blackball.
3 And I -- I turned back and went in his office. He's
4 like, Black -- Blackball or something like that. And I
5 said, it's Brackbill.
6     And he's like, how are you doing? He was pretty
7 polite and respectful. I said, I'm just here to still
8 see about getting my blood alcohol results. And I
9 remember him -- I vaguely remember him walking me down
10 the hall to Moody's office. And I think that's when he
11 confirmed that Moody wasn't in.
12     Well, we were there doing a little chitchat out
13 in the hall --
14   Q   Okay.
15   A   -- and sure enough back through the door, Deric
16 Moody, he walked through his door from his office there
17 where his secretary's sitting, walked through the door.
18 And then I believe at the time there were some steps
19 there in that building.
20   Q   Okay.
21   A   He kept walking. He -- and I -- I had -- while
22 he was walking, I asked him, I said, did you receive my
23 blood work results yet? And that's when he told me -- he
24 was like, I told you what to do, and he kept on walking.
25     MR. JACOB: Off the record a minute.

Page 154

1     (Discussion held off the record.)
2 BY MS. KRAMER:
3   Q   Okay. So when you went in for that meeting that
4 you had with the guy you said was -- had something to do
5 with the public relations with the police department --
6   A   Um-hum.
7   Q   -- was that before or after you had sent Deputy
8 Moody those e-mails that you mentioned?
9   A   I didn't really have a meeting with him. I ran
10 into him up there. I think it was -- it was tied with
11 one of those first two meetings, probably the second
12 meeting with Captain Moody.
13     And that's when, like I said, I just talked to
14 him briefly, told him -- I think I told him my story, and
15 I think he -- I think I said something about, I feel like
16 there's a cover-up going on here. And he said, I can
17 assure there's no cover-up going on here and --
18   Q   And when you're saying he, you're referring to
19 the guy -- you can't remember his name, but you said he
20 had some sort of public relations position?
21   A   He was the public relations guy, yes.
22   Q   Okay. And so you told him that you thought
23 there was a cover-up in relation to your arrest?
24   A   Yes.
25   Q   Okay. And when you say -- when you said

Page 155

1 cover-up, what did you mean by that, like who was doing
2 the cover-up and --
3   A   I had felt like the Harrisburg police were just
4 trying to cover -- cover this up and forget about it.
5 They weren't willing to provide me my DUI results. I
6 believe they came back within a couple weeks.
7   Q   Okay.
8   A   I had to go back multiple times and stuff.
9   Q   Okay. Do you have any idea why you thought
10 there was a cover-up that was going on?
11   A   Yes.
12   Q   And what was that?
13   A   Because I was not getting the results for my DUI
14 back.
15   Q   Okay.
16   A   And I was not getting cooperation from the
17 chief.
18   Q   Okay.
19   A   Or the captain.
20   Q   Did you think there was any sort of intent, like
21 bad intent behind that?
22   A   Yes.
23   Q   And what was that?
24   A   I felt like they were trying to swipe this under
25 the rug because I was not drinking and they just wanted

Page 156

1 to swipe it under the rug.
2   Q   Okay. Did you think that maybe some of the
3 delay was just that they were busy?
4   A   It could be possible.
5     MS. KRAMER: Okay. It could be possible.
6     All right. Okay. I'm just going to direct you
7 to another document.
8     Here you go.
9     All right. This will be Brackbill 9.
10     MR. JACOB: Yes.
11     (Brackbill Exhibit Number 9 was marked for
12 identification.)
13 BY MS. KRAMER:
14   Q   Mr. Brackbill, do you know what these documents
15 are?
16   A   Yes.
17   Q   And what is this?
18   A   This is the answers to the interrogatories.
19   Q   And when you say interrogatories, whose
20 interrogatories were they?
21   A   Mine.
22   Q   Okay. But were the -- they were, like, answers
23 to the interrogatories. Who -- who issued the
24 interrogatories?
25   A   Could you please elaborate.



Page 157

1  Q  Who sent you the interrogatories?
2  A  My attorney.
3  Q  Okay. But do you have any understanding of who
4  was asking, like, the questions?
5  A  Yes. It was the attorney for the defendants.
6  Q  Okay. So that would be my office?
7  A  Yes.
8  Q  Yeah. And if you could just go to the last page
9  of this packet, can you -- this is titled a verification.
10  Do you remember seeing this before?
11  A  Yes.
12  Q  Okay. And is that your signature at the bottom?
13  A  It's my signature signed electronically from
14  DocuSign.
15  Q  Okay. And so do you understand why you signed
16  this verification?
17  A  Yes.
18  Q  And why is that?
19  A  To certify that everything was true to the
20  best -- true and correct, factually correct, to the best
21  of my knowledge.
22  Q  Okay. And is it your belief that the answers in
23  these interrogatories are true, to the best of your
24  knowledge?
25  A  Yes.

Page 158

1  Q  Okay. All right. I'm just going to direct you
2  to -- if you could go to the interrogatory number 2.
3  A  Sure.
4  Q  And I believe that starts on page 2. And the
5  question that it reads is, if you know of anyone that has
6  given any statement as defined by the Federal Rules of
7  Civil Procedure concerning this action or its subject
8  matter, state, A, the identity of such person; B, when,
9  where, by whom, and to whom each statement was made and
10  whether it was reduced to writing or otherwise recorded;
11  and C, the identity of any person who has custody of any
12  such statement that was reduced to writing or otherwise
13  recorded.
14      Okay. So if we go then on to page 3 where the
15  answer to this interrogatory is continued, at the top it
16  states, Brackbill met with Deputy Chief, Deric Moody;
17  Chief of Police, Thomas Carter; and David Botero, former
18  Harrisburg Community Policing Coordinator, regarding his
19  complaint.
20      Did I read that correctly?
21  A  Yes, that's correct.
22  Q  And are those the individuals that we were
23  talking about before who you met with in regards to the
24  complaint you made with the Harrisburg Police Department?
25  A  Yes.

Page 159

1  Q  Okay. And is David Botero the individual that
2  you identified as the public relations person?
3  A  Yes.
4  Q  And you indicated that you thought he'd been
5  removed from his position?
6  A  Yes.
7  Q  And why do you believe that?
8  A  I read an article on PennLive.
9  Q  Okay. And do you know -- you said it was
10  because he got a criminal charge?
11  A  Yes.
12  Q  Do you know how that criminal charge -- what the
13  result of that was? Do you know what the result of that
14  criminal charge was?
15  A  Please elaborate.
16  Q  Do you know what the result was of the criminal
17  charge that you read that Mr. Botero received?
18  A  As far as if he was guilty or not guilty?
19  Q  Yes.
20  A  No.
21  Q  Okay. All right. Again, you said when you went
22  into the police department, when you spoke with
23  Mr. Botero, you were told that Deputy Moody was not at --
24  in the office at that time?
25  A  Yes.

Page 160

1  Q  And you were told that he was to be attending a
2  vigil?
3  A  Yes, a vigil for someone.
4  Q  Okay. And you stated that you saw him in the
5  office that same day?
6  A  Yes. That same day me and Mr. Botero actually
7  went to -- walked down to his office, the door where
8  Chief Carter and the captain's office is at. And then he
9  actually -- we started talking, and Captain Moody ended
10  up coming out. And like I said before, I asked him about
11  my blood results. And he told me, I told you what to do,
12  and kept on walking --
13  Q  Okay.
14  A  -- referring to send him an e-mail.
15  Q  All right. And when you just said that he said,
16  I told you what to do, you believe that to be him
17  referring to sending him an e-mail?
18  A  Yes.
19  Q  Okay. And you said he was walking out of his
20  office, correct?
21  A  Yes.
22  Q  So isn't it possible he was going to the vigil
23  at that point?
24  A  Yes.
25  Q  Okay.



Page 161

1　A　Absolutely.
2　Q　All right. And then going back to your blood
3　alcohol test results --
4　A　Um-hum.
5　Q　-- when -- you said you did finally get them
6　back at some point, correct?
7　A　Yes. After multiple attempts and different
8　agencies.
9　Q　Do you remember when you received those results?
10　A　I believe it was the -- I was finishing my last
11　semester at Penn State Harrisburg. I believe it was one
12　of the first few days there, so it would have been like
13　the last week of August or --
14　Q　Okay. And that would be August of 2015?
15　A　Yes.
16　Q　And you said that in order to get these results,
17　you reached out to multiple individuals and multiple
18　entities within the City, correct?
19　A　Yes.
20　Q　Okay. So you -- you went to Deputy Moody,
21　correct?
22　A　Yes.
23　Q　Who else did you go to?
24　A　I went -- as far as getting my blood results?
25　Q　Yes.

Page 162

1　A　I went -- I e-mailed Brownsweiger a
2　Right-to-Know request. And I actually believe I went to
3　the City solicitor's office and I got a Right-to-Know
4　request form and I filled that out and mailed it in.
5　Q　Okay.
6　A　And I believe I went back to the chief's office
7　one last time to see if he was in.
8　Q　Okay. And what happened when you went in to try
9　and talk to the chief?
10　A　The final time?
11　Q　Yes.
12　A　I was talking to his secretary, and his
13　secretary told me that I had to relay all the information
14　to Sergeant Laura Green, who was filling in for the
15　captain at the time. And at that point I didn't wish to
16　speak with someone lower because the chief was already
17　aware of it. I mean, it sometimes becomes redundant to
18　have to tell your story over and over again, you know.
19　Q　Um-hum.
20　A　So I didn't want to have to go -- at this point
21　we're very into it now. We're about over a month into
22　it, so I didn't want to have to tell my story again. And
23　the chief's secretary was insisting that I tell the story
24　to Laura Green. And that's when I was like, I'm not
25　telling the story.

Page 163

1　And at that point we had a -- we had a meeting.
2　Then she came -- or we briefly spoke, and she came out
3　and asked me to leave. And I asked her, why am I being
4　asked to leave? And she said I was yelling at the
5　secretaries. And I told her I'm not yelling at the
6　secretaries.
7　And she said -- she asked me, am I refusing to
8　leave? And I said, no. She said, please come out into
9　the hall. We went out into the hall. She got my
10　information. And then -- then she went and got my
11　information. At this point I was videotaping her. And
12　she got my information and then she told me she'd follow
13　up with me. I received a call probably, if I had to
14　guess, about an hour and a half later on the phone.
15　Q　Um-hum.
16　A　It was in the form of a voice mail. She left a
17　voice mail for me stating to give her a call back here.
18　And I did give her a call back, and she told me that I
19　need to disclose everything that happened to her before I
20　could speak to the chief. Once again, like I just
21　explained, I was not going to go through everything
22　again. At this point we're over a month in.
23　Q　Okay.
24　A　It's a lot of information to go through. So
25　I -- I told her that. And she's like, well,

Page 164

1　Mr. Brackbill, if you don't tell me, I can't schedule an
2　appointment with the chief. And I told her I was not
3　going to tell her.
4　And -- well, she said, at this point, if you
5　come back to the chief's office, you'll be arrested for
6　trespassing. So I remember at that point I was just -- I
7　was a little frustrated that no one wanted to help me
8　here, so I do remember hanging up on her.
9　Q　Okay. So let's go back a little bit. You said
10　that when you had the interaction with Laura Green --
11　Sergeant Laura Green, that was the last attempt you made
12　to talk to Chief Carter, correct?
13　A　Yes.
14　Q　Was there any other attempt that you made
15　between that and the first meeting you had with Chief
16　Carter?
17　A　Not that I know. There could possibly have been
18　another one. I remember at least back and forth between the
19　judicial center, the Dauphin County building, and the
20　Harrisburg police building numerous times in that month.
21　It was quite a bit. So there could possibly have been a
22　fifth meeting. It's possible.
23　Q　Okay. And when you say the Dauphin County
24　building, you mean the Dauphin County, like, government,
25　township building over on 2nd Street?

Page 165

1    A  Yes.
2    Q  Okay. The -- okay.
3        And did you send any other e-mails besides -- to
4  anyone else within the City besides what you've already
5  laid out or any other requests or anything like that?
6    A  Yes, I did. I e-mailed Deric Moody a couple
7  times like he requested. That's what --
8    Q  Um-hum.
9    A  I -- I followed his instructions when he asked
10  me to send an e-mail. I never heard anything back from
11  him. I did -- at one point I was frustrated not hearing
12  anything. I ended up sending an e-mail to the mayor
13  requesting a meeting, Eric Papenfuse. And then other
14  than that final Right-to-Know request which came back
15  denied, I had not -- I had not sent any other e-mails.
16    Q  Okay.
17    A  That I know of.
18        MS. KRAMER: I'm just going to show you some
19  documents related to some of that stuff we were just
20  talking about.
21        MR. JACOB: Let's go off the record.
22        (Discussion held off the record.)
23        MS. KRAMER: Let's go back on the record.
24        All right. I'm just showing you this -- the
25  documents.

Page 166

1        Here you go.
2        All right. So we'll mark this as Brackbill 10,
3  I believe.
4        (Brackbill Exhibit Number 10 was marked for
5  identification.)
6  BY MS. KRAMER:
7    Q  Mr. Brackbill, do you know what this document
8  is?
9    A  Yes.
10    Q  Can you tell me what it is?
11    A  These are the three e-mails I sent to Deric
12  Moody, as he requested, requesting my DUI results, my
13  blood results.
14    Q  Okay. And are these the only e-mails you
15  remember sending him?
16    A  Yes.
17    Q  Okay.
18    A  I think, yeah.
19    Q  All right. And do you remember if you told
20  him -- you sent these e-mails -- in relation to the
21  meetings you were talking about, when were these e-mails
22  sent?
23    A  This one here, the first one was definitely
24  sent -- definitely sent after I believe the -- I don't
25  remember, to be honest with you.

