# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CALVIN BRACKBILL | : | Civil Action No. 1:17-cv-1046 |
| v. | : | Jury Trial Demanded |
| STEPHEN RUFF, et al. | : | |

## PLAINTIFF'S COUNTER STATEMENT OF MATERIAL UNDISPUTED FACTS IN A LIGHT MOST FAVORABLE TO PLAINTIFF

Plaintiff Calvin Brackbill, by and through his attorney, Brian J. Zeiger, Esquire, file their Counter Statement of Material Facts in support of his response to Defendants' Motion for Summary Judgment.

**A. Plaintiff's Deposition**

1. On June 27, 2015, Plaintiff was working at the Hershey Hotel. (Brackbill Dep. at 18)

2. Work ended early in the morning of June 28, 2015. (Brackbill Dep. at 18)

3. As Plaintiff was driving home, he was at stop light at or near the Pennsylvania Apartments and Brico, at or near 3rd and Chestnut in Harrisburg, PA. (Brackbill Dep. at 30)

4. As the light turned green and Plaintiff began to drive, Plaintiff heard a sound. (Brackbill Dep. at 29)

5. The sound was a scraping sound. (Brackbill Dep. at 31)

6. Plaintiff got out of his car and noticed his bumper was sagging in the middle, touching the road. (Brackbill Dep. at 34-35)

7. The part that was sagging to the ground was a bumper cover. (Brackbill Dep. at 37)

8. Further, when direct by Plaintiff's previous lawyer at his deposition,

1

9. Okay. And just to be clear, because I know there was some confusion early on in the record, but the bumper to your car, not the bumper cover but the bumper to your car, never disconnected or fell off your vehicle on the night in question, correct?

10. Yes, that's correct.

11. Q. And the only thing that partially detached form your care was the bumper cover; is that correct?

12. Yes.

13. (Brackbill Dep. at 254-255)

14. Plaintiff was able to put the bumper cover back onto the bumper. (Brackbill Dep. at 39)

15. Defendant Hill then approached Plaintiff. (Brackbill Dep. at 39)

16. In response to a question from Defendant Hill, Plaintiff told Defendant Hill he had not hit anything. (Brackbill Dep. at 40)

17. In response to a question from Defendant Hill, Plaintiff told Defendant Hill he had not had anything to drink that night. (Brackbill Dep. at 41)

18. In response to further questioning from Defendant Hill, Plaintiff told Defendant Hill he was on his way home from work heading to his apartment down the street. (Brackbill Dep. at 42)

19. Defendant Ruff appeared on the scene. (Brackbill Dep. at 43)

20. Defendant Ruff asked Plaintiff what he hit, and Plaintiff told Defendant Ruff he had not hit anything. (Brackbill Dep. at 44)

21. Plaintiff has no memory of Defendants Ruff and Hill speaking to each other. (Brackbill Dep. at 44)

22. Defendant Ruff asked Plaintiff if he had been drinking and Plaintiff told Defendant Ruff he had not been drinking and was on his way home from work. (Brackbill Dep. at 44)

23. Further, Plaintiff was not using any other substances. (Brackbill Dep. at 46)

24. Plaintiff was placed in cuffs and asked Defendants why he was being arrested. (Brackbill Dep. at 48)

25. In response Defendant Ruff told Plaintiff they had already told Plaintiff the reason for his arrest and asked Plaintiff if he was retarded. (Brackbill Dep. at 48).

26. Plaintiff repeatedly told the officers on the scene (including Defendants Hill and Ruff), that he had not been drinking, was coming from work at the Hershey Hotel, showed them his Hershey Hotel name badge on his shirt, and was wearing the clothing associated with Hershey's dress code. (Brackbill Dep. at 53-54)

27. Officer Meik was chiding Plaintiff about his appearance. (Brackbill Dep. at 55)

28. Plaintiff continued to ask the Defendants why he was being arrested. Finally, Defendant Hill told him DUI. (Brackbill Dep. at 56)

29. Plaintiff repeated to the Defendants that he had not been drinking, he was just on his way home from work. (Brackbill Dep. at 58)

30. Defendants told Plaintiff again he was being arrested for DUI and Plaintiff began to laugh because he did not understand how he could be arrest for DUI when he had not drank any alcohol. (Brackbill Dep. at 58).