Page 167

1    Q  Okay. So you don't know if these were sent --
2    A  One of these were sent on the same day. And I
3  didn't hear back, so I sent another one.
4    Q  Okay.
5    A  And the next one, it was sent the next day.
6    Q  Okay. Do you -- so you don't know if these
7  e-mails were sent before or after you saw Mr. -- I mean
8  Deputy Moody at the police department when you were
9  talking with Mr. Botero?
10    A  I would say -- I would say these were sent
11  definitely after the one meeting. I did talk to him, and
12  he said, send me an e-mail.
13    Q  Okay. All right. And then if we look at the
14  first page, you said this one was sent -- well, look at
15  the date. It says -- in the top right corner it says
16  July 13th, 2015, at 5:13 p.m.; is that correct?
17    A  Yes.
18    Q  And do you have any other reason to believe that
19  that's when this e-mail was sent?
20    A  No. No. That's when it was sent.
21    Q  And it says it was sent at 5:13 p.m., and then
22  the second e-mail you sent is on the second page,
23  correct?
24    A  Yes. That was a follow-up e-mail to this one,
25  probably stating more information that, looking back, I

Page 168

1  should have probably included in this first one.
2    Q  Okay. And those were sent on the same day,
3  correct?
4    A  Yes. And the second e-mail was sent at 11 p.m.
5  that same day, correct?
6    A  Yes.
7    Q  And in that e-mail, you wrote, I do not -- if I
8  do not hear back from you by noon on Wednesday, which is
9  more than enough time to come up with the requested
10  information, I will stop by the chief's office to see
11  what the holdup is. I will continue to do so until I
12  have received the requested information.
13        Do you remember when Wednesday was in relation
14  to this e-mail?
15    A  No, I do not.
16    Q  Okay. Let's go to the last page where it's --
17  the last e-mail, and that's dated July 14th, 2015,
18  correct?
19    A  Yes.
20    Q  And that was sent at 5:18 p.m., right?
21    A  Yes. Over a whole day later from the first
22  e-mail.
23    Q  Okay. And it says, here is the second e-mail
24  I'm sending you requesting that you provide me with the
25  results of my BAC test. Is that what it says?



Page 169

1   A   Yes.
2   Q   Okay. And --
3        MR. JACOB:  Counsel, we'll just stipulate that
4   every single document that has writing on it says what it
5   says, to maybe speed this along.
6        MS. KRAMER:  Okay. Well -- all right. I won't
7   get into the writing of these documents.
8   BY MS. KRAMER:
9   Q   But so is it your feeling that you should have
10  gotten a response between July 13th, 2015, and July 14th,
11  2015, from Deputy Moody?
12  A   Yes.
13  Q   You thought a day was a reasonable turnaround
14  time?
15  A   Yes.
16       MS. KRAMER:  Okay. All right. Moving on to the
17  next document. I'm sorry. I'm just trying to -- okay.
18  I'll give you this document. Sorry.
19       MR. JACOB:  That's all right.
20       MS. KRAMER:  And then this will be Brackbill 11.
21       (Brackbill Exhibit Number 11 was marked for
22  identification.)
23  BY ATTORNEY:
24  Q   And then, Mr. Brackbill, can you tell me what
25  this is?

Page 170

1   A   This is my e-mail to the mayor of Harrisburg
2   stating that I would like to schedule a meeting with him
3   to discuss this ongoing issue that has been going on
4   for --
5   Q   Okay.
6   A   -- over a month now.
7   Q   All right. And then the date on this e-mail is
8   July 31st, 2015, at 11:44 a.m., correct?
9   A   Yes.
10  Q   Did you ever get a response to this e-mail?
11  A   No.
12  Q   Okay. So you never had a meeting with the
13  mayor?
14  A   No.
15  Q   And you never discussed your complaint with the
16  mayor?
17  A   Yes, that's correct.
18       MS. KRAMER:  All right. Moving on. I'll give
19  you this document.
20       MR. JACOB:  Thank you.
21       MS. KRAMER:  And then this will be Brackbill 12.
22       (Brackbill Exhibit Number 12 was marked for
23  identification.)
24  BY MS. KRAMER:
25  Q   This is a packet of e-mails. Can you tell me

Page 171

1   what these documents are?
2   A   Sure. These are the documents -- these are the
3   e-mails between me and Michael Brownsweiger, the
4   assistant to the City solicitor, stating about getting my
5   blood results.
6   Q   Okay. And the first e-mail in this e-mail
7   chain, I believe it starts on July 14th, 2015; is that
8   correct? You --
9   A   Yeah. It looks like 7:59 a.m. is when he
10  responded to me. I believe I actually filled out the
11  Right-to-Know a little earlier.
12  Q   Oh, okay. So you had sent him the Right-to-Know
13  request?
14  A   Correct.
15  Q   This e-mail was in response to that?
16  A   Correct.
17  Q   And then there's a chain conversation between
18  you and him over your Right-to-Know request, correct?
19  A   Yes.
20  Q   And your Right-to-Know request, that pertains to
21  getting the -- what information were you seeking?
22  A   The blood alcohol content results.
23  Q   Okay. And did you eventually get the results
24  from Mr. Brownsweiger?
25  A   Yes. As you can see here on Tuesday,

Page 172

1   August 25th, which is almost two months after my arrest,
2   I finally received the results.
3   Q   Okay. And did you receive any sort of
4   explanation for why there was a delay in you getting the
5   results?
6   A   No.
7   Q   Okay. All right. Did you get a response
8   from -- in response to your Right-to-Know request?
9   A   Yes. But there was never a -- never an
10  explanation as to why I didn't.
11       MS. KRAMER:  Okay. All right. I'm just going
12  to pass you this document.
13       THE DEPONENT:  This -- this is the second one.
14       MS. KRAMER:  This is Brackbill 13.
15       (Brackbill Exhibit Number 13 was marked for
16  identification.)
17  BY MS. KRAMER:
18  Q   Okay. And you started to kind of describe this
19  document. Can you tell me what it is?
20  A   Yes. I was confused with this Right-to-Know
21  request here sent via their online center versus the one
22  I filled out after I went to the judicial -- or after I
23  went to the City center and got a form and actually
24  mailed it in. So this document you just handed me is the
25  response from the office of the City solicitor regarding

Page 173

1 my second Right-to-Know request for my blood results.

2 Q Okay. And this would be their response,

3 correct?

4 A Yes.

5 Q And in this response does it indicate that they

6 are denying your Right-to-Know request?

7 A Yes.

8 Q And so this would be a response to your

9 inquiries about your -- your wanting to know the results

10 of the blood alcohol --

11 A Um-hum.

12 Q -- test, correct?

13 A Yes.

14 Q And from looking at this document, why did they

15 deny your Right-to-Know request?

16 A I don't know.

17 Q Okay. So it states in the document that it's

18 being denied under Section 708, Exceptions for Public

19 Records, and then it says 16(ii), a record of an agency

20 relating to or resulting in a criminal investigation,

21 including investigative materials, notes, correspondence,

22 videos and reports.

23 Do you remember reading that?

24 A Yes.

25 Q Do you know what that meant?

Page 174

1 A Yes.

2 Q And what does that mean?

3 A It means you cannot get any documents that are

4 related to a criminal investigation or videos such that

5 relate to a criminal investigation.

6 Q And did your blood alcohol test result relate to

7 a criminal investigation?

8 A No.

9 Q And why do you say that?

10 A Because I was not drinking and driving. I was

11 not under the influence. There was no investigation

12 going on.

13 Q Okay. Did you ever receive charges from the

14 June 28th, 2015 incident?

15 A Relating to?

16 Q Did you receive criminal charges from your

17 arrest on June 28th, 2015?

18 A No.

19 Q You didn't receive any criminal charges?

20 A No.

21 Q Did you receive any citation?

22 A Yes.

23 Q Okay. And so do you think that this denial may

24 refer to the investigation related to those citations?

25 A No.

Page 175

1 Q Okay. All right. And so you indicated you were

2 given citations in relation to your June 28th, 2015

3 arrest, correct?

4 A Yes, two traffic citations.

5 Q And what were those citations?

6 A They were two traffic citations. One was for

7 failure to have insurance, and another one was for

8 operating a vehicle with unsafe equipment.

9 Q Okay. Did you have to pay any sort of fine in

10 relation to those citations?

11 A Yes.

12 Q Do you remember how much they were?

13 A Yes.

14 Q How much were they?

15 A I paid $50 collateral for my hearing on the two

16 of them.

17 Q Okay. So you only paid the $50 collateral for

18 the initial hearing on both citations?

19 A Yes.

20 Q And that was a hearing in front of the

21 magisterial district justice, correct?

22 A Yes.

23 MS. KRAMER: Okay. All right. I'm just going

24 to bring -- I'll show you this document.

25 MR. JACOB: Counsel, just so we're complete,

Page 176

1 there's a -- there was an appeal fee, too. That's my

2 understanding.

3 MS. KRAMER: Yeah, I know.

4 MR. JACOB: I just wanted to make sure you're

5 aware of it.

6 MS. KRAMER: All right. This will be

7 Brackbill 14.

8 (Brackbill Exhibit Number 14 was marked for

9 identification.)

10 BY MS. KRAMER:

11 Q Mr. Brackbill, can you tell me what these are?

12 A Okay. These are the citations and summary that

13 were issued to me after 30 days of our interaction -- my

14 interaction. The first citation is for operating a

15 vehicle --

16 Q Okay. And so you said you received these 30

17 days after your arrest?

18 A Yes. It was roughly 30 -- over 30 days

19 actually.

20 Q Okay. And so on the first page of this

21 document -- this is the one citation. You said this is

22 for the insurance citation, the last --

23 A Yes, the insurance citation.

24 Q Okay.

25 A Yep.



Page 177

1 Q And so on the right-hand side in the middle, it
2 says, total due, at the bottom. It says $403.98. Do you
3 see that there?
4 A Yes.
5 Q And so you didn't have to pay that amount since
6 you went to the hearing in front of the magisterial
7 district justice, correct?
8 A Yes.
9 Q And you never paid that amount, correct?
10 A Yes.
11 Q Okay. Moving on to the next page, this is the
12 other citation, correct?
13 A Yes.
14 Q And you said this had to -- what does this one
15 have to do with?
16 A This one had to do with the bumper not being the
17 way it was -- he states, the bumper strength and mounting
18 must be that of original design.
19 Q Okay. And if we look over on the right middle
20 side, there is a list of fees. And then it says, total
21 due, $90.48. You didn't have to pay that, correct?
22 A No.
23 Q And you never paid that?
24 A No.
25 Q All right. That was easy enough.

Page 178

1 MR. JACOB: You want to keep going or take a
2 break? It's up to you. I'm fine. We could have
3 been --
4 THE DEPONENT: We can keep going.
5 MR. JACOB: Okay. I just wanted to make sure
6 because I could see you rubbing your head and --
7 THE DEPONENT: I'm good.
8 MS. KRAMER: I mean, it's up to you. If you
9 want me to figure out -- what do you want to do with the
10 depositions for the afternoon?
11 MR. JACOB: Yeah. I want to conduct the
12 depositions. I agreed to that schedule at your request
13 because of their schedule so -- as a courtesy. I've also
14 now pushed them at your request but -- plow forward, I
15 guess.
16 BY MS. KRAMER:
17 Q Okay. All right. And so in relation to the
18 citation you got for lack of insurance, on the day of
19 June 28th, 2015, did you ever present officers with proof
20 of insurance for your car?
21 A No. I was never asked.
22 Q Okay. So you say you were never asked?
23 A Yes.
24 Q Did you ever offer to show the insurance to
25 them?

Page 179

1 A I did not know I was -- it happened so quickly.
2 They were so adamant on arresting me for the DUI that
3 they never asked me. And I never would have -- it was in
4 the glove box; so I would have assumed that -- that's
5 assuming -- but I would have -- they should have checked
6 that.
7 Q Okay. So you're saying that your proof of
8 insurance card was in your glove box on June 28th, 2015?
9 A Yes.
10 Q And was that a -- and so you did have insurance
11 for your car at that time?
12 A Yes.
13 Q And who did you have insurance with?
14 A Allstate.
15 MS. KRAMER: This will be Brackbill 15.
16 (Brackbill Exhibit Number 15 was marked for
17 identification.)
18 BY MS. KRAMER:
19 Q Okay. And, Mr. Brackbill, can you tell me what
20 this is?
21 A This is my insurance card from Allstate stating
22 I have proof of insurance on my 2004 BMW 325ci.
23 Q So was this the insurance that you had at the
24 time of the June 28th, 2015 incident?
25 A Yes.