31. Defendant Ruff searched Plaintiff's car. (Brackbill Dep. at 59).

32. Defendant Ruff found Plaintiff's asthma medicine. (Brackbill Dep. at 60).

33. Plaintiff asked Defendant Hill if he was going to perform a field sobriety test on him. (Brackbill Dep. at 61).

34. Plaintiff began put a foot up as if to show Defendant Hill that he was able to perform a field sobriety test. (Brackbill Dep. at 62).

35. Defendant Hill told Plaintiff he did not have time for that. (Brackbill Dep. at 62).

36. Plaintiff was handed off to Police Officer Dawson for transport to the police station. (Brackbill Dep. at 62).

37. Dawson told Plaintiff, that Plaintiff would be fine and that Plaintiff looked like he was just coming from work. (Brackbill Dep. at 64).

38. Plaintiff told Dawson that's what he had been trying to tell Defendants Hill and Ruff all night. (Brackbill Dep. at 64).

39. Further, Plaintiff denies he ever bumped Defendant Ruff's chest. (Brackbill Dep. at 86).

40. Plaintiff denies he was very close to Defendant Ruff at any time. (Brackbill Dep. at 86).

41. Further, later at the police station, Plaintiff consented to a blood draw. (Brackbill Dep. at 95, 97-98).

42. At some point in time after Plaintiff was released from custody and got his car back, Plaintiff attempted to make a complaint against the Defendants to the Harrisburg Police Department. (Brackbill Dep. at 132-141).

43. However, Plaintiff was not permitted to make a complaint. (Brackbill Dep. at 141).

44. Eventually, Plaintiff was permitted to make a complaint through another officer. (Brackbill Dep. at 144).

45. Further, Plaintiff attempted to get the results of his DUI blood draw. (Brackbill Dep. at 150-152).

46. Plaintiff was not permitted to get the results of his blood draw, and Plaintiff believed there was a cover-up. (Brackbill Dep. at 155).

47. Plaintiff felt as though, "they were trying to swipe this under the rug because I was not drinking and they just wanted to swipe it under the rug." (Brackbill Dep. at 155).

48. Plaintiff kept attempting to get the results from his blood draw, but kept getting sent to different people for the results. Plaintiff contacted various people in government, through phone, email, in person, and right to know requests. (Brackbill Dep. at 155-168).

49. Plaintiff eventually got the results of the tests. (Brackbill Dep. at 152, 161).

50. Plaintiff was issued two traffic citations more then 30 days after the incident. (Brackbill Dep. at 176).

51. One of the citations related to lack of insurance. (Brackbill Dep. at 178).

52. Plaintiff was never given the opportunity to show the Defendants his proof of insurance. (Brackbill Dep. at 178).

53. Plaintiff's proof of insurance was in the glove box of the car at the time of the false arrest for DUI. (Brackbill Dep. at 179).

54. At first, Plaintiff was found guilty of the bumper citation (Brackbill Dep. at 194), but Plaintiff filed a *de novo* appeal to the Court of Common Pleas and he was found not guilty of the bumper citation because Plaintiff was found not to be in violation of the section of vehicle code for which Defendant Ruff charged him. (Brackbill Dep. at 195).