Page 180

1 Q And if we look there, it says, effective date,
2 March 17th, 2015, correct?
3 A Yes.
4 Q And expiration date of September 17th, 2015,
5 correct?
6 A Yes.
7 Q Okay. And you had this card in your car on
8 June 28th, 2015?
9 A Yes.
10 Q Okay. And so was this -- this was a physical
11 document in your glove compartment?
12 A Yes. It was actually in my -- I always -- I
13 always tend to keep my insurance stuff all together. I
14 just get it as it goes in the mail -- as it comes in the
15 mail I mean.
16 Q Okay.
17 A So it's in the envelope and everything.
18 Q All right. Okay. Now, I think, if you remember
19 correctly, in the preliminary hearing that you were
20 at -- or I guess it was the summary hearing in front of
21 the magisterial justice, Officer Ruff testified that the
22 proof of insurance that you had in the car was actually
23 an expired card.
24 A Um-hum.
25 Q Do you remember that?

Page 181

1  A   Yes.
2  Q   Was that -- was he wrong when he stated that?
3  A   Yes.
4  Q   So your -- so there was a proof-of-insurance
5  card in the car on June 28th, 2015, that was active --
6  A   Yes.
7  Q   -- or in effect?
8  A   Yes.
9  Q   All right. Okay. And so then going on to the
10  other citation that you had that was related to, you
11  stated, the bumper of the car --
12  A   Yes.
13  Q   -- or the bumper cover, do you remember -- did
14  you think that there was any issue with driving with a
15  bumper cover that was dragging on the road?
16      MR. JACOB: Objection.
17      MS. KRAMER: You can answer it.
18      THE DEPONENT: Can you elaborate on that.
19  BY MS. KRAMER:
20  Q   Did you think there was any safety issues with
21  driving a car where a bumper cover was dragging on the
22  road?
23  A   I never knowingly drove a car with the bumper
24  dragging on the road.
25  Q   Okay. So you're saying that you never drove

Page 182

1  your car while a bumper cover was dragging on the road?
2      MR. JACOB: Objection.
3      THE DEPONENT: Yes.
4      MR. JACOB: That's not what he stated.
5  BY MS. KRAMER:
6  Q   And do you think though in general that there
7  would be a safety concern if someone was driving the
8  car on a road where their bumper or bumper cover was
9  dragging on the road?
10  A   In general, yes.
11  Q   Okay. Do you think that that would qualify as a
12  violation of the traffic code?
13      MR. JACOB: Objection. He's not here to give a
14  legal opinion.
15      THE DEPONENT: I don't know.
16  BY MS. KRAMER:
17  Q   Okay. Do you think that you'd be -- okay. And
18  then you stated earlier that you believe the bumper cover
19  got, you know, dislodged or detached on June 28th, 2015,
20  because of an incident that occurred in January of 2015,
21  correct?
22  A   I stated that it could be a result of it
23  possibly.
24  Q   Okay.
25  A   I don't -- I honestly don't know to this day. I

Page 183

1  can't truthfully answer that question.
2  Q   Okay. But you told officers on June 28th, 2015,
3  that that was -- you thought that the incident that
4  occurred January 2015 was the cause of the issue with the
5  bumper cover on June 28th, 2015?
6  A   Yes. I said -- I told them it was a
7  possibility.
8  Q   Okay. And did you report the issue with your
9  car back in January of 2015 to your insurance company?
10  A   Yes.
11  Q   Okay. So you filed a claim?
12  A   Yes.
13  Q   And did you ultimately have that claim processed
14  through the insurance company?
15  A   Yes.
16  Q   So did they pay for any repairs to the car?
17  A   They gave me -- my deductible was a thousand
18  dollars. I believe they gave me 200-and-some dollars.
19  Q   Okay.
20  A   I don't know the exact amount.
21  Q   Okay. So do you remember the extent of all the
22  damage to the car that was caused in relation to the
23  January 2015 incident?
24  A   As far as -- elaborate please.
25  Q   I know you stated that the bumper cover had

Page 184

1  fallen off due to that incident.
2  A   Um-hum.
3  Q   Do you remember anything else that had happened
4  to the car because of that incident?
5  A   Yes.
6  Q   And what else do you remember?
7  A   The air intake ducts were both messed up. They
8  were both broken.
9  Q   Okay. And can you explain that?
10  A   The air intake ducts are in the front. They
11  help push air back to the motor. They were cracked, and
12  I think a piece was missing off the one.
13  Q   Okay. And did those hit the curb?
14  A   Yes.
15  Q   And you said you were going about 5 miles per
16  hour at the time of the January --
17  A   Roughly. I don't remember, to be honest with
18  you.
19      MS. KRAMER: Okay. All right.
20      MR. JACOB: Thank you.
21      MS. KRAMER: This will be Brackbill 16.
22      (Brackbill Exhibit Number 16 was marked for
23  identification.)
24  BY MS. KRAMER:
25  Q   Mr. Brackbill, do you know what this is?

Page 185

1   A   Yes.
2   Q   Okay. And can you tell me what this is?
3   A   This is the Allstate claim for when I hit the
4   curb at Penn State Harrisburg back in January. This is
5   the estimate from Sun Motors BMW, I believe.
6   Q   And did Sun Motors BMW perform the repair work
7   on your car?
8   A   Yes.
9   Q   Okay. Did you state previously that you had
10  fixed the issue with the bumper cover?
11  A   Yes. I -- I had -- I had did a temporary fix.
12  It was not completely fixed until -- I believe it was the
13  weekend before Labor Day in 2015.
14  Q   Okay. And you said before the incident in
15  January of 2015 you had never had an issue with the
16  bumper cover coming detached from your car, correct?
17  A   That is correct, yes.
18  Q   Did you ever make a complaint to Sun Motors Body
19  Shop after the June 28th, 2015 incident?
20  A   Please elaborate.
21  Q   Did you look into whether there was an issue
22  with the repair work that they had done?
23  A   As far as, they repaired -- they properly
24  repaired the bumper -- I believe it was the first week
25  before Labor Day in September of 2015. This incident

Page 186

1   occurred 6/28 of 2015. It was not properly repaired
2   prior to the incident.
3   Q   Okay.
4   A   I had -- I had repaired it, and I had not had
5   any incidents with it. It stayed up. I don't -- to this
6   date, I cannot truthfully tell you what caused that
7   bumper to come off.
8   Q   Okay. So you didn't have the bumper repaired
9   until September of 2015?
10  A   Yes.
11  Q   Okay. And, again, if we go to the second page,
12  like you were saying before, it states that your
13  deductible was a thousand dollars on this, correct?
14  A   Yes.
15  Q   And total repairs were 1,237 --
16      MR. JACOB: We'll stipulate that the document
17  says what it says, since it's not relevant to anything.
18      THE DEPONENT: Yes.
19  BY MS. KRAMER:
20  Q   Okay. And so your out-of-pocket costs were
21  $237.04 -- or that was what the insurance paid?
22  A   Yes.
23  Q   Okay. All right. So after you got the traffic
24  citations -- we've kind of discussed it briefly -- there
25  was a hearing in front of the magisterial district

Page 187

1   justice, correct?
2   A   Um-hum, yes.
3   Q   And you were represented in that hearing,
4   correct?
5   A   Yes.
6   Q   And you were represented by your attorney,
7   Mr. Jacob, correct?
8   A   Yes.
9   Q   And did you sign a fee agreement with Attorney
10  Jacob for your representation in that matter?
11  A   Yes.
12  Q   And what were his fees in relation to that
13  representation?
14  A   $350 an hour.
15  Q   Okay. And did you pay that on an hourly rate?
16  A   No.
17      MR. JACOB: It has not been paid yet.
18      THE DEPONENT: It's not been paid.
19      MR. JACOB: And it will be dealt with later.
20  BY MS. KRAMER:
21  Q   Okay. Do you know what the outstanding bills
22  are for Mr. Jacob's work in relation to defending you in,
23  like, the criminal component of this case?
24      MR. JACOB: I have not invoiced him yet.
25      THE DEPONENT: No.

Page 188

1       MS. KRAMER: Okay. Well, do you have those fees
2   somewhere?
3       MR. JACOB: I didn't invoice him yet.
4       MS. KRAMER: Okay. Well, when you do, we'll
5   need that information.
6       MR. JACOB: Um-hum.
7   BY MS. KRAMER:
8   Q   So you didn't pay a retainer?
9   A   No.
10      MR. JACOB: Again, I haven't invoiced him. He
11  hasn't paid anything yet.
12      MS. KRAMER: Okay. I mean, I'm asking him the
13  questions.
14      MR. JACOB: I know but he already told you.
15      MS. KRAMER: Yeah.
16  BY MS. KRAMER:
17  Q   Okay. And do you remember what the outcome of
18  the preliminary hearing was?
19  A   Yes.
20  Q   And what was that?
21  A   The financial responsibility one was dismissed.
22  Q   Okay.
23  A   And the bumper one was guilty.
24      MS. KRAMER: Okay. And we'll go back to the
25  transcript that was taken from that hearing, if you can



Page 189

1 find that for me.
2 BY MS. KRAMER:
3 Q Okay. And do you know why there was a
4 transcript taken of this hearing?
5 A Yes.
6 Q And why was that?
7 A To record the testimony of Officer Ruff.
8 Q Okay. And was -- was the transcript arranged by
9 anyone?
10 A Yes.
11 Q Who was that?
12 A My attorney.
13 Q Okay. And so were you -- did you pay for the
14 transcript?
15 A No.
16    MR. JACOB: It's part of the fees in this. It
17 was for the purpose of catching Officer Ruff's admissions
18 during the summary hearing, and it will be billed as part
19 of this case.
20 BY MS. KRAMER:
21 Q Okay. So is it your understanding that per your
22 fee agreement with Attorney Jacob for representing you in
23 the criminal matter that you will have to bear the cost
24 of -- incident to that representation?
25 A Yes.

Page 190

1 Q Such as the fees for the transcript, the
2 transcription of the hearing?
3 A Yes.
4 Q Okay. So you have not been billed for that yet?
5 A Yes, that's correct.
6 Q And do you have two separate fee agreements with
7 Attorney Jacob?
8 A No. I don't know.
9 Q Did you sign a separate agreement in
10 relationship to your suit against the Harrisburg police
11 officers?
12 A No.
13 Q And what is -- do you know what the terms of
14 that agreement would be? There's no set -- there's only
15 one agreement?
16 A Yes.
17    MR. JACOB: There's one agreement that
18 encompasses all of it.
19    MS. KRAMER: Okay.
20    MR. JACOB: At least that's my recollection. I
21 haven't looked at it in a while. But, yeah, that's how I
22 remember I did it.
23 BY MS. KRAMER:
24 Q Okay. I want to take you to page 15 of the
25 preliminary -- or I guess it's the summary hearing

Page 191

1 transcript. Do you remember this hearing?
2 A Yes.
3 Q Do you remember your demeanor in the courtroom
4 that day?
5 A Yes.
6 Q And can you remember what it was like?
7 A I was very calm and relaxed with the exception
8 of two points at which Officer Ruff was lying, and I
9 believe I rolled my eyes and kind of sat forward in my
10 seat two different times.
11 Q Okay. And when you say he was lying, what do
12 you mean by that?
13 A Well, the one time, if I remember correctly, he
14 said I was unreachable for the insurance card. That's
15 the reason he didn't reach out to me. And the other time
16 he had said he had stopped me; he came up to me and
17 stopped me, which was not true.
18 Q And when you say he stopped you, you meant
19 initially in your interaction with the officers?
20 A Yes. He testified under oath that he stopped
21 me.
22 Q Okay. Do you think it's possible that he was
23 mistaken?
24 A No.
25 Q Okay. So you think that he deliberately made a

Page 192

1 false statement about -- that he was the individual that
2 stopped you?
3 A Yes.
4 Q Okay. And you think that he made a deliberately
5 false statement in relation to the fact that he stated
6 you were unreachable in relation to figuring out the
7 status of your insurance?
8 A Yes.
9 Q Okay. All right. So then I guess -- do you
10 remember during this hearing that the magisterial
11 district justice told you, sit down in your seat?
12 A She told me to sit back in my seat.
13    MR. JACOB: Sit back.
14    THE DEPONENT: Yes.
15 BY MS. KRAMER:
16 Q So line 3 on page 15, it says, The Court, and
17 then it says, Mr. Brackbill, just sit back in your seat,
18 please. Thank you.
19    And what was that referring to?
20 A I was leaning forward when he was testifying.
21 Q Okay. Did you ever get out of your seat?
22 A No.
23 Q And how close were you to Officer Ruff during
24 this hearing?
25 A Probably about 12, 15 feet. Twelve, 15 feet.

Page 193

1  Q  Okay. And then if you go down on the same page,
2  on line 21, it says, The Court: Mr. Brackbill, keep your
3  facial expressions... dot, dot, dot.
4     Do you know what that's referring to?
5  A  Yes.
6  Q  And what was that referring to?
7  A  I rolled my eyes.
8  Q  Were you making any other facial expressions
9  during the hearing?
10 A  No.
11    MS. KRAMER: And this will be Brackbill 17, and
12 I think we kind of discussed this already.
13    (Applicant's Exhibit Number 17 was marked for
14 identification.)
15 BY MS. KRAMER:
16 Q  Do you know what this is, Mr. Brackbill?
17 A  Yes.
18 Q  And what is it?
19 A  This is an invoice for the court reporter for
20 the summary hearing.
21 Q  Okay. And the total amount, can you read what
22 that is?
23 A  It is one ninety-nine thirty.
24 Q  And I think we kind of discussed this before.
25 You stated you didn't pay this?