55. Plaintiff has had no additional interaction with Defendant Hill. (Brackbill Dep. at 223).

56. Plaintiff has had no additional interaction with Defendant Ruff. (Brackbill Dep. at 224).

II. **Defendant Ruff's Deposition**

57. Defendant Ruff arrested Plaintiff for DUI based in part on what Defendant Hill told him. (Ruff Dep. at 6)[1]

58. Defendant Ruff admits there is no crime of suspicion in Pennsylvania and the requirements for an arrest for suspicion of DUI are the same as any other arrest. Defendant Ruff admits he issued two tickets to the Plaintiff, but he does not recall if he ever saw Plaintiff actually driving the vehicle. (Ruff Dep. at 9-10).[2]

---

[1] A.   I made a decision to arrest Calvin Brackbill for suspicion of DUI based off of the – what Officer Hill told me when he – he detected an odor of alcohol coming from Mr. Brackbill.

(Ruff Dep. at 6)

[2] Q.   Okay. And you agree that the term "suspicion" is a word that police officers use but it is not in the statute of Pennsylvania?
MS. KRAMER: Object to form. You can answer.
A.   Correct
Q.   Okay. So when you arrest someone for suspicion of DUI, you're arresting them for DUI really, aren't you?
A.   Yes. And then a blood test or a breath test would confirm our suspicion.
Q.   Understood. And in this case there were two tickets that were issued. Do you remember that?
A.   Yes.
Q.   Are you responsible for issuing those two tickets
A.   Yes.
Q.   Okay. And did you ever actually see Mr. Brackbill operating the vehicle?
A.   I don't recall.
Q.   Okay. And by operating I mean driving. Did you ever see him driving the vehicle?
A.   I don't re -- I don't recall.
Q.   And you don't recall whether you ever saw him behind the wheel even if the car was stopped either, correct?
A.   To the best of my recollection he was already outside of the vehicle trying to attend to his bumper when I -- by the time I got there.
(Ruff Dep. at 9-10)

59. Again, Defendant Ruff admits he does not recall if he ever saw Plaintiff operate the vehicle. Defendant Ruff attempted to justify the issuance of the tickets. (Ruff Dep. at 23-25).[3]

60. Defendant Ruff admits he is not sure if there is a violation of Pennsylvania law if a bumper cover is loose from a bumper. (Ruff Dep. at 25-26).[4]

---

[3] A.  I don't re -- I don't recall.
Q.  And you don't recall whether you ever saw him behind the wheel even if the car was stopped either, correct?
A.  To the best of my recollection he was already outside of the vehicle trying to attend to his bumper when I -- by the time I got there.
Q.  Okay. And why did you institute those two summary proceedings against him?
A.  Again, it was common practice to issue traffic citations after an incident like that.
Q.  Understood. But what I mean to say is -- I'm changing the subject. So let's talk about -- so let's talk about the first one. You can make either one you want the first one. There's two here. Why did you issue that one, and tell me which one you're referring to.
A.  I issued the -- the no insurance because when I went to look for his in -- an insurance card I found that it was expired. I can't tell you when it was expired in relation to the day of the incident, but it was expired.
Q.  Okay. And did you ever ask Mr. Brackbill if he had insurance for the car?
A.  I did not.
Q.  Okay. And did you ever notify Mr. Brackbill that he had five days to come into your police station and tell anyone who worked there or present them with proof of insurance? Did you ever tell him that?
A.  I did not.
Q.  Okay. Are you aware that's the law in Pennsylvania?
A.  Yes.
Q.  Like it's not a courtesy for police to say to people you have five days to come in, I'm going to give you this courtesy? If you – if you -- if you tell me -- if you prove to me you have insurance, I'll tear up the ticket. That's not a courtesy, that's actually the law in Pennsylvania. Do you know that?
(Ruff Dep. at 23-25)

[4] Q.  Okay. And then let's talk about the second, the second ticket. What was that for?
A.  That was for the unsecured bumper.
Q.  Okay. And why did you issue that one?
A.  Because that was our -- the reason that I -- we came in contact with each other.
Q.  Right. And do you know what's required in order for you to write that ticket?
A.  That I -- that his bumper was unsecure and he was pushing it down the street.
Q.  Okay. If it's the cover to the bumper, is it different than if it's the bumper itself?
A.  I'm not sure.
Q.  Okay. So if -- okay. And when did you issue that, that ticket?