Page 194

1  A  Yes.
2  Q  Okay. Do you know if this has been paid yet?
3  A  I do not know.
4  Q  Okay. That's fair.
5     MR. JACOB: It's been paid.
6     MS. KRAMER: Well, we can figure that out later.
7  BY MS. KRAMER:
8  Q  Okay. And then so after the hearing in front of
9  the magisterial district justice, what happened after
10 that?
11 A  Can you please elaborate.
12 Q  I mean, what happened in relation to your
13 citations? You said you were found guilty in relation to
14 the traffic citations regarding the bumper, correct?
15 A  Yes.
16 Q  So did you do anything else in relation to that
17 citation?
18 A  Yes.
19 Q  What did you do?
20 A  We appealed it. I appealed it.
21 Q  And what was the result of the appeal?
22 A  Not guilty.
23 Q  And who did you appeal that to? What court? Do
24 you know?
25 A  Dauphin County Court.

Page 195

1  Q  Okay. And was there a hearing in relation to
2  the appeal?
3  A  Yes.
4  Q  And do you know why you were found not guilty in
5  relation to the bumper citation?
6  A  Yes.
7  Q  Why?
8  A  Because it was not a violation under that code
9  that he had wrote, the Vehicle Code.
10 Q  What do you mean by that?
11 A  This -- the Vehicle Code did not apply -- that
12 he had cited me for did not apply to what happened.
13 Q  Okay. And why didn't it apply?
14 A  I don't know.
15 Q  Okay. And do you know if there was a transcript
16 taken of that summary appeal hearing?
17 A  I believe there was, yes.
18 Q  Okay. And do you know if there was a charge for
19 the transcript?
20 A  I do not know.
21    MS. KRAMER: All right. And this will be
22 Brackbill 18.
23    (Brackbill Exhibit Number 18 was marked for
24 identification.)
25

Page 196

1  BY MS. KRAMER:
2  Q  And, Mr. Brackbill, do you know what this is?
3  A  Yes.
4  Q  And what is it?
5  A  This appears to be the Dauphin County court
6  reporter's fee for -- for sending us the five pages of
7  the transcript for court proceedings.
8  Q  Okay. And that's the transcript for the summary
9  appeal?
10 A  Yes.
11 Q  And that occurred on March 22nd, 2016?
12 A  Yes.
13 Q  Okay. And did you pay this?
14 A  No.
15 Q  Okay. And do you know if it's been paid?
16    MR. JACOB: It's been paid?
17    THE DEPONENT: I do not know.
18    MS. KRAMER: Okay. Well, he can just say he
19 doesn't know. It's his time to testify so...
20    MR. JACOB: Just trying to move this along.
21    MS. KRAMER: I understand.
22    MR. JACOB: Since the estimate -- the bill is
23 what it is.
24    MS. KRAMER: I get that.
25

Page 197

1  BY MS. KRAMER:
2  Q  Okay. I just want to take you back to the
3  complaint.
4  A  Sure.
5  Q  And so in relation to your suit against Officer
6  Ruff, Officer Hill, and Officer Melk, are you alleging
7  damages in relation to those claims?
8  A  Yes.
9  Q  All right. And you no longer have a claim
10 against Officer Dawson, correct?
11 A  Yes.
12     MR. JACOB: Objection. He's got a claim that's
13 been dismissed that will go up on appeal, so he still has
14 a claim.
15     MS. KRAMER: Well, at this point he doesn't,
16 according to the court order.
17     MR. JACOB: Well, if you say --
18     MS. KRAMER: I'm asking his understanding. If
19 he doesn't know --
20     MR. JACOB: He's not here to give a legal
21 opinion so...
22     MS. KRAMER: I get that but --
23     MR. JACOB: All right. So --
24     MS. KRAMER: If he doesn't know -- I'm not
25 asking him --

Page 198

1      MR. JACOB: But he's not going to agree that he
2  doesn't have a claim when he's got a claim but it's
3  subject to appeal.
4  BY MS. KRAMER:
5  Q  Okay. Do you actively have a claim against
6  Officer Dawson?
7  A  I don't know.
8  Q  Okay. And what damages are you claiming in
9  relation to the suits you have against the Harrisburg
10 officers in this lawsuit?
11 A  That will be determined by a jury.
12 Q  Okay. Well, at this point do you -- what
13 damages do you feel that you have?
14 A  I have the towing bills. I have the appeal for
15 the -- for the summary hearing. I have, of course, my
16 attorney fees.
17 Q  Okay.
18 A  And I have --
19 Q  And you haven't expended any costs in litigation
20 for your attorneys fees yet, correct?
21 A  Yes.
22     MR. JACOB: Objection.
23     MS. KRAMER: You can answer.
24     THE DEPONENT: Yes.
25

Page 199

1  BY MS. KRAMER:
2  Q  And you -- and for the appeal fee, you said that
3  was a $50 fee?
4  A  Sixty-eight fifty, I believe. I -- I don't
5  know.
6  Q  I think I have that here.
7      MR. JACOB: And just so you're aware. I object
8  to this line of questioning because there's case law that
9  says that non-liquidated damages to be set by a jury are
10 not proper for discovery. So he's seeking those damages
11 as well, but they're all laid out in the Amended
12 Complaint.
13     MS. KRAMER: Well, I'm not on those questions
14 yet but...
15     MR. JACOB: Well, you just were, so I'm just
16 simply putting my objection on the record.
17     MS. KRAMER: Well, we're still allowed to find
18 information that might be relevant.
19     MR. JACOB: Well, I agree. I'm just telling you
20 as far as the non-liquidated damages --
21     MS. KRAMER: Okay.
22     MR. JACOB: -- that will be set by -- he's not
23 here to guess or anything, and those are laid out in the
24 complaint.
25     MS. KRAMER: I'm not going to ask him the value

Page 200

1  of it.
2      MR. JACOB: All right. I'm just --
3      MS. KRAMER: So you don't have to worry about
4  that.
5      MR. JACOB: I'm just putting it on the record as
6  far as the category so there's no surprise later.
7      MS. KRAMER: This will be Brackbill 19.
8      (Brackbill Exhibit Number 19 was marked for
9  identification.)
10 BY MS. KRAMER:
11 Q  Okay. All right. Do you know what this is,
12 Mr. Brackbill?
13 A  Yes.
14 Q  Okay. And what is this?
15 A  This is the docket for the appeal on the bumper
16 citation, which was operating or permitted to operate
17 with unsafe equipment.
18 Q  Okay. And that was the appeal to the Dauphin
19 County Court of Common Pleas?
20 A  Yes.
21 Q  And if you'll go to the last page of this
22 document, there's a -- do you see where it says, case
23 financial information?
24 A  Yes.
25 Q  And then it has some costs there. There's the



Page 201

1 summary appeal. It says fifty-three fifty. There's a
2 postage fee for $10. There's a clerk of court's
3 automation filing fee for $5, and there's a copy fee for
4 eight-fifty. Do you see that?
5   A  Yes.
6   Q  Okay. And then for the total it says $70,
7 correct?
8   A  Yeah. Seventy-seven. Yes.
9   Q  Yeah, $77. That's my mistake.
10    Is this under -- did you pay this amount of
11 money in relation to the appeal?
12   A  I paid sixty-eight fifty, I believe it was.
13   Q  Okay. Did -- how did you pay that?
14   A  I believe I probably paid cash.
15   Q  Okay. Do you know if you got a receipt from
16 that?
17   A  I don't know. That's something I can definitely
18 look into.
19   Q  Okay.
20   A  I'm pretty sure it was sixty-eight fifty or
21 sixty-two fifty.
22   Q  Okay. If you find that, can you please send
23 that to us?
24   A  Sure.
25   Q  Okay. I mean, at the top here, if you see that,

Page 202

1 it says last payment date, 10/9 of 2018, back under the
2 case financial information.
3   A  Um-hum.
4   Q  Do you see that?
5   A  Yes.
6   Q  So it says October 9, 2018. So it looks like
7 the last payment that was made was in October of 2018.
8 If you scroll over, it says, total of last payment,
9 eight-fifty or negative eight-fifty, meaning --
10   A  Yes.
11   Q  -- that that was paid.
12    Do you know if you made a payment of $8.50?
13   A  I do not know. Honestly, I thought I just paid
14 sixty-two fifty. And I remember even debating with the
15 person in there about if -- I said, if I'm --
16   Q  Okay.
17   A  -- found not guilty of this, do I get a refund?
18 And she said, no.
19   Q  Okay. And you said you paid sixty-two fifty?
20   A  Yes. It was sixty-two or sixty-eight fifty. I
21 honestly don't know.
22   Q  Okay.
23   A  But I can have -- I'm going to have to do some
24 digging on my part here because this doesn't add up. I
25 didn't pay that much.

Page 203

1   Q  That's fine. And when did you pay that amount,
2 either the sixty-two fifty or the sixty-eight fifty?
3   A  It would have been sometime the end of November.
4 I think it would have been the end of November.
5   Q  Of what year?
6   A  2015.
7   Q  Okay.
8   A  It was after I was found guilty, I think within
9 30 days. I remember consulting my attorney, and he said
10 to go ahead and appeal it.
11   Q  Okay. So it was before you had the hearing on
12 the appeal?
13   A  Yes, correct.
14   Q  Okay. Thank you.
15    All right. So going back to the complaint, I'm
16 just going to read a paragraph from here.
17    Okay. If we go to paragraph 73 on page 12 --
18   A  Okay.
19   Q  -- it says -- and this says, as a direct and
20 proximate result of the defendant's conduct, Calvin
21 suffered and/or will continue to suffer embarrassment,
22 humiliation, physical and physiological harm, pain and
23 suffering, and financial harm, some or all which may be
24 permanent.
25    So do you agree that that's an accurate

Page 204

1 statement as some of the harms that were caused to you in
2 relation to the actions of Defendant Ruff?
3   A  Yes.
4   Q  Okay. And I think if you look through this
5 complaint, you have a similar statement for all of the
6 counts that you allege; is that correct?
7   A  Yes.
8   Q  So, like, in Count 2, paragraph 79 is the same
9 as 73?
10   A  Yes.
11   Q  And then for Count 3, paragraph 83 is the same?
12   A  Yes.
13   Q  And then for Count 4, paragraph 88 is the same?
14   A  Yes.
15   Q  And Count 5, paragraph 93 is the same?
16   A  Yes.
17   Q  And Count 6, paragraph 98 is --
18    MR. JACOB: We'll stipulate they're all the
19 same.
20    MS. KRAMER: Okay. They're all the same, so
21 98's the same as 107, 114, and 112 --
22    MR. JACOB: Again, we'll stipulate they're all
23 the same.
24    MS. KRAMER: -- and 132. Okay.
25

Page 205

BY MS. KRAMER:
Q So, essentially, those are the damages you're alleging in this suit against the defendants?
A Yes.
Q Can you explain to me what kind of embarrassment that you have suffered?
A Well, I -- when I applied for Norfolk Southern, I had to do an intense background check, and one of the things that came back was a DUI on my criminal record and I told them the story; I was falsely arrested in June of 2015 and that it was actually proved in a court that I did not do that.
I also had to -- I was asked about every little traffic citation I had over time, including the ones that were dismissed. So I had to provide those, too, to Norfolk Southern. And I had to provide some actual further documentation of that. So that was a little embarrassing for my first career job out of college.
Q Okay. And when were you applying for that job of Norfolk -- at Norfolk Southern again? Sorry.
A That was -- I think November 2015 was the -- when they started getting all of my documents, so it was sometime within that time frame. I don't have the exact date.
Q Okay. And you still got the job with Norfolk

Page 206

Southern, correct?
A Yes.
Q And in your subsequent job applications for your current job -- I think that's with Republic --
A Services.
Q -- Republic Services, did you have to do a similar background check?
A Yes.
Q And did this -- did the information about the DUI charge come up again?
A No.
Q Okay. So you didn't have to explain again what had happened?
A Correct.
Q Okay. Did your previous traffic citations come up?
A I don't know how much this company looked into it, so I don't know.
Q Okay. But you didn't have to discuss it with anyone?
A Correct.
Q When you applied for that job, did you have to sign any sort of background waiver check?
A Yes.
Q Okay. But no one had brought any issues to your

Page 207

attention with Republic Services?
A That's correct.
Q Okay.
A I will say this for the record, it was a -- I believe the bar was a lot lower for this job.
Q For the Republic Services?
A Yes. It depends what jobs I go for in the future. It may or may not affect it.
Q And when you worked for UPS doing -- when you were a part-time supervisor, did -- was there any sort of background check involved in that?
A Yes.
Q And did the June 28th, 2015 incident come up?
A No.
Q Did any of -- any other issues come up when you were applying for that job?
A No.
Q Okay. Did the situation -- did you -- sorry. Let me go back on that.
So in relation to the June 28th, 2015 incident, did you have work the following day with the Hotel Hershey?
A Yes.
Q And did you go to work that following day?
A Yes, very tired.