61. Defendant Ruff admits he did not issue the traffic tickets until after he received the 0.0 BAC results. (Ruff Dep. 44-45).[5]

---

A. The same time I issued the other, the first citation.
Q. And it was after you got the zeros in the -- in the report?
A. Yes.
Q. Okay. Now, after you got the zeros in the report, did you realize that it was a bad arrest for DUI?
A. Yes.
(Ruff Dep. at 25-26)

[5] Q. So they're your counsel's documents. They say 8 and 9 in the bottom right-hand corner. And so I'm asking you in the summary that you typed on the night in question if you wrote anything at all about either of those tickets on that night in this.
MS. KRAMER: So is this question just about the insurance?
Q. The question is -- I guess I'll just rephrase it. You issued him two tickets at a later point in time, and you typed these facts in a couple hours after the incident occurred, and I'm asking you if on the night the incident occurred when you typed this summary if there's any information in this summary about anything to do with driving without financial responsibility ticket or anything about this bumper issue for the -- for the -- for the ticket in this -- in this summary, and if so, can you point it out to me.
MS. KRAMER: Object to form.
THE WITNESS: Still answer?
MS. KRAMER: You can answer, yes, if you understand the question.
THE WITNESS: Yeah.
A. From what I read, there is no information about the insurance in this narrative, but I think it's clear that the bumper issue is well-documented.
Q. Okay. And I'm going to move to page 13 now. On -- on page 13 my mouse is -- my cursor is over here where it says "Reporting Officer," and again it says your badge number, your name, and now the date is 7/26/15 at 5:14 a.m. You see that?
A. I do.
Q. Okay. And so you're again, because this is your case, you're the typist here, correct?
A. Correct.
Q. And now at the bottom of this report it says, "I received the blood results. The labs showed that Brackbill was not under the influence at the time of the incident. Brackbill will be charged with 1786F and 4536. Citations completed." You typed that in, right?
A. Yes.
Q. Okay. And those two numbers that are on this paper, those are the numbers that correspond with the Motor Vehicle Code statute for the tickets that you issued, right? That's what these code numbers are for, right?
A. Correct.
(Ruff Dep. 44-45)

62. Defendant Ruff agrees the 5 day opportunity to show a police officer proof of insurance is not a courtesy, but Pennsylvania law. (Ruff Dep. at 54).[6]

63. Defendant Ruff admits no one issued Plaintiff a ticket for Disorderly Conduct. (Ruff Dep. at 59).[7]

64. Defendant Ruff refuses to admit he issued the tickets as a cover up after getting the 0.0 BAC results. Defendant Ruff refuses to admit Plaintiff was improperly charged on both tickets. (Ruff Dep. at 63-64).[8]

---

[6] Q. Okay. And when you -- when you issued this ticket to him more than -- more than a month later, you never gave him an opportunity to come in within five days and show you the actual paperwork, did you?
MS. KRAMER: Object to form.
A. I did not. I usually like to handle that at the hearing.
Q. Okay. But you agree that, reading this, it's not a -- it's not a courtesy. You're not giving anyone a courtesy by giving them that chance, right?
(Ruff Dep. at 54)

[7] Q. Okay. And no one issued him any tickets for like disorderly conduct, right?
A. No.
(Ruff Dep. at 59)

[8] Q. Did you ever -- did you -- did you issue these tickets to just cover yourself from this bad DUI arrest?
MS. KRAMER: Object to form.
(inaudible)
A. No.
Q. Did any supervisor order you to issue these tickets after the fact?
A. No.
Q. Do you have any proof anywhere in any documents that there was any contemplation of these tickets before the DUI results came back as all zeros?
A. No.
Q. And your testimony today is you didn't issue these tickets because you had a guy who had filed various complaints against you and the other police officers with all your supervisors and sent a ton of emails to everyone complaining about you guys, and your testimony today is you did not issue the tickets in retaliation for that?
MS. KRAMER: Object to form.
A. Yeah, I was never aware of any of that.
Q. So your testimony today is you didn't issue these tickets just to be spiteful?
A. No.
Q. And is your testimony today still that these tickets were properly issued?