Page 208

Q So that would have been at 4:00 on June 28th, 2015?
A Yes.
Q And you worked your full shift?
A Yes, roughly 8 to 10 hours.
Q Okay. And did you have work the following day?
A On Monday the -- the 29th it would have been -- or Monday, the 29th?
Q Yeah, June 29th, 2018?
A I don't know.
Q Okay. So you're saying you were very tired the day -- on June 29th in the afternoon -- no -- excuse me.
So you're saying you were tired on June 28th, 2015, when you had to go in to work at the Hotel Hershey?
A Yes, very tired.
Q Did it affect your ability to perform your job?
A Yes.
Q Did anybody make any sort of comments to you?
A Regarding the ability to perform my job?
Q Yes.
A Not that I recall.
Q Okay. Did the situation -- did the June 28th, 2015 situation ever come up with your employer at the Hotel Hershey?
A Yes.

Page 209

1 Q How did that come up?
2 A I believe I brought it up in casual conversation
3 with Kate.
4 Q Okay. Who's Kate?
5 A She was my direct -- she was my direct boss.
6 She was the assistant manager of room service. And then
7 there is Brian Confair, who was her boss. I believe I
8 was calling attorneys --
9 Q Okay.
10 A -- at work, and it came up. And that's how it
11 came up.
12 Q Okay. It came up because you were calling
13 attorneys at work?
14 A Yes. To --
15 Q Okay.
16 A To deal with the citations and stuff.
17 Q Was she concerned that you were calling
18 attorneys at work?
19 A I don't remember all the details.
20 Q Okay.
21 A But I think that's how it came up, if I remember
22 right.
23 Q Okay. Was there any sort of -- was that
24 situation embarrassing with your former supervisor, Kate,
25 when you had to explain the June 28th, 2015 situation to

Page 210

1 her?
2 A Yes, absolutely.
3 Q Okay. And other than what we just talked about,
4 is there any other way that you've been embarrassed
5 through this situation?
6 A Yes.
7 Q And what was that?
8 A So I had to let my college professor know that I
9 was leaving for two traffic citations for a court date on
10 a marketing class. It was Dr. Aybat. I had to let her
11 know the reason I was leaving her class because, you
12 know, in college part of your stuff is graded on
13 attendance. I'm sure you'd know. So I had to let her
14 know that day on November 5th that I was going to this
15 summary hearing for these two frivolous citations.
16 Q Okay.
17 A So that was a little embarrassing as well.
18 Q Was it part of Dr. Aybat's policy that you had
19 to give her a descriptive explanation for your reason
20 that you wouldn't be attending her class?
21 A I don't know.
22 Q Okay. Was it possible you could have just told
23 her you were handling a personal matter?
24 A It's possible.
25 Q Okay.

Page 211

1 A But she asked.
2 Q Do you remember what the attendance policy for
3 that marketing class was?
4 A I don't remember.
5 Q Okay. So you don't remember if it was like you
6 could only miss two days or three days?
7 A I don't remember that, but I was -- I was within
8 the scope that I would have had perfect attendance if it
9 weren't for this.
10 Q Okay. You would have had perfect attendance --
11 A Yes.
12 Q -- for that marketing class?
13 A The goal is to get all you can out of college
14 and learn.
15 Q Did -- is there any other situation that you can
16 remember where you were embarrassed because of the
17 incident that arose on June 28th of 2015?
18 A Yes. Well, my former -- my current employer
19 here, Brian Chalk, he -- he --
20 Q And that's -- sorry. Just to stop you, that's
21 with Republic Services?
22 A Yes.
23 Q Okay.
24 A I guess he -- I mean, when you Google my name,
25 it's out there, associated with this. So I guess he

Page 212

1 found out through that and then inquired about it. And
2 he's a big -- he's a big law enforcement supporter, so I
3 think it's actually affected possibly our relationship,
4 too. I'm not sure there. So it's a little embarrassing
5 to have to talk about it to this date, and at this point
6 I'd just like to get it over and put it behind us. I'm
7 sure all the parties involved would like to do that.
8 Q Okay. And when you say that when you Google
9 your name, stuff related to the June 28th, 2015 incident
10 shows up, do you know what shows up, to your knowledge?
11 A Yeah. I believe it's stuff regarding this
12 litigation.
13 Q Okay. So this lawsuit against the officers?
14 A Yeah. The lawsuit resulting from the inaction
15 to resolve it outside of court. Yes.
16 Q Okay. But does anything -- do you know if
17 anything shows up in relation to the DUI charge?
18 A I don't know.
19 Q Do you know if anything shows up in relation to
20 the two traffic citations you received?
21 A Yes. If you go on the Unified Justice portal,
22 they're --
23 Q Okay.
24 A -- shown on there as dismissed.
25 Q All right. But if I would just Google it

Page 213

1 without going on to the UJS portal, do you know if it
2 would show up, if I just typed in your name?
3 A I don't know, but I -- I don't think.
4 Q Okay. All right. And so you said your current
5 employer found out about this lawsuit through the
6 Internet?
7 A Yes. I guess his wife Googled it.
8 Q Okay. And how long ago was that?
9 A I don't know.
10 Q Okay. Well, when did you have a conversation
11 with him about this?
12 A Actually, it was just last month.
13 Q Just last month.
14 Okay. But you don't know how long ago he saw
15 it?
16 A I don't know. I can't --
17 Q And how did the conversation start about the
18 lawsuit?
19 A Basically, he just said something about seeing
20 online how -- how -- my interaction with the police
21 officers. I think he jumped to conclusions on how that
22 would have been as well. And then he inquired about it,
23 and that's when I told him part of the story, which was
24 kind of embarrassing and an unnecessary use of time.
25 Q Okay. And did -- you said that you think your

Page 214

1 relationship might have suffered with Brian --
2 A Yeah.
3 Q -- at Republic Services because of this?
4 A It's a possibility. I don't know.
5 Q Okay. Have you --
6 A I can't honestly say.
7 Q Okay. Sorry. I cut you off.
8 A That's all right. No worries.
9 Q Okay. Did he -- has he acted any differently
10 towards you?
11 A In ways. But like I said, I can't really -- for
12 your sake, I can't tie it to this. It's a possibility.
13 Q Okay. But if you -- like, when you say in ways,
14 what types of ways are you thinking might be a
15 possibility?
16 A I -- I don't know. It's just every now and then
17 he's a little shorter with me on things.
18 Q Okay. Have any of your job duties changed since
19 that conversation --
20 A No.
21 Q -- with him?
22 Okay. Can you think of anything else that's
23 been embarrassing?
24 A Not off the top of my head, not to say there
25 isn't something else though.

Page 215

1 Q Okay. But right now, sitting here today, that's
2 all you can think of?
3 A Yes.
4 Q Okay. And then if you look at that sentence, it
5 also says, humiliation. Is there anything separate that
6 you feel that's different from feeling humiliated and
7 embarrassed, or is that kind of the same thing to you?
8 A They're kind of the same thing. The humiliation
9 was the -- I mean, the conduct of the judicial center
10 employees was humiliating, them saying, enjoy working at
11 McDonald's, stating that I was going to be fired from the
12 Hotel Hershey. I think he said they'll be an opening at
13 the Hotel Hershey after this. All of that was very
14 humiliating.
15 Q Okay. So the statements said to you at the
16 judicial center, you feel were humiliating?
17 A Absolutely.
18 Q Has anything else that's been said to you since
19 or happened to you since caused you to feel humiliation?
20 A No. Just the over -- the whole thing and all.
21 I mean, like I said, I don't usually bring it up to too
22 many people other than close friends, you know, that will
23 understand.
24 Q Okay.
25 A But the whole situation, you know.

Page 216

1 Q Okay. And do you feel like you deal with the
2 embarrassment and humiliation every day?
3 A There's definitely periods where I go through
4 thinking about this and have frustration and anger at it,
5 or there's times that I can't believe they haven't
6 settled or offered an apology about this or worked it out
7 like adults. So there's definitely times that the anger
8 and humiliation come out.
9 Q Does it kind of come in waves?
10 A Yes.
11 Q And it can be kind of like strong and then it
12 gets --
13 A Yes. There are -- I can go months -- there was
14 a time -- I just bought a house a year ago, around there
15 I think it went down. Obviously, when I'm around
16 Harrisburg and see a police car, it's kind of a
17 flashback.
18 Q Okay.
19 A And that will be -- that probably will be
20 permanent, you know.
21 Q Okay. And how often do you come to Harrisburg?
22 A It depends. That depends, too. I mean, over
23 the summer, I might be here every two, three weeks but in
24 the winter, not so much, maybe every two, three months.
25 Q Okay. And you said when you see Harrisburg



Page 217

1 police or you're in Harrisburg you get, like, a
2 flashback?
3    A    Kind of anger, a little bit of anxiety.
4    Q    Okay.
5    A    You know, just knowing what was done and the
6 whole circumstances surrounding it.
7    Q    Is it only with Harrisburg police, or do you
8 feel that way when you see other police officers?
9    A    I mean, there is to a degree with other police
10 officers, just knowing what went down and the dishonesty
11 and the false conviction. There is to a degree, but
12 mainly it's the Harrisburg police.
13    Q    Okay. Do you think the situation has changed
14 your opinion on police in general?
15    A    Yes.
16    Q    Okay.
17    A    Absolutely.
18    Q    And so you said sometimes though the
19 embarrassment and humiliation isn't as bad. Are there
20 certain things that make it better, per se?
21    A    Correct. I mean, it goes in spurts. You know,
22 it could be a -- one month it could be here and there.
23 It -- it's in waves. It depends what I've got going on,
24 you know.
25    Q    Okay. Have you ever sought treatment for any of

Page 218

1 these issues or no?
2    A    No.
3    Q    Okay. And then I guess also alleged in this
4 complaint in paragraph 83, which we've stipulated to
5 pertains to all of your counts, you're alleging physical
6 and physiological harm. What kind of physical harm did
7 you suffer from this incident?
8    A    Again, it's just limited to the handcuffs.
9    Q    Okay. And that was -- was that temporary?
10    A    Yes.
11    Q    And it was a temporary discomfort?
12    A    Yes.
13    Q    Okay. And you have -- you don't have any
14 lasting effects from that, to your knowledge?
15    A    No.
16    Q    And you've never sought medical treatment in
17 relation to that?
18    A    No.
19    Q    Okay. And you're also alleging financial harm;
20 isn't that --
21    A    Yes, absolutely.
22    Q    And what kind of financial harm are you
23 alleging?
24    A    Well, I had to -- I had out-of-pocket for the
25 towing, the appeal --

Page 219

1    Q    Okay.
2    A    -- all that good stuff.
3    Q    Is there anything that we didn't go over today
4 that also caused you financial harm?
5    A    Not that I recall.
6    Q    Do you think that this situation has limited
7 your job prospects?
8    A    It very well could have with the stuff that's
9 out there on Google. I don't know. I don't know the
10 correct answer.
11    Q    Okay. And you don't know that it's affected,
12 like, your earning ability?
13    A    I -- I don't know that.
14    Q    Okay.
15    A    Yeah. I don't know that.
16    Q    All right. And then if we go on, still on the
17 complaint, if we go to page 23, under B it says -- do you
18 see that, 23?
19    A    Yeah. I'll turn there real quick. Yes.
20    Q    It says compensatory damages including, but not
21 limited to, the monetary value associated with the
22 following: Violations of legal rights, emotional
23 distress, emotional injury, embarrassment, loss of
24 reputation, and related physical injuries.
25        When you state the emotional distress and

Page 220

1 emotional injury, is that any different than the
2 embarrassment and humiliation?
3    A    No. I'd say it's along the same lines.
4    Q    Okay. Is there any other emotional effects that
5 we didn't talk about that you feel like you're suffering
6 from today?
7    A    No. Like I said, I just -- it just sometimes
8 makes me angry when I think about it that no one has
9 taken the responsibility and owned up and apologized and
10 is willing to make it right.
11    Q    Okay. So you feel angry and frustrated from
12 this?
13    A    Absolutely.
14    Q    Okay. And do you feel that that interferes with
15 your daily life?
16    A    Sometimes.
17    Q    And would that be the same for the embarrassment
18 and the humiliation?
19    A    Yes. It all ties in there. Yes.
20    Q    Okay. And can you think of any situation in
21 particular where this has interfered with your life?
22    A    Well, I mean, like, just having to deal with all
23 of this. You know, it's very -- very stressful. And
24 then, like I said, there's obviously times when, you
25 know, if I go downtown or something, just, you know,

Page 221

1  seeing the Harrisburg police, it's very frustrating, you
2  know --
3  Q   Um-hum.
4  A   -- to think so...
5  Q   All right. And then it states in here, you have
6  a loss of reputation. Is that separate from the
7  embarrassment and humiliation?
8  A   Yeah. I would -- I would say it's separate, but
9  I can't think of anything right now off the top of my
10  head for loss of reputation.
11  Q   Okay. So you don't know of anyone that's lost,
12  like, esteem for you over this situation?
13  A   I can only make assumptions.
14  Q   All right. Is there anyone that you can think
15  of now, I mean, as we sit here today, that might think of
16  you differently?
17  A   I -- I can't think of any. I don't know right
18  now.
19  Q   Okay. All right. And then, otherwise, it looks
20  like in here on paragraph D it says, equitable relief,
21  admission of the allegations stated in the complaint in
22  writing and an oral and written apology for same in
23  person from each defendant.
24      So is the apology something that's important to
25  you?