65. Defendant Ruff has no explanation why one of the documents shows the ticket was originally for failure to report and accident. (Ruff. Dep. at 84).[9]

66. Defendant Ruff was confronted and impeached with the email between two supervisors but still denies the tickets were issued as a cover up. (Ruff Dep. at 86, 88-89, 91).[10]

---

A. Yes.
Q. Even after I showed you the statute for the financial responsibility, that you're supposed to give the guy five days to show you the -- show you the card, you still think it was a good ticket?
A. Yes.
Q. And the ticket for the bumper dragging on the ground, even though I showed you there's a more specific statute for bumpers that he's not guilty of, you still think the way you issued the ticket was right?
(Ruff Dep. at 63-64)

[9] Q. Okay. Do you have any explanation as to why on your paperwork that we looked at first, the document that was called Ruff 1, the one that was produced by your attorney, that on that charge where the -- where the original charges go, and I'm happy to share the screen again if you'd like, where it said failure to report an accident on there as one of the tickets. Do you have any explanation for that?
A. Well, since we had no information, I thought that would be the cause of the -- his bumper coming off, but I definitely didn't have any evidence to support that.
(Ruff Dep. at 84)

[10] Q. Okay. Well, if I told you an email existed where he's -- he's talking to you about this incident and Calvin complaining, would you want to change your answer to what you said earlier when I said did you issue these tickets just to -- just to cover yourself for the bad DUI arrest?
(Ruff Dep. at 86)

Q. He says, "Well, I will have to ask Ruff about this again. Apparently Hill and Yost were riding together and were handling a robbery call in the 300 block of Chestnut when the car came with the bumper off. Corporal McGarrity directed Hill and Ruff to stop the car and find out what was going on. They arrested Brackbill. Ruff asked me Saturday night what happens if the lab comes back with not intoxicated. I told him what to do, but he didn't read the report until later. Ruff is on his days off. I will get more when he comes back."
Q. So even though you're not --you're not actually cc'd on this email or part of the email, do you remember speaking with Lieutenant Sorensen about the arrest in this case?
A. Yes.
Q. Do you remember asking Lieutenant Sorensen what happens if the BAC comes back with zeros?
A. Yes.

III. Email Message

An email exists from one police supervisor to another:

> Well, I will have to ask Ruff about this again. Apparently Hill and Yost were riding together and were handling a robbery call in the 300 bl of Chestnut when the car acme with the bumper off. Cpl. McGarrity directed Hill and Ruff to stop the car and find out what was going on. They arrested Brackbill. Ruff asked me Sunday night what happens if the lab results come back with not intoxicated. I told him what to do, but didn't read the report until later. Ruff is on his days off, I will get more when he come[s] back.

Email from Dennis Sorensen to Deric Moody on July 1, 2015 3:04 a.m.; Exhibit 3.

RESPECTFULLY SUBMITTED,

<u>November 13, 2020</u>       <u>/s/ Brian J. Zeiger, Esquire</u>
DATE       BRIAN J. ZEIGER, ESQ.
      **LEVIN & ZEIGER, LLP**
      1500 JFK BLVD STE 620
      PHILADELPHIA, PA 19102
      215-825-5183
      PA Bar Id. No. 87063

---

Q. Okay. And what was his response?
A. He said we usually just -- well, we as in the police department just issue the traffic citations for any traffic violations that would have occurred.
(Ruff Dep. at 88-89)

Q. So why were you asking your boss, what happens if the lab results come back as zeros? Why did you ask that question?
A. Just curiosity.
Q. It had nothing to do with making sure that we issue these tickets?
A. No.
(Ruff Dep. at 91)

11