Page 222

1  A   I -- I think it's a good step in moving on.
2  Q   All right. Do you think that that would help
3  with some of the damages that you're suffering right now?
4  A   Some of the anger and stress, yes.
5  Q   Okay. And, again, you said you haven't seen any
6  sort of medical professionals for the anger or stress or
7  emotional problems that you're saying that you're
8  suffering from?
9  A   Yeah. Yes. I have not.
10  Q   Okay. And have you ever seen any sort of
11  medical professional for those types of issues?
12  A   No.
13  Q   Okay. And have you ever had any sort of issues
14  with anger or frustration prior to this incident?
15  A   Not that I can recall.
16  Q   Okay. What about embarrassment or humiliation?
17  A   No.
18      MS. KRAMER: Okay. All right. I think we're
19  almost done.
20  BY MS. KRAMER:
21  Q   The only other thing I have to ask about is --
22  so I think we kind of mentioned that you said you get
23  stressed out when you see Harrisburg police officers, you
24  know, subsequently to the June 28th, 2015 incident.
25  A   Absolutely, yes.

Page 223

1  Q   Okay. Do you know how many times you've seen
2  police officers since then?
3  A   Police officers or Harrisburg police officers?
4  Q   Harrisburg police officers. Sorry.
5  A   I -- I don't know.
6  Q   Okay. Have you seen any of the officers
7  involved in your suit since the incident?
8  A   Yes.
9  Q   Who have you seen?
10  A   I've seen -- I think I've seen all of them.
11  I've seen Ian Dawson. I've seen Gregory Hill. I've see
12  Tyron Meik. I believe I even saw Stephen Ruff one time
13  investigating an accident downtown in 2015, but I have
14  not seen him since then --
15  Q   Okay.
16  A   -- other than the court hearing.
17  Q   Okay. Yeah. That makes sense.
18      Have you had any interactions with those
19  officers since then?
20  A   Yes.
21  Q   Let's start with Officer Hill. What
22  interactions do you remember that you've had with Officer
23  Hill since the June 28th, 2015 incident?
24  A   I really haven't had any interactions with him,
25  like talking interactions. I remember seeing him

Page 224

1  patrolling downtown at night, and I've seen him at a bar
2  that I frequent, which is Sawyer's Cantina. And,
3  obviously, there's some frustration and anger when you
4  see that and know that they're still -- when he's on the
5  job. He's still on the job doing his job like he was
6  back then without any repercussions, so that's very
7  frustrating.
8  Q   Okay. But you haven't had -- you haven't spoken
9  with Officer Hill, to your knowledge?
10  A   Not that I can recall.
11  Q   Okay. Then with Officer Ruff, you said you
12  believe other than the hearing that you saw him at, you
13  saw him investigating a car accident, correct?
14  A   Yes.
15  Q   That was a -- I think that was August of 2015 or
16  September. It was a couple months after.
17  Q   Okay.
18  A   It was still very fresh.
19  Q   And did you have any -- did you speak with
20  Officer Ruff on that day?
21  A   No. I just saw him exit his car.
22  Q   Okay. All right. And then have you -- you said
23  you've seen Officer Dawson as well?
24  A   Yes.
25  Q   Do you remember if you had any interactions with



Page 225

1　Officer Dawson?

2　A　Yes. I saw him the week after, when I went

3　downtown to meet up with my friends. This was like the

4　week after, so it would have been July of 2015. I

5　remember asking him -- I remember pulling out my camera

6　and videotaping him and asking him what he thinks of

7　himself after last week.

8　And he -- well, it started off -- it started off

9　with him -- actually, I said hi. I said, hi, Ian. And

10　he's like, how do I know you? And I said, how do you

11　know me? And he was like, oh, I know how I know you.

12　And then I proceeded to ask him questions, and

13　he didn't say anything because I was on video -- or he

14　was on video. This was immediately the week after.

15　Q　Do you still have that video?

16　A　It's possible. I'd have to look.

17　Q　Okay. Because I don't think we have that. Can

18　you look for that?

19　A　Yeah, I can.

20　Q　And then if you have it, send it over to me.

21　A　I could. It's from -- it'll be from July 2015.

22　Q　Okay. All right.

23　MR. JACOB: If he has it, we'll produce it to

24　you.

25　MS. KRAMER: Okay. Sounds good.

Page 226

1　THE DEPONENT: If I have it. I don't even know

2　that I have it.

3　BY MS. KRAMER:

4　Q　Okay. And have you had any other interactions

5　with Officer Dawson since then?

6　A　Other than seeing him patrolling, I don't.

7　Q　Okay. But you didn't speak with him those other

8　times you saw him?

9　A　We may have had a brief conversation one other

10　time, but that's about it.

11　Q　Okay.

12　A　But like I said, it's -- that's the hardest part

13　of this, you know, seeing them still without

14　repercussions.

15　Q　Okay. And then you've seen -- you stated you've

16　seen Officer --

17　A　Meik.

18　Q　-- Meik a few times?

19　A　Yeah. We've had -- I've seen him a couple

20　times. I see him more than any other officers because

21　he's the supervisor downtown.

22　Q　Okay. And how many times do you think you've

23　seen him since the incident?

24　A　Oh, I don't know. It's probably a good six to

25　12 times.

Page 227

1　Q　Okay. And do you remember any interactions that

2　you guys have had?

3　A　Yeah. We've had -- we've had a few.

4　Q　Okay. And can you remember any of them

5　specifically?

6　A　Yeah. Well, it depends. I mean, the latest

7　interaction I think was sometime in September of 2018.

8　Q　Okay.

9　A　I ran into him with officer -- another officer

10　outside of Arooga's.

11　Q　Okay. And what happened during that

12　interaction?

13　A　Of course, he just -- he was just staring me

14　down. And I think I went and said something to him

15　about, you're a real -- you feel like a real tough guy,

16　or something along those lines. And then he's there, and

17　we're going back and forth. And I said, well, you know,

18　how -- my frustration with the way police are harassing

19　people. I think I made some comment about a lot of white

20　officers harassing black people and it's very

21　frustrating, something along those lines.

22　Q　Okay. Have you -- do you remember anything else

23　that was said in that interaction?

24　A　I remember a guy that used to work for me at UPS

25　come up to me -- or coming up to me. His name was Blake,

Page 228

1　and he -- he -- I think he said, what's wrong,

2　Calvin? -- or something like that. And I was, like,

3　struck back. And then I remember Officer Meik getting

4　his information; and after he got his information, I

5　remember asking Officer Meik what he was writing down on

6　the paper.

7　Q　Okay. Do you remember any other interactions

8　with Officer Meik?

9　A　Not -- not off the top of my head. I mean, I've

10　had other interactions with him.

11　Q　Okay.

12　A　I -- I know I saw him one other night making an

13　arrest of this young black guy who shoved another black

14　guy and he ran away, and I videotaped that and

15　everything.

16　Q　Okay. So is Meik in that videotape?

17　A　Yeah.

18　Q　Do you still have that videotape?

19　A　Yes.

20　Q　All right. Can you send that to us or send it

21　to your attorney?

22　A　Yes.

23　MR. JACOB: Yeah. We'll produce it.

24　THE DEPONENT: We'll produce that.

25　MS. KRAMER: Okay.

Page 229

1 BY MS. KRAMER:
2 Q Have you had any other interactions with
3 Harrisburg police officers, ones that aren't parties to
4 this lawsuit?
5 A Yeah. But they're -- yeah.
6 Q Okay. All right. Do you know an Officer
7 Carriere or Carriere?
8 A Oh --
9 Q C-A-R-R-I-E-R-E.
10 A Yeah. He was -- I believe he was in -- he was
11 possibly in that video.
12 Q The one you're relating -- the one --
13 A Not -- not with Meik. He was in that video with
14 Ian Dawson back in -- it would have been July of 2015.
15 Q Okay. Have you had any interactions with -- I
16 guess his name is -- do you know his first name?
17 A Yeah, Brian.
18 Q Okay. So have you had any interactions with
19 Brian other than the incident you said you filmed with
20 Officer Dawson in 2015?
21 A Yeah. I ran into him -- I ran into him coming
22 into Sawyer's one day. I had pictures of officers
23 involved in this lawsuit at Sawyer's.
24 Q Do you remember an incident where you asked him
25 to arrest some officers that were at Sawyer's?

Page 230

1 A Yes. That's the one I'm referring to.
2 Q Okay. And you said the officers you asked him
3 to arrest were officers involved in this lawsuit?
4 A One of them was.
5 Q Which officer is that?
6 A Officer Hill.
7 Q Was -- so Officer Hill -- did you believe him to
8 be engaged in conduct that he should have been arrested
9 for?
10 A I don't remember at the time.
11 Q Well, did you ask Brian Carriere to arrest
12 Officer Hill for public drunkenness?
13 A I possibly could have, yes.
14 Q Okay. Did you take pictures of Officer Hill and
15 some of the other officers he was with at Sawyer's?
16 A Yes.
17 Q And at the time they were off duty?
18 A Yes.
19 Q Do you still have those pictures?
20 A Yes.
21 MS. KRAMER: And can you send those pictures to
22 us?
23 MR. JACOB: Sure.
24 MS. KRAMER: Okay.
25

Page 231

1 BY MS. KRAMER:
2 Q And do you remember when that incident was when
3 you had that conversation?
4 A It would have been sometimes during the summer
5 when Sawyer's was open.
6 Q Okay. Do you remember having a conversation
7 with Sergeant Tyron Meik about him getting a new canine
8 truck?
9 A No.
10 Q Okay. So you don't remember telling --
11 A I -- I may have made a comment about the truck
12 that was overheard by one of the other officers.
13 Q Okay. Do you know what the comment was?
14 A Well, I'm surprised the City bought you a new
15 truck, or something like that. I'm surprised they bought
16 him a new truck.
17 Q Why would you be surprised the City would buy
18 him a new truck?
19 A I don't know.
20 Q Okay.
21 Q Do you know -- did you explain that at the time?
22 A No.
23 Q Okay. Did officer -- or did Sergeant Meik
24 engage you during that interaction, if you remember?
25 A I don't remember.

Page 232

1 Q Do you remember if there were any other officers
2 around during that interaction?
3 A I think there was. That's why I said the -- the
4 comment to --
5 Q Okay. And this was during one of his downtown
6 details, Sergeant -- one of -- this was during one of
7 Sergeant Meik's downtown details?
8 A Um-hum.
9 Q And you don't remember when it was or --
10 A I don't -- it would have been sometime during
11 the summer.
12 Q Okay.
13 A Summer or fall.
14 Q Okay. Have you ever made comments to Sergeant
15 Meik about his wife?
16 A I think I just inquired about if his wife was
17 ██████ one time. Yeah.
18 Q And so you called his wife ██████ is that
19 correct?
20 A Yeah.
21 Q Is that her name?
22 A I don't know. I mean, I --
23 Q So where did you get that name from?
24 A Google.
25 Q So you just Googled Sergeant Meik?

Page 233

1  A   I Googled all of the officers involved in this
2  around the beginning.
3  Q   Okay. And what kind of stuff showed up?
4  A   For some, none, nothing.
5  Q   Okay. Have you ever mentioned Sergeant
6  Meik's -- one of his -- or any of his children's names to
7  him?
8  A   No, not that I know of.
9  Q   Do you know any of his children's names?
10  A   No. I don't even know if he has children.
11  Q   Okay. But you've mentioned Sergeant Meik's
12  wife's name or what at least you believed his wife's name
13  to be --
14  A   Um-hum.
15  Q   -- to him?
16  A   From the Google article relating to -- I think
17  there was one with K-9 Zeke.
18  Q   Okay. And had you mentioned her name to him on
19  more than one occasion?
20  A   I don't -- I don't remember. Could have,
21  possibly.
22  Q   Okay. And what was the purpose of telling
23  Sergeant Meik his wife's name or asking his wife's name?
24  A   I don't know. Just to confirm.
25  Q   Why did you need to know that information?

Page 234

1  A   I don't know.
2  Q   Okay. Was there any -- so what was your intent
3  behind bringing up Sergeant Meik's Wife's name?
4  A   There was no intent.
5  Q   There was no intent behind it?
6  A   Yes.
7  Q   Okay. So why did you do it?
8  A   I don't know.
9  Q   Okay. Do you know who Officer Cynthia Kreiser
10  is -- or Kreiser?
11  A   Yeah.
12  Q   Okay. And have you had any interactions with
13  her?
14  A   Yeah.
15  Q   And how do you know her?
16  A   I don't know her.
17  Q   Well, you just said you know who she is.
18  A   I know who she is from being a Harrisburg police
19  officer.
20  Q   Okay. So you'd be able to identify her if you
21  saw her walking down the street?
22  A   Yes.
23      I don't know any of these police officers.
24  Q   But have you mentioned to Officer Kreiser where
25  she lives?

Page 235

1  A   Not that I know of.
2  Q   Do you know where she lives?
3  A   No.
4  Q   Have you mentioned her daughter's name in front
5  of her?
6  A   No. I didn't even know she had daughters.
7  Q   Have you -- have you ever made any statements
8  about Officer Kreiser in public?
9  A   It's possible.
10  Q   Do you remember saying, don't listen to what
11  Officer Kreiser has to say; she's a fat, worthless cunt?
12  A   I did not say that.
13  Q   Okay.
14  A   It could have been something along those lines,
15  but I did not say that.
16  Q   What do you mean along those lines?
17  A   It could -- I don't -- I don't know.
18  Q   Like not to that degree or not --
19  A   Not to that degree.
20  Q   Or not those exact words?
21  A   Not those exact words.
22  Q   Do you have any idea what you would have said
23  about her?
24  A   I don't remember.
25  Q   Okay. In any of your interactions with --

Page 236

1  regarding Sergeant Meik, you said at one time you asked
2  him if he was a tough guy, correct?
3  A   Um-hum.
4  Q   And that was --
5      MR. JACOB: Yes or no?
6      THE DEPONENT: Yes.
7      MS. KRAMER: Yes.
8  BY MS. KRAMER:
9  Q   And that was in relation to the incident that
10  occurred in September of 2016?
11  A   Yes. He was kind of staring me down. I said,
12  do you think you're a tough guy? -- or something along
13  those lines.
14  Q   And do you know, did he say anything to you in
15  relation to that?
16  A   I think he just kept staring at me.
17  Q   All right. So he was just looking at you?
18  A   Yes.
19  Q   Do you remember anything that he said to you
20  during this interaction?
21  A   Not really.
22  Q   Okay. Do you know where Sergeant Meik lives?
23  A   I've -- I've -- from the Google reports, I've
24  seen that he is from ▇▇▇▇▇▇▇.
25  Q   And have you mentioned that he lives in

Page 237

1          to him?
2    A   Yes, I think I have.
3    Q   Okay. And --
4    A   I asked him.
5    Q   And what was the purpose of that?
6    A   I don't know. I didn't really have a purpose.
7    Q   Okay. But why would you bring that up?
8    A   I don't know.
9    Q   Okay. Do you remember saying to Sergeant Meik,
10 do you want to meet me -- do you want me to meet you out
11 of uniform in         ? Is that what you want?
12    A   No, I don't remember that.
13    Q   Do you ever remember asking Sergeant Meik if he
14 wants to fight you or insinuate something like that?
15    A   I don't remember.
16    Q   Okay. You don't remember?
17    A   I don't -- yeah. I don't remember.
18    Q   All right. Do you think you would have said
19 something like that?
20    A   It depends on the situation. It's possible,
21 could be.
22    Q   So it's possible --
23    A   Yeah.
24    Q   -- you would have said something like that?
25    A   It's possible, yes.

Page 238

1    Q   And why would you have said something like that?
2    A   I don't know.
3    Q   Okay.
4    A   Maybe just, like I said, the anger.
5    Q   The anger?
6    A   Yeah.
7    Q   Do you think that's why you brought up his
8 wife's name?
9    A   Yeah. I don't know.
10    Q   Do you think the anger's related to, like, most
11 of these interactions you've had with the officers?
12    A   Yes.
13        MR. JACOB: Just so you know; we're at 2:30.
14        MS. KRAMER: Okay. The only thing I have left
15 is some of the videos, so I don't know how you want to
16 handle that.
17        MR. JACOB: We're seriously going to go through
18 the videos?
19        MS. KRAMER: Well, I --
20        MR. JACOB: They are what they are. I mean, it
21 can't be disputed.
22        MS. KRAMER: Okay.
23        MR. JACOB: What do we really need to do with
24 the videos?
25        MS. KRAMER: Well, I mean, do you want to just

Page 239

1 stipulate to the contents of some of them right now
2 quickly?
3        MR. JACOB: Yes. We'll stipulate to the entire
4 contents of each of those videos as true and correct as
5 to what they are.
6        MS. KRAMER: Okay. All right. Well, let me
7 just identify which ones we're going to use then.
8        Okay. So, I mean, can I give you the exhibits
9 after the fact? I'll just tell you which ones we're
10 using.
11        MR. JACOB: That's fine.
12 BY MS. KRAMER:
13    Q   So in -- there's the one video you took of
14 Sergeant Meik during the September 2018 interaction, if
15 you recall that.
16    A   Yeah.
17    Q   It's the video we just received.
18    A   Yep.
19    Q   So you'll stipulate that you took the video?
20    A   Yep.
21    Q   That you are speaking in the video as well as
22 Officer -- or Sergeant Meik?
23    A   Um-hum.
24        MR. JACOB: Yes?
25        THE DEPONENT: Yes. Yes. Sorry.

Page 240

1 BY MS. KRAMER:
2    Q   Okay. And the contents of that are true?
3        MR. JACOB: You mean as far as --
4        MS. KRAMER: Yeah. Yeah.
5        MR. JACOB: -- they show what they show?
6        MS. KRAMER: They show what they show.
7        THE DEPONENT: Yes.
8        MS. KRAMER: Okay. I mean, can I just ask you
9 shortly about the contents of it? I know what it says in
10 it.
11        But, I mean, I'll give you that exhibit. That
12 will be the next exhibit. That will be Brackbill 20.
13        (Brackbill Exhibit Number 20 was referenced but
14 was to be marked for identification at a later time.)
15 BY MS. KRAMER:
16    Q   I think you ask Sergeant Meik why you're
17 harassing him. Do you remember that?
18    A   Yes.
19    Q   What did you mean by that?
20    A   He was writing down something on a note --
21 notepad regarding something I had just said or something
22 like that.
23    Q   Do you know what he was writing on the notepad?
24    A   No.
25    Q   But -- so when you were saying that he was

Page 241

1 harassing you, it was referring to him writing on a
2 notepad?
3    A   Yes.
4    Q   Did he say anything else to you?
5    A   After that, I don't remember.
6    Q   Okay.
7        MR. JACOB: And I'll just make a document
8 request for that note that he wrote during that
9 interaction.
10       MS. KRAMER: Okay. If we can find it. I will
11 ask about that.
12       Okay. Then the only other video I think is the
13 other video you sent us from --
14       MR. JACOB: Laura Green.
15       MS. KRAMER: Yeah, Laura Green.
16       THE DEPONENT: Yeah.
17       MS. KRAMER: That's the July --
18       THE DEPONENT: 31st or 30th or something, the
19 29th.
20       MS. KRAMER: -- the 28th. I think it was
21 July 28, 2015.
22       THE DEPONENT: That was the time I went to the
23 office to request to speak to Chief Carter.
24       MS. KRAMER: Okay.
25       THE DEPONENT: Yep.

Page 242

1        MS. KRAMER: Okay. And that will be another
2 exhibit. That will be Brackbill 21.
3        (Brackbill Exhibit Number 21 was referenced but
4 was to be marked for identification at a later time.)
5 BY MS. KRAMER:
6    Q   And you took that video on your phone?
7    A   Yes.
8    Q   And I think in that interaction, she -- Sergeant
9 Green asked you why you were yelling at secretaries?
10   A   Um-hum.
11   Q   Do you know why she said that?
12   A   Like I stated before, I think sometimes when I
13 get excited or get passionate I get loud. It's -- it's
14 as to the person's perception if I'm yelling, you know.
15 I did not yell in that interaction. But like I said, it
16 could have come off as that.
17   Q   All right. Do you think it was reasonable for
18 Sergeant Green to inquire as to what you wanted to meet
19 with Chief Carter about at the time?
20   A   I told her it was a DUI. I told her it was a
21 false arrest.
22   Q   Okay. And you told her that that's what you
23 wanted to talk about?
24   A   Yes.
25   Q   And do you remember if that video shows you

Page 243

1 telling her that?
2    A   I don't remember actually.
3    Q   Okay.
4    A   I did -- I do -- I do think I remember saying
5 something about drinking. Yes. I do think it says
6 something about that, but I don't remember.
7    Q   Okay.
8    A   But the video would have it and what I said.
9        MS. KRAMER: Okay. And then the only other
10 video is that surveillance video.
11       MR. JACOB: It is what it is.
12       MS. KRAMER: Yeah. I mean, that will be the
13 next exhibit. I mean, that one's actually our exhibit.
14 I mean, you stipulate that it is what it is?
15       MR. JACOB: I can't dispute it. I mean, you're
16 going to say it's this.
17       MS. KRAMER: Okay. So I mean --
18       MR. JACOB: It's a surveillance video.
19       MS. KRAMER: Okay. That will be Brackbill 22.
20 BY MS. KRAMER:
21   Q   Do you admit that you're in that video?
22   A   I haven't seen it, but I would say it's a good
23 chance. Without seeing it, I don't know.
24       MS. KRAMER: Okay. All right. Well, I have to
25 take a break real quick before we do this, just to figure

Page 244

1 out something, and I'll be right back. Okay?
2        MR. JACOB: Um-hum.
3        MS. KRAMER: Is that all right? We'll go off
4 the record.
5        (A recess was taken.)
6        MS. KRAMER: We're going back on the record.
7 I think we can end things -- I just have to
8 touch on two things. So the other exhibit we would be
9 using is the surveillance video that, you know, we
10 provided on Friday.
11       I guess Calvin stated he hasn't seen it; but if
12 you'll stipulate that he's the one -- that he's depicted
13 in the video interacting with Officer Meik, then we don't
14 have to go over it in this deposition.
15       MR. JACOB: I'll just say I'll stipulate that it
16 is what it is. He's either in there or he's not. I
17 mean, I -- frankly, I haven't even looked at it either.
18       MS. KRAMER: But I think that, like, if he's not
19 going to -- I mean, if you want to play it right now, I
20 know where it is in the video where he shows up.
21       MR. JACOB: Go for it.
22       THE DEPONENT: I haven't seen it. I know you
23 sent it to me. My Dropbox didn't accept it because I
24 don't have enough room in my Dropbox.
25       MR. JACOB: If you want to go ahead and --

Page 245

1    MS. KRAMER: I mean, the only problem is, then I
2 have to get Kathy to come back in.
3    MR. JACOB: Whatever you want to do. I mean, I
4 don't -- off the record.
5    (Discussion held off the record.)
6    MS. KRAMER: Back on the record.
7    So this is -- on top of those other two videos,
8 this will be 23, Brackbill 22.
9    (Brackbill Exhibit Number 22 was referenced but
10 was to be marked for identification at a later time.)
11    (The video was played and paused and the
12 following discussion occurred:)
13 BY MS. KRAMER:
14    Q    Okay. Mr. Brackbill, do you know what this is?
15    A    Yeah. It's 2nd Street near Arooga's, and then
16 Sawyer's is over there.
17    Q    Okay.
18    MR. JACOB: Is over where? Where's Sawyer's?
19    THE DEPONENT: It looks like they're right
20 there, the red awnings, I think.
21 BY MS. KRAMER:
22    Q    Okay. So you're saying Arooga's is on the
23 right?
24    A    Yes.
25    Q    And then the street that's depicted is

Page 246

1 2nd Street, and then you're saying Sawyer's is across the
2 street from that?
3    A    Yes.
4    Q    On the left?
5    A    Yes.
6    Q    Okay. And you're familiar with this area?
7    A    Yes.
8    Q    Okay. Have you ever seen this video before?
9    A    No.
10    Q    Okay. Do you see right here, the bottom middle,
11 there's a police officer --
12    A    Um-hum.
13    Q    -- it would appear.
14    MR. JACOB: Yes or no?
15    THE DEPONENT: Yes.
16 BY MS. KRAMER:
17    Q    Do you know who that is?
18    A    It looks like it could be Sergeant Meik
19 possibly.
20    Q    Okay. And why would you say that?
21    A    The bald head. Without knowing anything else,
22 the bald head.
23    MS. KRAMER: Okay. All right. And will you
24 stipulate that this video was taken on September 15th,
25 2018?

Page 247

1    MR. JACOB: I -- I don't know when it was taken,
2 so I can't stipulate to that, obviously. I don't mean,
3 to say obviously obnoxiously. I'm just saying I don't
4 know when it was taken. I know what it's dated. I have
5 no reason to disbelieve it, but I really don't know. I
6 didn't take it.
7    MS. KRAMER: Okay.
8    MR. JACOB: I don't know who took it. So I -- I
9 mean, I'm sure -- well, let's put it this way: If, for
10 some reason, this was admitted at trial, I'm not going to
11 make you bring somebody in to date and time it. It just
12 kind of is what it is.
13    MS. KRAMER: Yeah.
14    MR. JACOB: They're either in the video or
15 they're not.
16    MS. KRAMER: Okay. I think I'm going to play it
17 around -- and the way that it -- the time is on this
18 video, it's by, like, the time of day so --
19    MR. JACOB: Oh, I see.
20    MS. KRAMER: -- right here -- I mean, it's
21 saying that this video -- it says from, like, 1:40 a.m.
22 on to, like, a little after 2:05 a.m. So I'm going to
23 play it around 1:46 a.m. and around 46 seconds.
24    MR. JACOB: All right.
25    MS. KRAMER: So I'm playing the video now.

Page 248

1 There is no sound.
2    (The video was played.)
3    MS. KRAMER: Okay. I'm going to pause it right
4 here.
5    (The video was paused.)
6    MR. JACOB: The -- you're going to ask him about
7 the guy in the plaid or whatever?
8    MS. KRAMER: Yeah.
9 BY MS. KRAMER:
10    Q    So just for the record, did you see,
11 Mr. Brackbill, an individual who walked down the sidewalk
12 next to Arooga's in like a black and white flannel, plaid
13 shirt?
14    A    Yes.
15    Q    Do you recognize that individual?
16    A    Yes.
17    Q    Who is it?
18    A    It does appear to be me.
19    Q    Okay. And did you notice that there was any
20 sort of interaction with yourself and the officer that
21 was located in the center middle of the video?
22    A    Yeah.
23    MR. JACOB: Yes?
24    THE DEPONENT: Yes. Yes.
25 BY MS. KRAMER:

Page 249

1  Q   And what kind of interaction did you observe?
2  A   It looks like I just briefly said something.
3  Q   Okay.  Do you have any idea of when this might
4  have occurred?
5  A   The date?
6  Q   Yeah, or just the general time frame.
7  A   The date, probably -- I'd say around that
8  Saturday.  I don't know if that's Saturday,
9  September 14th or 15th.
10  Q   Of -- was that of 2018?
11  A   Yes.
12      MS. KRAMER:  Okay.  All right.  Now I'm just
13  going to fast forward the video a little bit.
14      All right.  So I'm going to start playing this
15  video at 2 a.m. and 25 seconds.
16      (The video was played.)
17      MS. KRAMER:  And let me just pause it again for
18  just one second.
19      (The video was paused.)
20  BY MS. KRAMER:
21  Q   Mr. Brackbill, now in the center, bottom of this
22  video where the bald police officer is, did you observe
23  him doing anything right now?
24  A   Right now?
25  Q   Yes.

Page 250

1  A   He appears just to be standing there.
2  Q   Okay.  Is he standing next to anyone?
3  A   Yes.  Another officer.
4  Q   Do you recognize who that officer is?
5  A   Not from that.  His face looks to be very
6  blurred.
7      MS. KRAMER:  Okay.  No problem.
8      All right.  I'm going to just try to fast
9  forward this again.
10      So right now it's at 2:01 a.m. and 42 seconds,
11  and I'm just going to try to fast forward it a little
12  bit.
13      Okay.  Now, I'm going to start it again at 2:02
14  and 7 seconds, and that's a.m.
15      (The video was played.)
16      MR. JACOB:  Are we going to watch the rest, or
17  do you just want to say it's him or --
18      MS. KRAMER:  I'm going to pause it right now
19  at 2 -- okay.  I'm going to pause it at 2:04 a.m. and 42
20  seconds.
21      (The video was paused.)
22  BY MS. KRAMER:
23  Q   Mr. Brackbill, we just watched a portion of
24  video.  Can you describe to me what you saw?
25  A   It looks to me like an individual talking to two

Page 251

1  police officers on the side of a street near Arooga's.
2  Q   And the individual that you saw talking to the
3  police officers, is that the same individual we saw
4  previously in the video with the black and white
5  checkered, flannel-type shirt?
6  A   Yes.
7  Q   And do you know who that individual is?
8  A   Yes.
9  Q   And who is that?
10  A   It appears to be me.
11  Q   Okay.  And does -- do you have any memory of
12  when this incident was?
13  A   No.  No, I don't.  Other than the date,
14  September 14th, I don't.
15  Q   Okay.  Did you notice that there was a -- like,
16  there was an item in the individual's right hand that you
17  identified as yourself?
18  A   Oh, yeah.  It does appear like there's something
19  there.
20  Q   And do you know what that is?
21  A   It looks like a cell phone.
22      MS. KRAMER:  Okay.  All right.  And I guess
23  that's probably all we need for that.
24      MR. JACOB:  All right.
25      MS. KRAMER:  Okay.  And then other than that,

Page 252

1  the only other matter we have to do just has to do with
2  the attorney's fees issue.
3  BY MS. KRAMER:
4  Q   So at this point, have you received any bills
5  from Attorney Jacob in relation to his representation of
6  you in your criminal matter?
7  A   No.
8      MR. JACOB:  Again, we already covered that.  I
9  haven't invoiced you yet.
10      MS. KRAMER:  All right.  Well, I want to just
11  hear him say that.
12      THE DEPONENT:  No.
13  BY MS. KRAMER:
14  Q   Okay.  So you've received no invoice?
15      MR. JACOB:  And again.
16      THE DEPONENT:  No.
17  BY MS. KRAMER:
18  Q   Okay.  All right.  And you have no outstanding
19  bills?
20      MR. JACOB:  Yes, whatever the criminal matter's
21  going to be.
22  BY MS. KRAMER:
23  Q   Do you have any outstanding bills,
24  Mr. Brackbill?
25  A   Could you please elaborate.

| Page 253 | Page 255 |
|---|---|
| 1 Q Do you have any outstanding legal bills to | 1 Q And the only thing that partially detached from |
| 2 Mr. -- to Attorney Jacob in your related criminal matter? | 2 your car was the bumper cover; is that correct? |
| 3 A Yes. | 3 A Yes. |
| 4 Q Have you received those bills? | 4 MR. JACOB: No further questions. |
| 5 A No. | 5 MS. KRAMER: Okay. I have just one follow-up |
| 6 MS. KRAMER: Okay. All right. No further | 6 question. |
| 7 questions then. | 7 Okay. I just have one additional document for |
| 8 MR. JACOB: Just real quick. | 8 you to look at, and then we'll be done. We'll mark this |
| 9 EXAMINATION | 9 then as Brackbill 23. |
| 10 BY MR. JACOB: | 10 (Brackbill Exhibit Number 23 was referenced but |
| 11 Q After you were done with work on the night in | 11 not marked for identification.) |
| 12 question, did you immediately leave the Hotel Hershey? | 12 EXAMINATION |
| 13 A Yes. | 13 BY MS. KRAMER: |
| 14 Q Did you take any detours and go anywhere else | 14 Q Mr. Brackbill, do you know what this packet of |
| 15 other than -- | 15 documents is? |
| 16 A No. | 16 A Yes. The first one is the bag that I put my |
| 17 Q Sorry. That was my poor question. | 17 personal property in when I was booked into the judicial |
| 18 Other than towards your home? | 18 center. |
| 19 A No. | 19 Q Okay. |
| 20 Q And it was during that travel from work to home | 20 A And the second one appears to be the property |
| 21 that you were stopped? | 21 record. |
| 22 A Yes. | 22 Q Okay. So when you say the first one, you mean |
| 23 Q When you were placed in the back of the | 23 the first page; and when you say the second one, you mean |
| 24 transport van, were you seat-belted in? | 24 the second page, correct? |
| 25 A Yes, I believe so. | 25 A Yes. |

| Page 254 | Page 256 |
|---|---|
| 1 Q You referred to leg cuffs. Did you mean | 1 Q Okay. And so on both of these sheets, does it |
| 2 shackles? | 2 outline all of your personal belongings that were taken |
| 3 A Yes, I believe so. | 3 from you on the night that you were taken into the |
| 4 Q Did any police officer ask if they could have | 4 booking -- or the early morning you were taken into the |
| 5 your permission to pull your car to the side of the road | 5 booking center on June 28th, 2015? |
| 6 and park it to avoid the towing expense? | 6 A No. |
| 7 A No. | 7 Q What item is missing? |
| 8 Q Did you suffer any embarrassment standing out in | 8 A The name tag. |
| 9 the street in handcuffs on the night in question? | 9 Q Do you know why the name tag was not included on |
| 10 A Yes. | 10 this one? |
| 11 Q And was this -- were you embarrassed to have to | 11 A I do not know. |
| 12 discuss this matter with your mom? | 12 Q Is there any other item that was not included on |
| 13 A Yeah, extremely. | 13 this list? |
| 14 Q Were there people around in the area of the | 14 A Not that I know of. |
| 15 incident on the night in question when you were in | 15 Q Did you receive your name tag back after you |
| 16 handcuffs? | 16 were released from the booking center? |
| 17 A (No verbal response.) | 17 A Yes. |
| 18 Q Out on the street I mean. | 18 Q And the name tag was taken with the items listed |
| 19 A I don't remember. | 19 on this inventory sheet, to the best that you remember? |
| 20 Q Okay. And just to be clear, because I know | 20 A Yes. |
| 21 there was some confusion early on in the record, but the | 21 MS. KRAMER: Okay. No further questions then. |
| 22 bumper to your car, not the bumper cover but the bumper | 22 MR. JACOB: Oh, just one follow-up. |
| 23 to your car, never disconnected or fell off your vehicle | 23 |
| 24 on the night in question, correct? | 24 |
| 25 A Yes, that's correct. | 25 EXAMINATION |

Page 257

1 BY MR. JACOB:

2 Q You testified that Ruff had used an ignorant

3 term -- I think you said retarded, to refer to mentally

4 ill persons -- on the night in question, correct?

5 A That was Hill.

6 Q Oh, that was Hill.

7 A Yes.

8 Q Okay. I'm sorry.

9 Do you recall that?

10 A Yes.

11 Q I think you indicated that he asked if you were

12 retarded?

13 A Yes.

14 Q Do you suffer from any mental illnesses?

15 A No.

16 Q Did you find that term to be offensive?

17 A Yes.

18 MR. JACOB: No further questions.

19 MS. KRAMER: All right.

20 MR. JACOB: Okay.

21 MS. KRAMER: I think we're done.

22 (The deposition concluded at 3:05 p.m.)

23

24

25

Page 258

1 COUNTY OF LANCASTER:

2                               SS

3 COMMONWEALTH OF PENNSYLVANIA:

4

5          I, Kelly S. Ryan, RPR, Court Reporter and

6 Undersigned Commissioner, do hereby certify that the

7 witness personally appeared before me, being by me first

8 duly sworn or affirmed to testify to the truth, the whole

9 truth and nothing but the truth, and in answer to the

10 oral questions propounded to the witness by the attorneys

11 for the respective parties, testified as set forth in the

12 foregoing deposition.

13          I further certify that before the taking of said

14 deposition, the above witness was duly sworn or affirmed,

15 that the questions and answers were taken down

16 stenographically by the said Kelly S. Ryan, RPR, Court

17 Reporter, Lancaster, Pennsylvania, approved and agreed

18 to, and afterwards reduced to print by means of

19 computer-aided transcription under the direction of the

20 aforesaid Reporter.

21          In testimony whereof, I have hereunto subscribed

22 my hand this 8th day of March 2019.

23

24                      *Kelly S. Ryan*

25

                    KELLY S. RYAN, RPR

Page 259

1                    ESQUIRE ERRATA SHEET

2 Esquire Job ID: J3631127

3 Case Caption: CALVIN BRACKBILL vs. STEPHEN RUFF, ET AL.

4

5

6

            DECLARATION UNDER PENALTY OF PERJURY

7

          I declare under penalty of perjury that I

8 have read the entire transcript of my deposition taken

  in the above-captioned matter or the same has been read

9 to me and the same is true and accurate, save and

  except for changes and/or corrections, if any, as

10 indicated by me on the DEPOSITION ESQUIRE ERRATA SHEET

  hereof, with the understanding that I offer these

11 changes as if still under oath.

  Signed on the _____ day of _____, 20___.

12

13          _____

CALVIN EDWARD BRACKBILL

14

15

16

17

18

19

20

21

22

23

24

25

Page 260

1 DEPOSITION ERRATA SHEET

2 Page No._____ Line No._____ Change to: _____
  Reason for change: _____

3

  Mpage No._____ Line No._____ Change to: _____

4 Reason for change: _____

5 Page No._____ Line No._____ Change to: _____
  Reason for change: _____

6

  Page No._____ Line No._____ Change to: _____

7 Reason for change: _____

8 Page No._____ Line No._____ Change to: _____
  Reason for change: _____

9

  Page No._____ Line No._____ Change to: _____

10 Reason for change: _____

11 Page No._____ Line No._____ Change to: _____
   Reason for change: _____

12

  Page No._____ Line No._____ Change to: _____

13 Reason for change: _____

14 Page No._____ Line No._____ Change to: _____
   Reason for change: _____

15

  Page No._____ Line No._____ Change to: _____

16 Reason for change: _____

17 Page No._____ Line No._____ Change to: _____
   Reason for change: _____

18

  Page No._____ Line No._____ Change to: _____

19 Reason for change: _____

20 Page No._____ Line No._____ Change to: _____
   Reason for change: _____

21

  Page No._____ Line No._____ Change to: _____

22 Reason for change: _____

23 Page No._____ Line No._____ Change to: _____
   Reason for change: _____

24

25 SIGNATURE: _____        DATE: _____
  CALVIN EDWARD BRACKBILL



Page 261

```
1   DEPOSITION ERRATA SHEET
2   Page No.____Line No.____ Change to: _____
    Reason for change:_____
3
    Page No.____Line No.____ Change to: _____
4   Reason for change:_____
5   Page No.____Line No.____ Change to: _____
    Reason for change:_____
6
    Page No.____Line No.____ Change to: _____
7   Reason for change:_____
8   Page No.____Line No.____ Change to: _____
    Reason for change:_____
9
    Page No.____Line No.____ Change to: _____
10  Reason for change:_____
11  Page No.____Line No.____ Change to: _____
    Reason for change:_____
12
    Page No.____Line No.____ Change to: _____
13  Reason for change:_____
14  Page No.____Line No.____ Change to: _____
    Reason for change:_____
15
    Page No.____Line No.____ Change to: _____
16  Reason for change:_____
17  Page No.____Line No.____ Change to: _____
    Reason for change:_____
18
    Page No.____Line No.____ Change to: _____
19  Reason for change:_____
20  Page No.____Line No.____ Change to: _____
    Reason for change:_____
21
    Page No.____Line No.____ Change to: _____
22  Reason for change:_____
23  Page No.____Line No.____ Change to: _____
    Reason for change:_____
24
25  SIGNATURE:_____DATE:_____
    CALVIN EDWARD BRACKBILL
```

